IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
LUFKIN DIVISION

WILLIAM JERRY                §
    Plaintiff,           §
                             §
V.                           § CIVIL ACTION NO.: 9:23-cv-00032-MJT
                             §
POLK COUNTY, TEXAS,          § JURY DEMANDED
AND POLK COUNTY              §
SHERIFF'S OFFICE,            §
    Defendants.          §

---------------------------------------------------------
VIDEOTAPE ORAL DEPOSITION OF
WILLIAM JERRY
TAKEN ON OCTOBER 18, 2024
_____

ORAL DEPOSITION of WILLIAM JERRY, produced as a witness at the instance of the Defendants, was duly sworn, was taken in the above-styled and numbered cause on the 18th of October, 2024, from 10:10 o'clock a.m. to 02:51 o'clock p.m., before Angela Steele, Shorthand Reporter, Notary, in and for the State of Texas, reported by machine shorthand at, Zehl & Associates, 2700 Post Oak Boulevard, Suite 1000, Houston, Texas 77056, pursuant to the Federal Rules and the provisions states on the record or attached hereto.

A P P E A R A N C E S:


FOR THE PLAINTIFF(S):

     Mr. Marc Anson Bozeman
     LAW OFFICE OF MARC ANSON BOZEMAN
     5499 Braesvalley Drive
     No. 462
     Houston, Texas 77096
     832-741-7950
     mb@bozemanlitigation.com



FOR THE DEFENDANT(S):

     Mr. John "Jack" R. Fulgham
     FLOWERS DAVIS, P.L.L.C.
     1021 ESE Loop 323
     Suite 200
     Tyler, Texas 75701
     903-534-8063
     jrf@flowersdavis.com



Also present:  Jim Dunham, Videographer

I N D E X

                                                    PAGE

Appearances ...........................     2

Exhibits...............................     4

WILLIAM JERRY

     Examination by Mr. Fulgham........     5

Reporter's Certificate ................   177

EXHIBIT(S) MARKED

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit A | TCOLE Report | 12 |
| Exhibit B | Resignation letter | 41 |
| Exhibit C | Letter of incident with Johnathan Ridgley | 83 |
| Exhibit D | Complaint | 88 |
| Exhibit E | Termination Letter | 89 |
| Exhibit F | Reference Complaint - letter | 99 |
| Exhibit G | Video | 103 |
| Exhibit H | Policies and Procedures Polk County Sheriff's Office Body Worn Cameras | 132 |
| Exhibit I | Garrity Warning | 146 |

William Jerry

Page 5

P R O C E E D I N G S

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

THE VIDEOGRAPHER:   We're on the record on File 1.  It is Friday, October 18th, 2024 at 10:10 a.m., and the witness is William Jerry.

THE COURT REPORTER:  Raise your right hand, please.  Do you solemnly affirm that the testimony you are about to give in this action will be the truth, the whole truth, and nothing but the truth subject to the penalties of perjury?

THE DEPONENT:  Yes, ma'am.

THE COURT REPORTER:  Thank you, sir.  Go ahead, Counsel.

E X A M I N A T I O N

BY MR. FULGHAM:

Q.  Hey, Mr. Jerry, how are you doing today?

A.  I'm okay.

Q.  My name is Jack Fulgham, I'm an attorney and I represent Polk County and Polk County Sheriff's Office in this lawsuit that you have filed.  Do you understand my -- my role?

A.  A little bit, somewhat.

Q.  Okay.  So you filed Civil Action 923-cv-32, William Jerry, plaintiff, versus Polk County and Polk County Sheriff's Office.  I represent Polk County and the

Polk County Sheriff's Office in this action.  And you're familiar with the lawsuit that I'm referencing?

A.  Yes, sir.

Q.  Okay.  And what we're here to do today is I'm essentially here to gather information about you and the claims that you're making against my client.  So have you done a deposition before?

A.  No, sir.

Q.  Okay.  Well, as you know you've been sworn in and you're under oath, so the testimony you give today is sworn testimony.  Do you understand that?

A.  Yes.

Q.  Okay.  And I know that you've been in law enforcement for a long time, so I'm sure you've testified in -- in court in criminal proceedings.  Is that right?

A.  Yes, sir.

Q.  Okay.  So similar to that, you know, it's -- there's not a jury here today, we have a court reporter and we have the videographer, your attorney and me, but you're testifying as if you were testifying in front of the jury.  So there'll be a transcript of this deposition, and like I said that -- that will be used -- can be used in this case.  And, you know, the testimony in that transcript is sworn testimony.  I just want to make sure you understand all that.

A.    Yes, sir.

Q.    Okay, great.  And you know, as far as the deposition, I just wanna kind of call them ground rules, but really it's just things to make this go smoother. When I'm asking you a question, I would ask that you let me finish the question before -- before answering. Sometimes it'll get conversational and, you know, human nature is to sometimes cut in and if you -- because you kind of might know where I'm going with the question and you want to answer.  I'll just ask that you, you know, let me finish before -- before you offer an answer.

And then she's -- she's -- the court reporter is transcribing this, so when you do answer make sure to answer verbally.  Don't -- try not to nod your head, say yes or no, and also if you go nuh-un or un-huh, you know I'll probably understand what your answer is, but as far as putting it on a -- on a transcription, you know, it's hard to tell.

So I'll just ask that, you know, try to remember to answer yes or no, although I'm sure there'll be a few times where you might not do that and she might say, Sir, can you please say yes or no.  So just -- just giving you a little heads up on that.  That's just to make the record cleaner.

Also if you don't understand one of my

questions, perfectly reasonable for you to say, you know, Counselor, I don't understand that question can you please rephrase it. You know, sometimes I just get in -- we'll be talking about a topic and, you know, I might ask a poorly worded question that you might not understand or you might just not hear me. Either way I would -- you know, I want you to understand the questions you're answering.

It's not my intention or my -- it doesn't do any benefit to me to try to trick you or anything like that. I want you -- I want to be sure that you understand the questions I'm asking and you're providing, you know, responses to questions that you understand. So I'm not trying to trick you with anything. If you don't understand my question or it's confusing, you tell me and I'll -- I'll rephrase the question. Do you understand that?

A. Yes, sir.

Q. Okay, great. And then last thing, if you need to take a break I'm -- that's perfectly fine. You know, we'll probably take a break like maybe every hour, hour and a half depending on how this is going and -- but if you need for some reason to take a break to use the restroom or something like that, I'm -- I'll -- I'm happy to -- everyone's agreeable to take a -- take a short break

if we need to.

I would just ask that the last question I ask you, just finish your response to that question and then we can take a break.  Do you understand that?

A.  Yes, sir.

Q.  Okay.  So, yeah, I'm just going to start off with some background questions.  You know, it's pretty much customary for every -- every deposition.  I'm going to ask you about your education, family, work history, things like that.  I'm not trying to just pry into your private life, all these questions have -- there's a reason why I'm asking them, particularly about your family.

You know, if this case goes to trial, you know, it'll be tried in, you know, the county that you filed this case in and -- and you may have family members there so we don't want any of your family members on the jury.  So if you think I'm prying I'm really -- there's a reason behind me getting this information but -- what's your date of birth?

A.  2/28/1976.

Q.  And what's your Social Security number?

A.  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.

Q.  And where were you born?

A.  Houston, Texas.

Q.  Where do you live now?



A.  New Caney, Texas.

Q.  New Caney?

A.  Yes, sir.

Q.  What county is that in?

A.  Montgomery.

Q.  Is that a pretty small town?

A.  Kind of -- it's fairly.

Q.  Okay.

THE COURT REPORTER:  It's fairly?

THE DEPONENT:  It's fairly, big.

BY MR. FULGHAM:

Q.  What's the biggest city that New Caney is close to?

A.  You've got Splendora, you got Kingwood, Patton Village.

Q.  Okay.

A.  It's all up in that area.

Q.  Okay.

A.  Right there in the middle.

Q.  Okay.  I'm just not familiar with New Caney, so. How long have you lived there?

A.  Two years now.

Q.  Where did you live before New Caney?

A.  I lived in Polk County, Texas.

Q.  Okay.  Do you know about the date that you moved

William Jerry

Page 11

from Polk County to New Caney?

A.   I've been in my home now going -- like I said, we're right at the two year mark in my home, so.

Q.   Okay, right around two years?

A.   Yes, sir.

Q.   Okay.  What city did you live in, in Polk County?

A.   Livingston.

Q.   Livingston.  Is that the county seat?

A.   Yes.

THE COURT REPORTER:  County what?

MR. FULGHAM:  County seat.

THE COURT REPORTER:  Seat, okay.

BY MR. FULGHAM:

Q.   And that's -- the Polk County Sheriff's Office is in Livingston.  Is that correct?

A.   Yes.

Q.   Okay.  And you worked for the Polk County Sheriff's Office prior to moving to New Caney.  Is that correct?

A.   Yes.

Q.   Okay.  So I'm going to kind of start with what you're doing now and work backwards.  I have as far as -- as far as your job experience, I just want to get an understanding of your law enforcement career and any other job experience you've had.

MR. FULGHAM:  I'm going to go ahead and offer this -- this is his TCOLE Report.  It has a list, I just think this might make this easier --

MR. BOZEMAN:  Okay.

MR. FULGHAM:  -- of his job experience. So I'm just going to go through this and ask him about -- that's a the copy for you guys.

MR. BOZEMAN:  Okay.

MR. FULGHAM:  And this is Exhibit A and this is his TCOLE personal information report of Mr. William Jerry.  I'm on that page the service history page.

Q.  And if you want to look at that, Mr. Jerry, I just want to walk through this and talk about your -- your law enforcement experience.  And again this is Exhibit A. Let me just put it in there.

(Exhibit A was marked for identification.)

Q.  Okay, alright.  Alright, Mr. Jerry, you're on the page that says service history at the top?

A.  Yes, sir.

Q.  Okay.  And have you ever seen your TCOLE personal information report before?

A.  Yes, sir.

Q.  Okay.  So this document looks familiar to you?

William Jerry

A.  Yes, sir.

Q.  Okay.  Well why don't we -- I'm just going to start with your current position and then we'll work back, and just -- I'll just have a few questions about your experience.  So are you currently with the Benavides Police Department?

A.  Yes, sir.

Q.  Okay.  And Benavides is that a city in Montgomery county?

A.  No, sir.

Q.  Okay.  What county is it in?

A.  Duval County.

Q.  Duval County?

A.  Duval.

Q.  Okay.  And you started there in July of 2024.  Is that correct?

A.  Yes, sir.

Q.  What's your current title?

A.  I'm a reserve police officer.

Q.  Reserve.  So what is your, I guess what -- so you've been there for approximately three months.  What have you done service-wise since you've been there?

A.  I have to go report there twice a month, 24-hours a month and conduct police duties such as work traffic, answer calls, etcetera.  Police duties.

Q. So you do some patrol work?

A. Yes, sir.

Q. And then also some work in the station?

A. If you have to write a report.

Q. Oh, okay. Well, you said you answer calls -- oh, you were just like what?

A. Respond to calls.

Q. Respond to calls. Okay, so kind of like patrol work?

A. Yes.

Q. Okay. And then you drive, of course, if needed based on the call or incident or whatever?

A. Yes.

Q. So are you a deputy?

A. It's considered a police officer.

Q. Okay, police officer. And are you -- do you have any other employment right now?

A. I do little odd jobs.

Q. Okay. Like what?

A. I got a buddy he -- got a wood company, cut logs, and I go -- I go do clean up make a little extra change.

Q. Okay. Anything else?

A. When I'm not there I -- when I'm not in Benavides I do traffic control jobs.

Q. Is that like -- are you saying like -- what do

you mean by traffic control jobs?

A. Directing traffic, you know, like if they have a company they're doing --

Q. Oh, okay.

A. -- work in the road, I do -- I do those type -- type of jobs.

Q. Like if they're doing construction on the road you'll divert traffic to different lanes to, you know, not interfere with the construction work?

A. Yes.

Q. Okay. Anything else?

A. No.

Q. Okay. And then it looks like prior to that you worked at the Texas Medical Center Police Department from July 2023 to April '24. Is that correct?

A. Yes, sir.

Q. Okay. Where -- where was that?

A. That was in Houston, Texas.

Q. What was your position there?

A. I was a sergeant on the night shift.

Q. And it's Texas Medical Center Police Department. Where is the Texas Medical Center in Houston?

A. Yes, sir, in Houston.

Q. Okay. So is it like working at a hospital?

A. I was -- I was assigned to the hospital.

Q.   Okay.  So y'all were essentially the police department for the hospital?

A.   They have security there as well but, yes.

Q.   Okay.  And I guess what was your -- you were sergeant.  What were your kind of roles and duties in that position?

A.   To supervise the officers under me, to protect the staff, visitors that comes to the hospital -- to the Texas Children.

Q.   Okay.  And you left that position in April of '24?

A.   I believe that's correct.

Q.   Okay.  What was the -- why did you leave?

A.   I still don't know to this day, I was forced to resign.

Q.   They forced you to resign?  Who forced you to resign?

A.   My lieutenant.

Q.   And did they give you any reason for that?

A.   No, sir.  Showed up one morning at 5:00 a.m., took me over to the PD and asked for my stuff.

Q.   Was there any incident that they cited or were you given any sort or disciplinary or anything like that?

A.   No, sir, no.  No.

Q.   So you have no idea why they forced you to

resign?

A. No, sir. I just had an evaluation, had an exceptional evaluation, had no write ups, had no -- had nothing. Best job I ever had.

Q. Did you like that job?

A. The job paid well. Like I said, the best job I ever had.

Q. Yes, sir. And you weren't terminated, you said you resigned?

A. Yeah, I did.

Q. Okay, we can take a break if you --

A. No, I'm good. Just upset --

Q. I understand.

A. -- emotional.

Q. I understand. Who was your lieutenant?

A. Ingrid Pinzon.

THE COURT REPORTER: Ingrid Prinzone?

THE DEPONENT: Pinzon, P-i-n-z-o-n.

BY MR. FULGHAM:

Q. Ingrid Pinzon. And was there a chief?

A. John Walton. Walton.

Q. John Walter?

A. Walton I believe.

Q. Walton, okay. And I guess anything else you want to tell me about the Texas Medical Center Police

Department?  Okay.  But you weren't -- you weren't given a -- were you given a discharge?

A.   What -- what do you mean?

Q.   Like were you given an honorable discharge or dishonorable or general discharge?

A.   They -- they -- TCOLE don't recognize it anymore. Around that time ever -- I think I had to have a discharge, I think it would have been honorable because I didn't have no -- no problems.

Q.   Okay.  But you're saying you resigned so it wasn't a termination.  Is that correct?

A.   The way it presented itself to me either I could resign or I could have another termination on my record.

Q.   Okay, gotcha.  You resigned.

A.   I resigned because the way it was presented either I was to resign or they was going to fire me.

Q.   Yes, sir.

A.   In this business, in this business, if you have two terminations on your record, you -- your career is over.

Q.   Okay.

A.   And I couldn't have another termination on my record.

Q.   Okay, no, that answers my question, I appreciate it.  I just wanted to be crystal clear.  And that would

explain then why you would not have a discharge if you resigned in lieu of termination which it sounds like that's what happened.

Alright, I guess prior to that you were at -- you were at the Jasper County Sheriff's Office from March '23, to August 31st, '23.  Is that correct?

A.  Seems about right.

Q.  Okay.  What was your position at Jasper County?

A.  I was a patrol deputy.

Q.  Okay.  And just did you have a patrol vehicle?

A.  Yes.

Q.  Okay.  And you're -- I guess just tell me generally about your duties as a patrol deputy for Jasper County.

A.  I patrolled assigned section -- section that was given to me.  I worked traffic and responses to calls that was given to me.

Q.  Okay.  And you left in August 31, 2023.  Like what were the circumstances of you leaving Jasper County?

A.  The opportunity presented itself for the Texas Medical Center.

Q.  Okay.

A.  That's more money, really more money.

Q.  More money to work at the Texas Medical Center.  So did you just -- you just left for a better opportunity?

A.   Yes.

Q.   Okay.  So no termination and you just resigned because you had a better opportunity?

A.   Yes.

Q.   Alright.  And did you have any incidents or disciplinary incidents while you were at Jasper County?

A.   No, sir.

Q.   Okay.  And then prior to Jasper County you were at Corrigan Police Department for about five months from October of 2022 to March 2023.  Does that sound right?

A.   That sounds about right.

Q.   Okay.  Where is Corrigan?

A.   It's north of Houston right before you get to Diboll and right after -- right after you pass Moscow, Texas -- Moscow -- Moscow, Texas.

Q.   Do you know what county it's in?

A.   Polk.

Q.   Okay.  What was your tile at Corrigan?

A.   I was a reserve officer for -- reserve officer.

Q.   Okay.  So wait -- I'm looking a little closer. So you were actually there for, well, two years.  Was this the first place you went after Polk County?

A.   Yes.

Q.   Okay.  You were full time for a period of a year and eight months, and then you were a reserve officer for

approximately five month. Is that right?

A. Yes.

Q. Okay. So looks like you went basically immediately after -- immediately after you left Polk County you started at Corrigan. Is that right?

A. Yes.

Q. Almost the next day. Did -- when were you terminated from Polk County?

A. I don't recall the exact date.

Q. Was it right before you started at Corrigan?

A. It was around February -- February of '21.

Q. Yes, sir.

A. I know.

Q. Okay. So I just want to be sure. You weren't ever working at Corrigan and also working at Polk County. It was after this incident, that we'll get into in a little bit, we're still getting the background from you, you -- you went from Polk County to Corrigan --

A. Yes, sir.

Q. -- correct? Okay. You weren't ever having any sort of overlap with working at both of those?

A. No, sir.

Q. Okay. Okay. Although here it says 3/4 of 2021, that was probably when your term -- your employment at Polk County was finalized, but you had stopped working

before going to Corrigan?

A.  Yes, sir.

Q.  Is that fair -- okay.  Okay.  So then you worked at Corrigan from February 25th, 2021 to October 14th, 2022 for a period of a year and eight months as a full-time officer.  Is that right?

A.  No, sir.

Q.  No, sir?

A.  I was a reserve officer.

Q.  Okay.  So where it says full time, one year eight months is -- on this report we're looking at, is that incorrect?

A.  I would say so, yes, sir.

Q.  Okay.  So this -- this -- if you do the math here it looks like this has you working at Corrigan for a little over two years from February 25th of 2021 to March 10th of 2023.  Do you see what I'm looking at?

A.  Yes, sir.

Q.  Is that correct?

A.  It's correct to say that, yes, I was a reserve officer at that time at Corrigan.

Q.  You were never a full-time officer?

A.  No, sir.  No, sir.

Q.  And when you were a reserve officer, what -- I guess explain to me what you did as a reserve officer.



A.  If they needed help they'll call me.  I basically do police duties but I don't get paid for it.

Q.  So you were never paid by Corrigan?

A.  No.

Q.  In the whole time you worked there they never paid you any money?

A.  No, I was reserve.

Q.  So -- and then when -- you were kind of on an as needed basis?

A.  Like if someone go down sick, as needed basis, yes, sir.

Q.  Okay.  And then you would do typical police work. Did you do patrol?

A.  If they called me.  If they had a parade and they needed help with traffic or needed me to cover a shift or -- if he call me I went.

Q.  Okay.  And that's -- so that whole a little over two year period you were a reserve officer and you, you know, were on standby essentially for them to call you to help out and you would do whatever kind of police activities they needed you to do.  Is that right?

A.  Yes, sir.

Q.  Okay.  But they weren't paying -- they never paid you that whole time?

A.  No.



Q.   Okay.   Were you doing any other work at that time?

A.   If I wasn't working for them, I was doing the traffic details.

Q.   Okay.   And is that similar to the traffic work you described earlier, basically there's road work being done or some sort of construction and your job is to steer traffic around that and, I guess, manage the flow of traffic while the construction is ongoing?

A.   Yes, sir.

Q.   Okay.   Anything else that you were doing at that time?

A.   That was it.

Q.   That was it?

A.   Yes, sir.

Q.   Okay.   And then -- so before that -- before Corrigan, you were at Polk County Sheriff's Office, correct?

A.   Yes, sir.

Q.   Okay.   And aside from looks like a nine-month period in -- the end of 2012 to the mid 2013 you were at Polk County from 2003 to 2021.   Does that sound right?

A.   Yes, sir.

Q.   Okay.   And there's some dates broken out here, so I'm going to try to just get a summary of kind of your

experience going from, you know, when your -- when your time ended at Polk County to when you started in 2000 -- oh, sorry 2004.  Just -- it looks like you started at Polk County in 2004?

A.  October 2004.

Q.  Okay.  Sorry, I think I misread the date.  That was -- you were at Newton County before, right?

A.  Yes, sir.

Q.  Okay.  Well let's focus on Polk County.  So from -- it says you were a full-time jailer from July 2017 to March 2021.  What was your -- is that correct?

A.  That look about correct.

Q.  Okay.  And were you -- were you a lieutenant that entire time?

A.  No, sir.

Q.  Okay.  I guess when you started in 2017 as a jailer, because I think you were on patrol before that, when you started as a jailer at Polk County in 2017, what was your title?

A.  They just -- they just held -- held my license. I have a peace officer and a jailer license.

Q.  That's right.  That's right.

A.  So they just was -- I was assigned to patrol when I first started, they just held my --

Q.  Okay.



A.  -- my commissions.

Q.  But at some point you -- you went and worked primarily in the jail, right?

A.  Yes.

Q.  When was that?  When did you start -- I know that you were -- we're working backwards so I know that you were on patrol when you worked at Polk County and you probably had other duties, and we'll get to that, I just want to know when did you start in the jail, I guess, before you were terminated?

A.  I don't recall the date --

Q.  Okay.

A.  -- but I know I went to the jail as a -- the transport supervisor.

Q.  Okay.

A.  I went to the jail as transport supervisor.

Q.  And that was a promotion, right?

A.  Kind of a demotion.

Q.  It was a demotion?

A.  I had -- I had got burned out working the streets, but yet I needed a change and that opportunity was -- was there, so...

Q.  Okay.  So was that something you decided to do yourself or was that something that your superiors -- a position they put you in?

A.   No, sir, something I -- it was available --

Q.   Okay.

A.   -- and I -- I decided myself.

Q.   Was your pay affected?

A.   I think it's kind of balanced out a little bit, I think.

Q.   It wasn't like you took a big pay cut to do that?

A.   The -- all I know is the deputy made more than the jail staff, but by it being a supervisor position it -- it had a little cushion in there.

Q.   So it -- it was, I guess, was it close to what you were making before that?

A.   I don't recall.

Q.   Okay.  Well, you had kind of said, well, it was sort of a demotion, but were you formally -- were you demoted?

A.   No, sir.

Q.   Okay.

A.   The opportunity was there for -- for a trans -- for a supervisor position, but it was -- it just happened to be in the jail.

Q.   Gotcha.

A.   And I -- I decided, Hey, I'll put in for it.  I put in for it and I got it.

Q.   Okay.  And was there anything that had happened,



any incident that had happened that led to you to make that decision, or were you -- you said you were burnt out, so was it that you were just burnt out or did something happened that made you decide to do that?

A.  No, sir, just burned out.

Q.  Just burnt out.  How long had you been working the streets?

A.  I -- when I started in 2004 I was a deputy and I -- years.

Q.  Gotcha.  So basically -- yeah, because I see what you're saying.  Just looking at this when it says jailer or peace officer there's some overlap there where you're -- they're holding both of your licenses.  But typically you would either be working -- you weren't like doing both?  You were either working patrol or working in the jail, right?

A.  Yes.

Q.  Okay.  And at some point you were -- you switched to transportation supervisor.  Do you -- do you know about when that was?

A.  No, sir, I don't.

Q.  Okay.  Was it before 2017 or after 2017?

A.  I -- I don't recall.  I know I had a couple years down in the jail, but most of my time was on patrol or narcotics, so.



Q.  Okay.  Do you remember how long you were in the jail, working in the jail before you were terminated?

A.  I don't know the exact number if -- no, I don't. I don't.

Q.  Okay.  Was it before -- were you there during Covid?

A.  Yes.

Q.  Okay.  Did you start there before Covid?

A.  I don't recall.

Q.  Okay.  But you had been in the jail for -- you hadn't just started in the jail whenever you were terminated in February, you had been there for a while, right?

A.  Yes, sir.

Q.  At least a couple or years?

A.  Fair to say, yes, sir.

Q.  Okay.  Okay, I just want to get my timeline right.  And then before -- before you went to become a transport supervisor while you're at Polk County -- and I know there's this little gap in here where you went to this Alabama-Coushatta Tribe of the Texas Police Department, but taking that out, when you were at Polk County from 2004 to 2021 -- it's a long -- it's about 17 years roughly, before you became this transport supervisor, did you work patrol that whole time?

A.   Between patrol and narcotics.

Q.   Narcotics, okay.   When did you work narcotics?

A.   I can't tell you exact when, but I did about five or six years in there.

Q.   Okay.   So when you started in 2004, did you start on -- as a patrol deputy?

A.   Yes, sir.

Q.   Okay.   And then at some point you worked in the narcotics division?

A.   Yes, sir.

Q.   Do you remember when abouts you became -- went to narcotics?

A.   No, sir.

Q.   Okay.   But you were -- tell me again how long you think you were in narcotics?

A.   I think about six years.

Q.   Okay.   So you went from patrol to narcotics and then back to -- and then to the jail.   Did you go back to patrol after narcotics before you went to the jail?

A.   I started in patrol, did years in patrol, promoted through the ranks.

Q.   Okay.

A.   Went to narcotics, did some -- some years in there --

                    THE COURT REPORTER:   Did some what in

there?

THE DEPONENT:  Years.

THE COURT REPORTER:  Years.

A.  -- and if I got -- if I got this right, then I left and I went to that short break to the Alabama Coushatta.

Q.  Okay.

A.  And then after leaving there I went back to Polk County, started over as a deputy at the bottom and worked some years on patrol.  And then that's when the opportunity presented itself for transport officer and then I applied and -- and took that.

Q.  Gotcha.  Okay, that makes sense.  So I just want to get a little -- so you were started in patrol in '04, what was the highest -- before you went to narcotics you said you were promoted?

A.  Yes, sir.

Q.  So you were promoted from deputy to sergeant?

A.  Yes, sir.

Q.  Did you get promoted any hirer than that before you went to narcotics?

A.  No, sir.

Q.  Okay.  And then when you're -- what was your -- when you were in the narcotics division what was your title?

A.   Just a sergeant.

Q.   The sergeant.  And did you stay a sergeant in narcotics the whole time?

A.   All detectives and not -- they're considered sergeants.  They are on a sergeant pay scale.

Q.   Gotcha.  And then tell me about this Alabama-Coushatta Tribe of the Texas Police Department.  Is that like a -- like an Indian tribe?

A.   It is.

Q.   Okay.  So how did you end -- how did you decide that you were going to go join them -- join that -- that police department?

A.   That's when they was starting the casino, they have a casino there.

Q.   Okay.

A.   And they started a police department and they paid well.  I was offered by the chief who was coming in to go out there and help him re-establish the department, and he made me a captain.  And with that title comes money, you know.

Q.   Um-hmm.

A.   And I took it.

Q.   Okay.  So you're -- yeah, it was an opportunity to make more money and have a higher -- to be -- have the rank of captain?

A.   It wasn't about the rank of captain --

Q.   Okay.

A.   -- it was just -- it was more money.

Q.   Because you're a captain you make more money?

A.   The opportunity itself.

Q.   Yeah.

A.   They -- they paid more than Polk County.

Q.   They paid -- they paid more at Alabama?

A.   Yes.

Q.   Yeah.  Okay, no, that's -- and it was -- financially a better opportunity and is that why you went?

A.   Yes.

Q.   Okay.  So there wasn't any problems at Polk County, it was just the opportunity?

A.   Yes.

Q.   Okay.  And it looks like you were there for nine months and then went back to Polk County.  So I guess tell me a little bit about your experience there and why you ended up going back to Polk County.

A.   I resigned from that.  I resigned from there.

Q.   Why did you resign?

A.   I had a relationship with one of the -- flirtatious relationship with one of the Indian girls.

Q.   Okay.  You weren't terminated, you just resigned?

A.   Yes.



Q.  Okay.  Was it short of like this other deal where it was -- they were -- told you, you can either resign or we're going to terminate you?

A.  No.

Q.  Okay.

A.  It's -- it's very frowned upon in they culture.

Q.  Yeah.

A.  It's frowned upon in their cultural, you know, and it was just best that I remove myself from that situation.

Q.  Were you married at the time?

A.  Yes.

Q.  Okay.  And I mean, you said flirt -- did y'all have like a sexual relationship or --

A.  No, we didn't.

Q.  Okay.  So there wasn't any like investigation or anything like that?

A.  No.

Q.  Okay.

A.  Not that I recall but it wasn't sexual.

Q.  Okay.  So I just want to be clear.  So you're telling me, you know, you had this flirtatious relationship with an Indian -- did she work at the casino?

A.  She worked at the -- they -- she was -- worked at the police department.



Q.  Okay.  She was also an officer?

A.  No, she was like office staff.

Q.  Do you remember -- do you know her name?

A.  I don't remember her name.

Q.  Okay.  And I just want to be clear.  So you said y'all had this flirtatious relationship, you know, I guess you're saying is kind of inappropriate for the workplace?

A.  Nah, I wouldn't say that.

Q.  Okay.  Well, you decided to leave based off that relationship?

A.  Yeah, it came about -- came to light, it was investigated.

Q.  Okay.

A.  You know, it was an investigation, I know they did.  And, you know, say you could -- you know, it don't look good, man, so he gave me the opportunity to resign, I resigned.

Q.  Anything else?  I mean, did you like the job?

A.  It's a good job.

Q.  A little bit different than Polk County?

A.  More different, yes, sir.

Q.  I guess, you know, being at a casino -- how -- just describe for me what your duties were there.  And were you -- strike that.

So were you a captain the whole time you were

there?

A.  Yes.

Q.  Okay.  And tell me as captain what were your roles and duties.

A.  Oh, we started the patrol division.  I also worked the streets, just normal police duties.

Q.  At the casino?

A.  No.  No, they got the Indian reservation --

Q.  Oh, okay.

A.  -- so you patrol.

Q.  Okay.  So it was -- there -- they get -- there was a casino, that wasn't the only -- there was a tribe this Alabama-Coushatta tribe and you did kind of --

A.  Patrol the Indian reservation.

Q.  Patrol the Indian Reservation, okay.

A.  Yes.

Q.  Okay.  And what part of Texas was this in?  Like this reservation?

A.  It's in Polk.

Q.  Oh, in Polk County?

A.  Yes, sir.

Q.  Okay.  And what was the name of the casino that they had there?

A.  Alabama-Coushatta.

Q.  Okay.  And is that still there, do you know?

A.   It's still there.

Q.   Okay.  Alright, and then we talked about before Alabama-Coushatta you were patrol, you went from -- started in patrol in 2004, promoted to sergeant, then you moved to narcotics where you remained a sergeant, and then you went to Alabama, right?

A.   Yes, something like that.

Q.   Okay.  And then when you came back in 2013 you said you started back as a deputy?

A.   At the bottom.

Q.   And was that part of -- did you -- did you expect to be starting at the bottom again?

A.   That, that was the opportunity that presented itself.

Q.   Okay.

A.   We have a patrol, deputy slot if you want it.

Q.   Okay.  But you had already had a lot of experience in that position?

A.   Yes.

Q.   Okay.  And who was the sheriff at that time?

A.   Kenneth Hammack.

Q.   Kenneth Hammack.  Okay.  Do you know -- and was he the sheriff when you started in 2004?

A.   Yes.

Q.   Okay.  So --



A.   He was coming in.

Q.   Oh, he's coming in.  So basically the whole time that you had worked at Polk County until, I guess, Sheriff Lyons came into office was it Hammack that was in office?

A.   Yes.

Q.   Okay.  Did you get along with Sheriff Hammack?

A.   I didn't have no problems.

Q.   Okay.  And then when you came back you started as a deputy, did you get, again, promoted to sergeant in patrol?

A.   No, sir.

Q.   Okay.  So you stayed deputy and then you went to transport supervisor?

A.   Yes.

Q.   Okay.  And how long did you stay transport supervisor?

A.   I'd say about a year or two.

Q.   Okay.

A.   I'm not concrete on that, but I'll say about a year or two.

Q.   Okay.  And then what was your next position?

A.   The opportunity came up for the lieutenant position and I applied and reluctantly got it.

Q.   Then you became jail lieutenant?

A.   Yes, sir.



Q.  Do you know when you were promoted to lieutenant?

THE COURT REPORTER:  When you what?

MR. FULGHAM:  I'm sorry, when he was promoted to lieutenant?

BY MR. FULGHAM:

Q.  Do you understand the question?

A.  Yes, sir.

Q.  Do you know when you were promoted to lieutenant?

A.  I don't recall the date.

Q.  Okay.  And then that was the last position you held at Polk County, correct?

A.  Well, before this incident the captain was going home and I had pretty much got the position but my paperwork ain't went -- went there.

Q.  So you're saying you were going to be promoted to captain?

A.  Yes, sir.

Q.  Who was the form -- so there was a captain who was moving on.  What was his name?

A.  Patrick Dickson.

Q.  And he was -- so he was kind of your boss?

A.  Yes.

Q.  Okay.  And had he left -- so he -- he was still there at the time of this incident, right?

A.  Yes.

Q.   He was going to leave and then you were going to become captain, right?

A.   Yes.

Q.   Okay.  And who's in charge of promoting -- I guess who made the decision, then, to promote you to captain?

A.   It was a board form.

Q.   You said the board?

A.   Yes, sir.

Q.   Who was on that board?

A.   I think it was discussed between the captain, the chief deputy, and the sheriff.

Q.   Sheriff Lyons?

A.   Sheriff Hammack.

Q.   Hammack.  So Sheriff Lyons was not sheriff at the time that decision was made?

A.   Was he sheriff?  I'm not -- I'm not sure if he was.

Q.   Okay.  Do you know about when Sheriff Lyons came into office?

A.   2000 -- no, I don't recall the date.

Q.   Okay.  I'm looking for a letter because I think there was a letter that talked able this.  Do you recall receiving a letter informing you of this promotion to captain?

A.  I don't -- I think it was one, but I'm not sure.

Q.  But you had been told -- here we go.  Give you guys a copy of this.  I'm going to give you a letter, Mr. Jerry, you and your attorney.  It's a letter from Sheriff Lyons talking about your promotion.  Give you a chance to look at that.

MR. FULGHAM:  I'm going to mark as Exhibit B a January 21, 2021 Letter from Sheriff Lyons to Adrena Gilbert discussing Mr. Jerry being promoted to jail captain:

(Exhibit B was marked for identification.)

Q.  Have you ever seen this letter, Mr. Jerry?

A.  Oh, yes, sir, I think I have.

Q.  Okay.  So I'm going to read from this letter and tell me if you agree with what this letter says.  It says: Ms. Gilbert -- and Ms. Gilbert is -- she was the director of human resources.  Is that right?

A.  Yes, sir.

Q.  Captain Patrick Dickens has submitted his resignation of captain from for the Polk County Sheriff's Office Detention Center effective March 12, 2021.  Do you agree that's what that first line says?

A.  Yes, sir.

Q.  Okay.  I have sat and had an extensive



conversation with Lieutenant Jerry.  After meeting with Lieutenant Jerry, I met with members of my administrative staff concerning the resignation of Captain Dickens.  On January 20th, 2021, I offered Lieutenant Jerry the soon to be vacation position of captain of the Polk County Sheriff's Office Detention Center.  Lieutenant Jerry has accepted the offer of the soon to be vacant captain's position.  Is that what that letter says?

     A.  Yes, sir.

     Q.  Okay.  And do you recall this discussion you had with Sheriff Lyons?

     A.  Vaguely but, yes.

     Q.  Okay.  So you did speak with -- you did speak with Sheriff Lyons and you had accepted this promote, correct?

     A.  Yes, sir.

     Q.  And you don't disagree that Sheriff Lyons was part of this decision to promote you?

     A.  Do I?

     Q.  Sorry.  Do you -- do you agree that Sheriff Lyons was part of this decision to give you this promotion?

     A.  Yes.

     Q.  Okay.  And as sheriff he's the head of the Polk County Sheriff's Office, correct?

     A.  Yes.



Q.  Okay.  And means he's above the Polk County Jail, correct?

A.  Yes.

Q.  And then as jail captain you're right below the sheriff.  Is that right?

A.  No.

Q.  Okay, sorry.  There's a chief deputy below the sheriff, correct?

A.  Yes.

Q.  And is that Rickey Childers?

A.  Childers.

Q.  Childers, okay.  And then like the chain of command would the jail captain be below Chief Deputy Chillers?

A.  Yes.

Q.  Okay.  But as far as a promotion like this, the sheriff is -- will have the final say in a promotion of this nature to captain?

A.  Yes.

Q.  Okay.  And is it your understanding that that's kind of how this happened as far as your promotion?

A.  Yes.

Q.  Okay.  I just wanted to be clear.  Okay. Alright, let's -- I think we've covered your time at Polk County.  Prior to Polk County you worked at the Newton

County Sheriff's Office.  Is that correct?

A.  Yes, sir.

Q.  And you worked there from 2003, January of 2003 until October 2004.  Does that sound right?

A.  Sounds about right.

Q.  Okay.  And you had your jailer and peace officer's license at Newton County Sheriff's Office, right?

A.  Yes, sir.

Q.  Did you work -- I guess did you work patrol or jail and patrol while you were there?

A.  Patrol.

Q.  Patrol the whole time?

A.  Patrol.

Q.  Okay.  So you're -- for the entire time you're at Newton County was your title patrol deputy?

A.  Yes.

Q.  Okay.  Did you have any -- I guess so tell me then when you left in October 2004 it looks like you immediately started at the Polk County Sheriff's Office after that.  What was the -- I guess, were you -- did you resign or were you terminated from Newton County?

A.  Wayne Paul the sheriff of Newton County got beat in the election --

Q.  Okay.



A.   -- the incoming sheriff Joe Walker informed me that when he took office my service would no longer be needed.

Q.   And his name was what?

A.   Joe Walker.

Q.   Joe Walker.  And he was an incoming sheriff at Newton County in 2004 and he told you your services would no longer be needed, and -- and did you resign?

A.   No, that's -- that mean you go look for another job.

Q.   Okay.  But did -- so did they terminate you?

A.   No, sir, he -- he just now got elected --

Q.   Un-huh.

A.   -- he's the incoming sheriff.

Q.   Un-huh.

A.   He...

Q.   He basically just said go find another job, but you weren't given a F-5 termination letter, right?

A.   No.

Q.   That's just what I'm trying to get clear.  So he basically said I don't have a role for you in my sheriff office?

A.   In my administration, yes.

Q.   In my administration.  Did you know him before he -- he came into about?

A.   I knew him around town but, no.

Q.   Was he -- was he a part of the Newton County Sheriff's Office when he got elected?

A.   No.

Q.   Okay.  Was he part of another PD?

A.   He just running for sheriff, you know --

Q.   Okay.

A.   -- it's an elected position.

Q.   No, I understand.  I was just wondering -- a lot of sheriffs -- not all of them, obviously as you know -- are at the sheriff's office and they -- or another police department and when they get elected or they're not even affiliated with a local law enforcement agency, are you saying that he wasn't even part of the local law enforcement agency when he was elected?

A.   The story on that was he was Wayne Paul chief deputy.

Q.   Okay.  The current sheriff was Wayne Paul that he worked for?

A.   Wayne Paul.

Q.   Okay.

A.   He was Wayne Paul chief deputy at one time.

Q.   Oh, okay.

A.   Wayne Paul fired him for whatever reason it was.

Q.   Before you started working there?



A.   Before I started working there.

Q.   Okay.

A.   So when I start working there it's around election time, so he say, Alright, well, I'm going to run for sheriff.  And this time he beats the --

Q.   Yeah.

A.   -- incumbent, and around -- around that time when they be ready to take office they'll -- they'll get at you.  They'll come by and tell you, Hey, I'm going to be taking sheriff here, I'd like for you to stay on.  You know, he offered that to some people, and then to some of us he told us, Hey, when I take office January 1st your services will be...

Q.   Yes, sir, I understand.  That cleared it up, I appreciate that.  Did you know him before he came in?

A.   No, sir, I didn't.

Q.   Okay.  Did he give you a reason why he didn't need your services?

A.   He just told me.

Q.   Okay.

A.   When I take office.

Q.   Do you think it was something personal against you or just he didn't know you that well?  Or do you have -- I guess, what's your understanding of why he did that?

A.   I backed -- I backed Wayne Paul.



Q.  Oh, okay.

THE COURT REPORTER:  You want?

THE DEPONENT:  I backed -- I backed the current sheriff.

BY MR. FULGHAM:

Q.  Yeah, so it was a political thing?

A.  I would say so.

Q.  Okay.  Yeah, no, I -- did he -- so there were other officers and deputies that he let go as well?

A.  Yes.

Q.  Okay.  And you think that it was people that supported his opponent that he let go?

A.  Well, you know, when them guys get ready to take office they usually have their administrative team or staff --

Q.  Un-huh.

A.  -- that they want to bring.  You know, they're not just going to come in -- we're thanking [sic], we assume that they're going to come in and wipe the whole slate clean, you know.  But auh...

Q.  Yeah, I'm sure that's -- just depends on who was elected and, you know, some sheriffs probably come in and let -- leave most everybody and then some come in and, you know, clean house.  It just happens, it just depends on the sheriff and situation.  Is that fair?

A.   Yes.

Q.   Okay.  But nothing -- nothing that happened -- there was no performance issue or incident that spurred that, it was -- like you said, you think that was because of the change in the administration and he got rid of some people who supported his opponent?

A.   Yes, sir.

Q.   Okay.  So there wasn't like an incident that caused your termination?

A.   No, sir.

Q.   Okay.  And had you -- did you have any disciplinary or any -- any sort of reprimands or any just disciplinary action while you were at Newton County?

A.   Yeah, I think I did.

Q.   Okay.  I guess, could you describe those for me?

A.   I -- I don't recall what they was, but I got in trouble a time or two.

Q.   Okay.  Anything for -- anything related to like excessive use of force?

A.   No, sir.

Q.   Okay.  Did any inmates or citizens complain that you used an excessive amount of force during an arrest or anything like that while you were at Newton County?

A.   No, sir.

Q.   So when you say you had a few incidents, was that

anything related to, you know, using physical force on either a citizen or someone you're arresting or inmate, anything like that?

A.  No, sir.

Q.  You know, I'm asking that because that's what this relates to this lawsuit.  So I just want to know at Newton County you never had any similar incidents where you got reprimanded or disciplined for, you know, a finding that you went a little too far with a citizen or an arrestee or an inmate?

A.  No, sir.

Q.  Alright.  And we're almost -- see we got a few more here, and these probably shouldn't take long; and then why don't we take a short break when we get through the rest of your --

MR. FULGHAM:  You're good with that, Mr. Bozeman?

MR. BOZEMAN:  Yeah.

MR. FULGHAM:  Okay.

Q.  So prior to Newton County you were at Orange County Sheriff's Office from July 2001 to August 2002.  Is that right?

A.  It seems about right.

Q.  Okay.  So a little over -- a little over a year. What did you do at Orange County?



A.  I was in charge of the work in commissary department, and I was a rec -- rec officer.

Q.  So you worked in the jail?

A.  Yes.

Q.  Rec and commissary.  So when you did commissary -- you're, I guess distributing commissary?

A.  Yes.

Q.  Okay.  And then at rec I guess you're just overseeing the rec yard?

A.  Taking the inmates to rec?

Q.  Taking inmates to rec.  Okay.  And did you do any patrol at Orange County?

A.  No, sir.

Q.  Okay.  What -- so you left there in August and then you started at Newton County in January of 2003.  So when did you -- why did you decide to leave Orange County?

A.  Well, the -- the Newton County was a patrol stop.

Q.  Okay.

A.  And, you know, if you work in the jail -- I was young back then, I'm not young no more.

Q.  Yeah.

A.  But most sheriff office requires you to work in the jail before you go to the street.

Q.  Yes, sir.

A.  And when you're young like that -- I was young

back then, my ultimate goal is to be a patrol officer.

Q.  Um-hmm.

A.  A street officer is what we call it.

Q.  Okay.  So did you -- did you quit in August or?

A.  Yes.

Q.  Okay.  You weren't terminated, you left in August, and then your goal -- was your goal to then find another job where you could work patrol?

A.  Yes.

Q.  Okay.  So there was a little gap there, though, when you left and when you started at Newton County Sheriff's Office, right?

A.  Yes.

Q.  Did you work during that time?

A.  They had -- at that time Newton County had a correctional facility called -- I think it was CSC -- anyway they had -- I don't want to lie about nothing. They had a correction facility in Newton County, and the sheriff, Wayne Paul, gave me -- he oversaw the jailers down there because the county got to hold the jailers' license --

Q.  Yeah.

A.  -- so that correction facility was in Newton County, and he gave -- I got a job down there working as a correctional officer for the correctional facility.

Q. So that was in between --

A. That was the gap.

Q. The gap, okay. So you were kind of doing kind of like jailers type of work at this constructional facility?

A. Yes.

Q. Okay. And that's not on here because it was --

A. It's not.

Q. -- it's a --

A. It's on here but it's held under the Newton County correctional thang because the sheriff office got to hold your jailers license.

Q. Gotcha.

A. He -- even though that -- even though that facility is not his, he still have to hold the licenses --

Q. Okay.

A. -- for the correctional officers who work there.

Q. Gotcha. Okay, so it's not like -- it's a correctional facility, it's not a law enforcement technically like a sheriff's office or a PD and that's why that wouldn't show up on here, I'm guessing. Is that what you're saying?

A. Yes.

Q. Okay.

A. If that makes sense.

Q. No, no, no, I mean that makes sense to me. And

like I said, I'm not trying to trip you up, I -- I'm just trying to get your background and stuff.  So and that was, I guess, him -- like you were telling me earlier, you know, a lot of sheriff's officers want people in the jail for a little while, kind of show that they're committed and they're willing to do what it takes to then be -- work patrol.  That's kind of the goal that a lot of these jailers have.  Is that right?

A.  Yes.

Q.  Okay.

A.  But my -- my situation with Mr. Paul was like, Hey, I can't bring you on right now because, you know, when you got them small sheriff departments they give comp and everything.  So if you got someone leaving, you got to -- you got to burn all that time unless -- and if not, the county got to write you a big check.

Q.  Yeah.

A.  And he said, Look, go work down here until this time run out.  As soon as his time run out, I'm going to give you that spot.  You got the job, but I need you to go down here right now.

Q.  Yeah.  Okay, and -- okay, cool.  And then so you went -- you -- for intents and purposes you went from Orange County to Newton County?

A.  Yes.



Q.   There wasn't anything -- okay.  And then you were at Galveston County before -- before going to Orange County.  And what were you doing at Galveston County?

A.   I was working in the jail.

Q.   Okay.

A.   That's another one of them thangs --

Q.   Um-hmm.

A.   -- you're going to start in the jail, and when bid -- when bid season come up, you take a test and where you fall in the line you -- you bid out.

Q.   Okay.  So you were there for it looks like eight month then went to Orange County.  I guess tell me about your decision to go from Galveston to Orange County?

A.   I -- I was -- I think I was staying in Port Arthur then, it just -- I was staying in Galveston and staying in -- got a house in Port Arthur, it's just hard.

Q.   Oh, okay, like the distance?

A.   Well, trying to pay rent in two places.

Q.   Oh.  Oh, gotcha.  So, I guess, tell me, you didn't -- so you were not terminated from Galveston County, you just left that job to start at Orange County and, I guess, what was the reason for that?

A.   I would have been closer to home.

Q.   Okay.  You wanted to be closer to home.  And you were probably pretty young at the time.  How old were you



around 2000?

A.  I'm 48 now.  I was young in my 20s, young buck.

Q.  And you -- was your family -- Orange County is closer to Houston, right?

A.  Orange County is closer to Port Arthur.

Q.  Port Author, okay.  So you're -- you're going from Galveston to Orange County was just a closer -- get closer to home move?

A.  Yeah, because I'm married at the time.

Q.  Okay.

A.  I'm paying two, you know --

Q.  Oh, yeah.

A.  -- paying -- trying to help my wife at home, trying to stay down there at the place.

Q.  So you had to rent to place to stay in Galveston is what you're saying?

A.  Yes.

Q.  Okay.  And that was obviously financially hard to be paying rent in two places.  I understand that.

So then you -- you decided to go to Orange County, you don't have to pay rent in Galveston, so you're saving some money and you're closer to home?

A.  I'm closer to home, and I could drive from my house every day over there and try to be with my family.

Q.  Okay.  And then Kountze, so you started at -- you

got your license when you're at Kountze.  Is that your first law enforcement job?

A.  First law enforcement job.

Q.  Okay.  And you weren't there very long.  Were you -- what did you do while that short period you were at Kountze?

A.  I was a patrol officer.  Very first patrol job.

Q.  Okay.  Was that -- that's probably a really small PD, huh?

A.  It is.

Q.  How many people were in the PD?

A.  Very small.

Q.  Okay.  So you did -- I guess, why did you decide to leave that job and go to Galveston?

A.  It was financial.

Q.  Okay.  You got paid more to be a jailer at Galveston County?

A.  Yes, sir.  Young, just starting, want to chase the money --

Q.  Um-hmm.

A.  -- you know.

Q.  Um-hmm.  So there wasn't any incidents that happened at Kountze or Galveston County, any disciplinary or anything like that?

A.  No, sir.



Q.   Okay.  And I guess while you were a jailer at Orange County did you have disciplinary or incidents there?

A.   I ha done.

Q.   What was that?

A.   I had a mental health suspect female on the rec yard.

THE COURT REPORTER:  I'm sorry?

THE DEPONENT:  A mental health female suspect I dealt with.

BY MR. FULGHAM:

Q.   You had a what?

A.   A mental health.  She suffered from mental health.

Q.   Mental health?

A.   Yeah.

Q.   Oh, sorry I thought you said many something. Mental health?

A.   Yeah.

Q.   What happened?

A.   She was acting up on the courtyard, I went hands on with her and, you know, that was an incident like that.

Q.   And did you -- so you were reprimanded?

A.   Yes.

Q.   What kind of reprimand?

LEXITAS

A.   I got wrote up.  I think I even got suspended.

Q.   And this was a -- I guess, did they find that you used too much force for the --

A.   I don't -- I don't think it was that.

Q.   Then what was the basis of your suspension?

A.   So long ago I don't know.

Q.   Okay.  But as you recall, there was a mental health --

A.   Female --

Q.   -- female inmate and you went hands-on and you were written up and suspended?

A.   I was reprimanded.

Q.   And reprimanded?

A.   Yes.

Q.   And you think it was related to you going hand-ons with her?

A.   Yeah.

Q.   Okay.  But you don't -- I mean, you don't recall specifically --

A.   So long ago.

Q.   Okay, yeah, that was a long while.  But you didn't  -- you were suspended for a period of how long?

A.   I don't -- I don't recall.  But I remember the incident, I can't tell pacifics [sic].

Q.   Yes, sir.



MR. FULGHAM:  Well we've been going for probably -- let me check my phone -- maybe an hour, little over an hour.  Y'all want to take a break, restroom?

MR. BOZEMAN:  Yeah --

MR. FULGHAM:  Take ten minutes.

THE VIDEOGRAPHER:  Off the record at 11:25 a.m.

(A short recess was taken.)

THE VIDEOGRAPHER:  Back on the record on File 2 at 11:42 a.m.

BY MR. FULGHAM:

Q.  So you said you were born in Houston, Texas.  Is that correct?

A.  Yes, sir.

Q.  Where did you go to high school?

A.  Thomas Jefferson.

Q.  And that's in Houston?

A.  No, sir, Port Arthur.

Q.  Okay.  Did you graduate?

A.  Yes, sir.

Q.  What year?

A.  1995.

Q.  Did you do any -- well, I guess, when did you move from Houston to Port Arthur?

A.  About 13.

Q.   13, okay.  So you're born in Houston, stayed in Houston until you're 13, and then moved to Port Arthur?

A.   Yes.

Q.   Okay.  So do you still have family in Port Arthur and Houston?

A.   Yes.

Q.   Both?

A.   Yes.

Q.   Okay.  After you graduated from Thomas Jefferson did you pursue any further education?

A.   Nothing that -- no.  No, sir.

Q.   Okay.  Did you attend any colleges or any sort of post high school schooling?

A.   No, sir.

Q.   Okay.  What did you do after you graduated high school?

A.   I worked construction.

Q.   Okay.  Starting around 1995?

A.   Yes.

Q.   And then -- you started your law enforcement career in September of 2000?

A.   Yes, sir.

Q.   Did you work construction that entire period in between law enforcement and graduating high school?

A.   Yes.



Q.   Okay.  Do you remember was it one company or did you work for multiple?

A.   Multiple.

Q.   Okay.  Could you just try to remember -- I know this is a long time ago, the names of those companies and then the years, roughly the years that you worked there?

A.   I was a scaffold builder.  I worked for Cherokee Scaffolding.  I worked for Dynamic Scaffolding.  My -- my trade was scaffolding, so.

Q.   Okay.

A.   Scaffold builder, so.

Q.   Cherokee, Dynamic.  And was this in Port Arthur?

A.   SBI was another company I worked for.

Q.   SDI Construction?

A.   A scaffolding build -- scaffolding.  Remember I was scaffolding.

Q.   Okay.

A.   Scaffolding company.

Q.   So you did scaffolding that was your main thing you did while you were working construction?

A.   Yes.

Q.   And you worked for Cherokee, Dynamic, SDI and --

A.   Many others.

Q.   Many others, okay.  Do you remember any of the names, other names?

A.   That was long a long time ago.

Q.   Okay.  Did you -- were you in Port Author?

A.   Nedeland [sic].  They based out of Nedeland, Port Neches area.

Q.   So for Port Arthur, Neiland [sic]?

A.   Nedeland.

Q.   How do you spell that?

A.   N-e-d-e-l-a-n-d [sic], Nederland.

Q.   Nedeland.  And then what was the other one you said?

A.   Port -- Port Neches Groves.

Q.   Port Neches.  So those were the -- that's primarily the areas you were working construction after high school?

A.   Yeah, that's right, yes.

Q.   Okay.

A.   Beaumont.

Q.   Also Beaumont?

A.   Yeah.

Q.   And then what made you decide to get into law enforcement?

A.   Every since I was a kid I wanted to be a police officer.

Q.   Okay.

A.   We used to play cops and robbers.  I never with

the robber.

Q. So you've always looked up to law enforcement?

A. Absolutely.

Q. Okay. Do you have -- do you have family that was in law enforcement?

A. No, sir.

Q. Okay. You just -- friend -- family, friends was there any -- I guess my question was is there any, like, individual from your upbringing that, you know, inspired you to get in law enforcement or was it just generally you liked the perception of police officers and --

A. Like the shows like One Adam 12 or Chips, you know, growing up as a kid you watch the shows.

THE COURT REPORTER: What was the first one?

THE DEPONENT: One Adam 12.

THE COURT REPORTER: One Adam 12.

A. That was just always been a thang for me.

BY MR. FULGHAM:

Q. Okay. And so you -- you were in Houston until you were 13. What -- I'm going to talk a little bit about your family. What are your mother and father's names?

A. My mother is Cassandra Jerry -- Cassandra and Jerry Lewis.

Q. Cassandra and Jerry Lewis?



A.   Um-hmm.

Q.   Is your mother still alive?

A.   No, she passed away.

Q.   Your father's name?

A.   William Estes.

THE COURT REPORTER:  Spell Estes.

THE DEPONENT:  E-s-t-e-s.

BY MR. FULGHAM:

Q.   Is he still alive?

A.   Passed away.

Q.   Okay.  Did you have any stepmothers or stepfathers growing up?

A.   I did.

Q.   Okay.  Could you give me their names?

A.   James Louis.  James Edward Louis.

Q.   Stepfather?

A.   Yes.

Q.   Any others?

A.   No, sir.

Q.   Okay.  And when you were growing up, did you live with your mother?

A.   My grandmother.

Q.   Okay.

A.   My grandmother and my sister.

Q.   And then your sister?

A.   Yeah.

Q.   Okay.  What's your grandmother's name?

A.   Ah, damn.  I think she -- I want to say Ella -- I forgot her name, man.

Q.   Okay.  And she's deceased?

A.   Yes.

Q.   And then so you have siblings?

A.   Yes.

Q.   How many?

A.   Now?

Q.   Yeah.  Well, I guess tell me how many you've had and then --

A.   It's -- it's -- it was five of us.

Q.   Okay.  How many are living?

A.   Three of us.

Q.   Okay.  So you have two siblings -- you say us, so there's two that are surviving?

A.   Yes.

Q.   Okay.  Could you tell me their names?

A.   Damonica Keal, Keal.

THE COURT REPORTER:  Keal?

THE DEPONENT:  K-e-a-l.

BY MR. FULGHAM:

Q.   So that's D-e-m-o-n-i-c-a?

A.   D-a.

Q. D-a. Damonica, gotcha. D-a-m-o-n-i-c-a, K-e-a-l?

A. Um-hmm.

Q. Okay. And then your other -- how -- how old is she?

A. She's in her 50s.

Q. Okay. And your other sibling?

A. Ina, I-n-a, Lavan.

Q. Spell --

A. L-a-v-a-n.

Q. I-n-a, L-a-v-a-n?

A. Um-hmm.

Q. Sister?

A. Um-hmm.

Q. How old is she?

A. 55.

Q. Okay. And then you're married. Is that correct?

A. Yes.

Q. And what's your wife's name?

A. Laura Jerry.

Q. Laura, L-a-u-r?

A. L-a -- L-a-u-r-a.

Q. Laura?

A. Un-huh.

Q. Laura Jerry. When did y'all get married?

A.  Oh, shit.  I don't -- been a couple of years.

Q.  A couple years?

A.  Yeah, I think.

Q.  Were you married to her when y'all -- when you were at Polk County Sheriff's Office?

A.  Yes, sir.

Q.  Okay.  I guess just a rough estimate of how long y'all been married?

A.  I'd say six or seven years.

Q.  Okay.  Did y'all have children today?

A.  No.

Q.  And did you have another spouse before Laura?

A.  Yes.

Q.  What was her name?

A.  Leshata.

THE COURT REPORTER:  Spell that.

THE DEPONENT:  L-e-s-h-a-t-a.

BY MR. FULGHAM:

Q.  L-e-s-h-a-t-a?

A.  Um-hmm.

Q.  And does she got my Leshata Jerry?

A.  Um-hmm.

Q.  Okay.  When were you guys married?

A.  God, you asking me -- we met about a year or two, me and Leshata.

Q.  Y'all were only married a couple years?

A.  Yes.

Q.  Okay.  And you don't recall -- do you -- I guess do you know what years that was?

A.  No, sir, I can't.

Q.  Okay.  Any other spouses Laura and Leshata?

A.  Amy.

Q.  Amy.  Before Leshata?

A.  Yes.

Q.  I guess do you and Leshata have children?

A.  No.

Q.  Okay.  What is Amy's name?

A.  Amy Jerry.

Q.  Amy Jerry.  Does she still -- does Leshata and Amy still use Jerry as their last name?

A.  Leshata passed away?

Q.  Oh, Leshata passed away?

A.  Um-hmm.

Q.  Did she pass away while y'all were married?

A.  No.

Q.  Okay.  After y'all got separated?

A.  Yes.

Q.  And then when were you married to Amy?

A.  When I was young.

Q.  Okay.  Was she your first wife?



A.   Yes.

Q.   Were you in high school when y'all got married or?

A.   No.

Q.   Okay.  Was it after -- was it before you were in law enforcement?

A.   I think it was right when I was going through, you know, I was married to Amy.

Q.   Okay.  So like early 2000s?

A.   We -- that's safe to say, yes.

Q.   Okay.  Did y'all have children together?

A.   One.

Q.   And what's your child's name?

A.   Aaliyah.

THE COURT REPORTER:  Spell --

BY MR. FULGHAM:

Q.   Spell that for me.

A.   It's A-a-l-i-y-h-a [sic], like the singer Aaliyah.

Q.   I was going to ask that.

A.   Yeah.

Q.   She was very popular during that time period, huh?  Does your wife like the name?

A.   I mean, you know how it go.

Q.   That's right.  And how old is Aaliyah?

A.  Aaliyah is in her 20s, man.  Man, I got -- I got eight kids, man.

Q.  Oh, you have eight kids?

A.  Shit, so I...

Q.  Okay.  Yeah, I'm just going to try to get all your kids names.

A.  All man I -- that's --

Q.  Do the best you can, okay, because I just need to have it for, you know, if this goes to a trial and we have to pick a jury, I can't have anyone from your family on the jury.  So let's just do our best.  So --

A.  Alright, man, my first kid is Kiara.  Kiara Jerry.

Q.  Spell that.

A.  K-i-a-r-a.

Q.  K-i-a-r-a, Jerry?

A.  Un-huh.

Q.  How old is she?

A.  She's in her 20s -- 30s.  She should be in her 30s now.  She was my very first one.  I don't know their birthday, man, and I don't know their age.

Q.  Okay.  Well, she's the oldest.  Let's go from oldest to youngest.  How about that?

A.  Alright.

Q.  And then just try to say since so she's --

William Jerry

Page 72

A.   Early 30s.

Q.   Okay, early 30s.  And do you know where she lives?

A.   Houston, Missouri City.

Q.   Okay.  Okay, let's go back from Kiara.  And I -- well, do you know who's Kiara's mother?

A.   Courtney.

Q.   Courtney?

A.   Blanton.

Q.   Blanton.  Okay.  And -- okay, let's go to the next.

A.   I got the twins.

Q.   Okay.

A.   Tyler and Tailor.

Q.   Jerry?

A.   Roy, R-o-y.

Q.   Their last name's Roy?

A.   Yes.

Q.   Do you know about how old they are?

A.   They 20s.

Q.   Are they boys?

A.   Boy and a girl.

Q.   Okay.  Do you know where they live?

A.   Tyler live in Georgia and Taylor just moved to Killeen.  Something like that.  Yeah, Killeen.

Q. Outside of Austin?  And then who's their mother?

A. Rene.  Rene Roy.

Q. Okay, keep going.

A. Alright, after the twins is Aaliyah.

Q. Spell that.

A. It's like the sanger Aaliyah.

Q. Oh, Aaliyah, alright.  Okay, A-a-l-i-y --

A. Yeah, like the singer.

Q. And her mother is Amy?

A. Yes.

Q. 20s.  Where does she live now?

A. Nederland, Texas.

Q. Okay, keep going.  After Aaliyah is Kennedy.  Kennedy Jones.

Q. Who's her mother?

A. Misty Jones.

Q. She's in her 20s?

A. Yes.

Q. Where does she lives?

A. Jasper.  Jasper, Texas.

Q. Alright.  I guess there's two more?

A. Yeah, after Kennedy is Warren?

Q. Warren?

A. Warren, W-a-r-r-e-n, Hampton.  Like the hotel Hampton.

Q.  Okay, Warren Hampton?

A.  Um-hmm.

Q.  20s?

A.  No, he's 14.

Q.  14.  Who's Warren live with?

A.  His mom Charlotte.  It's S-h-a-r-o-t-t-l-e, something like -- it's spelled with --

Q.  With an S?

A.  Yeah.

Q.  Charlotte Hampton?

A.  Yeah.

Q.  And where do they live?

A.  Livingston.

Q.  Okay.  Okay, and I guess your last?

A.  My last is Jackson.  Jackson Alex -- Alexander.

Q.  How old is Jackson?

A.  Jackson is about six or seven.  He auh...

Q.  Who's his mother?

A.  Ashley.  Ashley -- yeah, Alexander.

Q.  And where do they live?

A.  Lufkin.

Q.  And let's see.  Do you have any surviving like aunts and uncles that live in and around Polk County?

A.  No.

Q.  Okay.  Cousins that live in Polk County?

A.  No.

Q.  Alright.  And besides the -- we talked about your construction jobs and then your law enforcement jobs and then you've worked some traffic control since leaving Polk County and then some odd jobs.  Anything that we haven't discussed employment wise that you have done?

A.  That's about it.

Q.  Okay.  And what -- what jail license -- what sort a jail license do you hold?  I'm sorry, what law enforcement license do you hold?

A.  Masters.

Q.  Masters peace officer?

A.  Yes, sir.

Q.  And you've had that since 2021?

A.  Sound about right.  I don't know when they --

Q.  Yeah, if you look on here -- on this -- that document I gave you --

A.  Yes, sir.

Q.  -- Exhibit A.  The next page after your service history it says master peace officer issued 4/18/2021.

A.  Yes, sir, I see.

Q.  And that's the highest certification you've held is peace officer?

A.  Yes.

Q.  Okay.  And you've taken several training courses

over your auh, you know, law enforcement career.  I assume you've taken courses on use of force.  Is that right?

A.  Yes.

Q.  Okay.  Probably several courses on use of force. Is that right?

A.  Yes.

Q.  Just as part of your TCOLE and other trainings at the sheriff's office requires you guys to take?

A.  Yes.

Q.  Okay.  De-escalation training, have you done de-escalation training?

A.  I have.

Q.  Okay.  And again you've probably done multiple times of de-escalation training over your career.  Is that right?

A.  Yes.

Q.  And then, I guess, it's -- any trainings that, you know, about dealing with inmates in the jail setting, you know, did you do those types of trainings as well?

A.  I'm not --

Q.  I guess as far as handling inmates in the jail setting, have you taken trainings that talk about, you know, how to handle inmates in certain situations and things like that?

A.  Yes.

Q.   Okay.  And taser training, did you undergo any taser trainings?

A.   Yes, I did.

Q.   And you went starting from -- you know, you started your law enforcement career in 2000 and you're still a reserve officer now.  You know, throughout that period you always stayed on top of your training and -- and probably done countless trainings throughout that time.  Is that fair?

A.   Yes, sir.

Q.   Okay.  Before we get to this incident I want to talk a little bit about any disciplinary you had at -- while you're at Polk County.  Because I guess you're -- Polk County was the -- as far as your law enforcement career that's where you spend the most time, right?

A.   Yes, sir.

Q.   Okay.  I guess did you have any citizen or inmate claimants filed against you while you were working at Polk County?

A.   Yes.

Q.   Aside -- and I'm not taking about Mr. Richards, let's talk about before that, before Mr. Richards.  I guess could you tell me about which incidents you recall and we can just -- I guess tell me the name of the individual that filed the claimant if you can remember and

then I might just have some questions about that.

A.  I don't -- I don't remember, but -- I don't remember the name, but they had an incident where I transported a female inmate to the hospital and while checking her in she alleged that I touched her breast and it was a big deal.

Q.  Do you remember when this was?

A.  No, sir, I don't.  I don't recall a date, a year, but I know it happened.

Q.  And this was when you're at Polk County?

A.  Yes, sir.

Q.  Was this when you were working patrol?

A.  It was when I was transporting in transport.

Q.  Oh, so this -- would have been more recent then as far as -- after you -- you went from patrol to transport supervisor?

A.  Um-hmm.

Q.  This was when you were transport supervisor?

A.  Yeah, I was in transport.

Q.  Okay.  Do you recall her -- her name?

A.  It was a -- they got it, because it was -- it was a big deal.

Q.  Okay.  Were you -- so was there an internal investigation?

A.  It was.



Q.  Who investigate -- was it the sheriff's office that investigated it?

A.  Yes.

Q.  Okay.  Who is -- is there an internal affairs person at the Polk County Sheriff's Office?

A.  Rickie Childers.

Q.  Rickie, okay.  So he kind of lead the investigation?

A.  Yes, sir.

Q.  What was the outcome of that?

A.  She lied.

Q.  Okay.  So you -- was her complaint found to be unfounded?

A.  It was found that she lied.

Q.  Okay.  So there -- was there any discipline on you as a result of the investigation?

A.  No.

Q.  Okay.  You were exonerated is what you're saying?

A.  Yes.

Q.  Okay.

A.  And she wasn't charged.

THE COURT REPORTER:  She wasn't charged?

BY MR. FULGHAM:

Q.    She was --

THE DEPONENT:  She wasn't charged.



Q.  -- was not charged for making a false statement. Okay.  You don't recall her name?

A.  They got it, man, I don't know.

Q.  Okay.  Okay.  I don't -- I have some of your personnel file here, I don't have -- I don't believe I have that --

A.  Okay.

Q.  -- investigation.  But I can -- she -- you're telling me that -- so you were not given any reprimand or discipline as a result of that investigation?

A.  No, sir.

Q.  Okay.  And it was a female inmate not another coworker?

A.  It was a female inmate.

Q.  Female inmate, okay.  Any other -- any other times any other citizen or inmate complaints --

A.  They had another inmate complaint of a guy in the shower, had another officer there with me, said I punched him in the face.

Q.  And this is while you were in the jail, right?

A.  Um-hmm.

Q.  Was this -- so this was when you were either in the --

A.  Working in the jail.

Q.  Okay.  So later in the last stage of your Polk

County because you were patrol.  Just to recall, you're patrol, narcotic, then you went to Alabama then you came back patrol and then --

A.  The jail.

Q.  -- jail.  So this is when you're in the jail. Inmate said you punched him in the face?

A.  Un-huh.  Had another male correction officer there in the cell with me.

Q.  Okay.  Who -- who was that?

A.  His last name was Dawson.  The correction officer was there, the witness.

Q.  Okay.

A.  I think he's the jail captain now.

Q.  Okay.  So I just want to be clear.  So this inmate, do you remember his name?

A.  No, I don't.

Q.  Okay.

A.  I remember the incident.

Q.  Okay.  Was it -- was it -- was it Johnathan Ridgley, does --

A.  I --

Q.  -- that ring a bell?

A.  -- I don't recall his name, but I remember the incident.

Q.  Okay.



THE COURT REPORTER:  Can you spell that last name?

MR. FULGHAM:  Ridgley, R-i-d-g-l-e-y.

BY MR. FULGHAM:

Q.  Okay.  Do you recall -- so was that also investigated?

A.  Yes, it was.

Q.  What was the result of that investigation?

A.  Unfounded and he lied, too.  And no charges filed against him.

Q.  I guess any other that you recall?

A.  Man, when you work in that type of an environment you get complained on all the time.

Q.  Okay.

A.  I know I done had several responses where I have to respond to jail commission.

Q.  Yeah.

A.  Well, you know, so I done had several.

Q.  Any -- any times where you were found to violate policies or you were disciplined or reprimanded while you're at Polk County that you recall?

A.  Have -- are you asking have I ever been recommended [sic] --

Q.  Yeah.

A.  -- at Polk County?

Q.  Well, I'm asking because I -- my initial question that you brought these two up they were unfounded, and you're saying, well, they make complaints all the time, I understand that.  My job -- I -- I work in law enforcement civil defense so I do a lot of this and I understand how inmates file complaints and grievances all the time.  So that was probably a bad question because of how long you worked in the jail, there's probably been a lot of those and a lot of them have been unfounded.

I guess my question is now is:  As far as complaints filed by inmates or citizens when you're on patrol where they were investigated and you were found to violate policies or you were reprimanded or disciplined, can you recall any of those?

A.  No, sir.

Q.  Okay.  And I know you worked there for a long time, so I'm not trying catch you in anything, but I do want to talk about this one here.  I'm going to give you a copy of this, you and your attorney.

MR. FULGHAM:  I want to admit --

I think I'm on C.  Exhibit C?

THE COURT REPORTER:  Yes.

(Exhibit C was marked for identification.)

Q.  This is a Letter regarding an incident with an

inmate named Johnathan Ridgley dated January 26, 2016. Again, that's Exhibit C.  It looks like the letter is signed by -- is it Rick Childers?

A.  Rickie.

Q.  Rickie?  Rickie Childers.  Why don't you just take a second to read that, Mr. Jerry.  Have you had a chance to read that?

A.  Yes, sir.

Q.  And after reading this, do you recall this incident?

A.  Vaguely.

Q.  Vaguely.  Do you agree that you were given a written reprimand as a result of this inmate claiming that you had assaulted him in November of 2015?

A.  2016.

Q.  I think the incident happened in November of 2015.

A.  Okay.

Q.  If I'm looking at the second paragraph it says: On November 3rd, 2015, I received a copy of the use of force paperwork where you had an incident with inmate, Johnathan Ridgley, in the Polk County Jail.  During our conversation you informed me that inmate Ridgley threatened you.  I then informed you to type -- I formed you to type of a case and refer it to the district

attorney's office, which you failed to do [sic].

On November 3rd, 2015, the Polk County Jail received a grievance from inmate Johnathan Ridgley in reference to an assault complained that he filed against you.  I read the use of report that -- use of force report that you submitted along with the jailer's report and received a copy of the video that Jailer Duenes recorded. An investigation was then conducted where inmate Ridgley and other inmates in the tank were interviewed.

I then watched him listen to the video from jailer Duenes in which during -- in which during the incident you were unprofessional and used profane language.  Deputy William Jerry, this type of behavior will not be tolerated by the Polk County Sheriff's Office. You are hereby given a written reprimand.  Any other violations of policy and procedure could lead to suspension and/or termination from employment with the Polk County Sheriff's Office.  Do you agree that's what's this letter says?

A.  Yes, sir.

Q.  Okay.  And then you signed on the back:  I have read the contents of this report and agree to the substance of it.  I agree to follow the directions or orders provided herein.  You signed that, correct?

A.  I did.

Q.   Okay.  So you didn't challenge or appeal this?

A.   No, I didn't.

Q.   Okay.  And do you recall this incident now?

A.   Yes.

Q.   Okay.  Is this the same thing -- this isn't the shower incident that you were talking about earlier, is it?

A.   It think it -- it might be.

Q.   Okay.

A.   But I had a witness there and, like I say, I was reprimanded for my language.

Q.   Okay.  But you agree that there was a reprimand as a result of this?

A.   Yes.

Q.   Okay.  Anything -- is there anything you want to add, I guess, as far as this incident?  There's some more documentation here but, you know, is there anything about this incident you want to tell me about or?

A.   It was a witness there.

Q.   Okay.

A.   Like I said, Dawson.

Q.   Dawson.

A.   He was there, he witnessed it.  I think he signed a statement saying that I -- I didn't assault or -- or -- I wasn't recommended [sic] for use of force against that

inmate, I was reprimanded for language.  And the language was he called me a porch monkey, I called him a white cracker.  He cussed me, I cussed him.

Q.  Okay.  Give me one second.  Is there ever any other incidents with inmates where you were reprimanded for using force against them?

A.  No, sir.

Q.  Okay.  Where an inmate -- I know in this situation Mr. Richards he flipped you off and that kind is what started this.  Was there any -- any other similar incident that you had with another inmate during your time at Polk County?

A.  Man, I had a lot of incidents.  Like I say --

Q.  Where, I guess, you were reprimanded for going too far in response to an inmate doing something against you or making --I guess either saying something to you or giving you the middle finger, anything like that?

A.  I don't recall offhand.

Q.  Okay.  Okay.  Well, have you had a chance to look at your -- the complaint that you filed in this case?

A.  No.  I might have, I...

Q.  I want to give you a copy of your complaint.

A.  Okay.

Q.  Sorry, I was looking for something, but I'm going to go ahead and move on and then I might come back to

that.

A.  Okay.

Q.  But here.  So, sir, that's the complaint that you filed in this lawsuit.  I think it's Polk County and Polk County Sheriff's Office, and there's been no amended complaint so that's the only complaint on file.  Have you had a chance to look at that?

A.  Yes.

Q.  Did you say yes?

A.  This is the first time I done saw this.

Q.  Okay.

THE COURT REPORTER:  Are we marking that one, Counsel?

MR. FULGHAM:  Yes, ma'am.  I'm sorry. We're on D is that right?

THE COURT REPORTER:  Yes.

MR. FULGHAM:  So I'm gonna -- Exhibit D is the  original complaint in this lawsuit Civil Action 9:23-cv-32.

(Exhibit D was marked for identification.)

Q.   I'll give you a chance to read over this, Mr. Jerry.

A.  Okay.

Q.  You've had a chance to look over that?

A.  Yes, sir.

Q.  So I'm just going to read some parts of this complaint.  I want you to tell me if you agree with what it says in the complaint.  It says:  On or around February 24th, 2021, plaintiff was terminated.  Polk County alleges plaintiff had committed violations that the plaintiff did not commit.  Do you agree with that?

A.  I'm not understanding your question.

Q.  So you say in your complaint:  Polk County alleges plaintiff had committed violations that plaintiff did not commit.  This is regarding your termination.  Do you agree with that statement?

A.  They saying that I violated rules and policy, right?

Q.  Yes.  Do you agree that you did not commit those violations they said that you committed?

A.  Yes, I do.

Q.  Okay.

MR. FULGHAM:  I'm going to go ahead and admit Exhibit E.  It's a Termination Letter that was sent to Mr. Jerry on March 2nd, 2021.  I have to mark this.

(Exhibit E was marked for identification.)

Q.  And I'm going to have to get this back for you, Mr. Jerry, because this is the clean version with the

exhibit sticker.  But have you seen this letter?

A.  Yes, sir.

Q.  Okay.  And you agree that this was the letter, the termination letter regarding your separation from Polk County Sheriff's Office?

A.  Yes, sir.

Q.  Okay.  And at that top of that letter I'm going to go ahead and read this first paragraph.  And I want you tell me if you agree with -- that's what it says.  It says in the first paragraph of this Exhibit E:  Polk County Sheriff's Office Jail Policy and Procedure Violations 3.18 Rules of Conduct; 1.1 Obedience to Rules and Conduct; 1.1 Conduct Unbecoming; 2.4 Conduct and Behavior; 801 Use of Force --

THE COURT REPORTER:  Slow down.

MR. FULGHAM:  Sorry.

THE COURT REPORTER:  Use of force.

BY MR. FULGHAM:

Q.  -- Use of Force; 4.30 Body Worn Camera and 5.06 Taser.  Do you agree that's what that paragraph says?

A.  Yes, sir.

Q.  Okay.  And are -- when going back to your complaint when you say Polk County alleges plaintiff had committed violations that plaintiff did not commit, are you talking about violations of those policies and

procedures that we just read?

A.  Yes, sir.

Q.  And it's your position that you did not violate those policies and procedures?

A.  Yes, sir.

Q.  Okay.  Moving on.  I'm going back to the complaint, so you can look at the complaint.  It's -- you say in your complaint, and this is Paragraph 13.  Sir, you following on Paragraph 13?

A.  Yes, sir.

Q.  Okay.  So when inmates insult jail officers in front of other inmates, what usually follows is a reprimand from the officers through the removal of that inmate to another cell away from other inmates.  Is that true?

A.  Yes.

Q.  This practice is essential to keeping the jail officers from being overrun by out of control inmates dismissive of authority.  Such a practice is an integral part of maintaining an orderly jail.  Is that true?

A.  Yes, sir, it is.

Q.  Okay.  And is this what happened on February 23rd of 2021 between you and Mr. Richards?

A.  Yes.

Q.  Okay.  So what you did to Mr. Richards was in

line with what you're saying here in Paragraph 13?  You were removing him to another cell away from other inmates in response to him insulting you, correct?

A.  And not following the -- yes.

Q.  Okay.  Plaintiff then instructed the offending inmate -- and that's referring to Mr. Richards, right?

A.  Yes, sir.

Q.  -- to pack his belongs and be moved to another cell.  The inmate refused.  Plaintiff repeated his request.  The inmate refused.  Is that -- do you agree with that statement?

A.  Yes.

Q.  As a result of these refusals, William Jerry used appropriate physical force to subdue the inmate and extract him from his cell so that the inmate could be moved to another cell.  Do you agree with that statement?

A.  Yes, sir.

Q.  The practice of physically subduing inmates to move them out of their cell to another cell, when those inmates remain defiant in the face of a request to voluntary move -- voluntarily move was a customary practice of the jail.  Do you agree with that?

A.  Yes.

Q.  And I'll just keep going on this.  And we're on Paragraph 17.  At the end of the day, two white officers

-- who are these white officers that you're referring to here?

A.  It's going to be Wyatt Cronin and Mr. -- I got that name down here, let's see.

Q.  Is it Mr. Guidry?

A.  Let me find it.  Michael Goins and Wyatt Cronin.

Q.  Goins and Cronin?

A.  Yes.

Q.  And they were pretty during this incident?

A.  Yes.

Q.  So we're continuing on Paragraph 17.  At the end of the day -- at the end of that day, two white officers who you're saying are Officer Goins and Cronin -- Cronin who were present at the time of the inmate's removal, traveled to another location and informed another official of their versions of the incident.  However, those officers who worked underneath William Jerry, as he was their supervisor, told an untrue story as to what happened.

So you're saying that Goins and Corning's versions of this incident were untrue?

A.  Yes.

Q.  Okay.  In the past William Jerry had justly disciplined both officers for multiple violations.  Is that true?

A.   Yes.

Q.   Okay.  Both officers had been punished by the disciplinary  measures taken against them.  Is that true?

A.   Yes.

Q.   Can you tell me what -- what these incidents when you had punished these individuals?  Do you recall when they were or the circumstances of them?

A.   I can recall some of them.  I don't know when it was but it's -- it's documented.

Q.   Okay.  So you for -- and we're talking about Goins and Cronin, correct?

A.   Yes, sir.

Q.   Okay.  What -- what did Goins do that he was disciplined for?

A.   He had a problem with coming to work, call, no show.

Q.   No show at work?   And you punished him for that?

A.   Yes, sir.

Q.   Anything else?

A.   I think he had -- he had some incidents where you got to make the rounds and check, he wasn't up on his rounds.  That's a big jail commission thang.

Q.   Yeah.

A.   And he was disciplined for that.

Q.   He was missing his observations?



A.   Yes.

Q.   Disciplined for that.  Anything else that related to this statement in your claimant?

A.   It was -- it was something else, I can't recall, but everything I'm saying that -- it's documented.

Q.   Okay.  And then --

A.   And he -- he put in for promotions and he was denied.

Q.   Okay.  So just to be clear, I believe what you're saying in your complaint is because of his prior discipline and possibly because he was denied promotion and your involvement in that, that he told an untrue story about this incident to get back at you?

A.   Retaliation, yes.

Q.   Okay.  And so for Cronin why don't you tell me about what he had done -- your -- the prior discipline against him?

A.   It's the same.  They was running a tight face.

Q.   So Mr. Cronin was also no show in work?

A.   No showing at work, missing the rounds.  Went -- went up for to try to be promoted, it was denied.

Q.   Denied promotion.  So similar to Mr. Goins?

A.   They was running a tight race.

Q.   You're saying these guys were friends -- friends and working with each other is what you're saying and they

both -- it's your opinion, I just want to make sure I understand your complaint, that you're saying that because of you -- your prior discipline against them and because they weren't promoted, you -- they were denied promotions, they told an untrue store about what happened between you and Mr. Richards to retaliation against you?

A.  Absolutely.

Q.  Okay.  What -- what -- what did they say that you -- that you're saying is untrue about what happened?

A.  I never received a copy of their complaint or what -- or what they said.

Q.  Well, how do you know what they said was untrue?

A.  Because I'm -- I'm saying they the one who reported this incident, and I was never presented with a copy of their statement or what they said, so I'm saying whatever they said is untrue.

Q.  You're saying because you were terminated whatever that said must be untrue if that resulted in -- in your termination?

A.  Well usually when you -- to answer a complaint it usually work.  When somebody file a complaint against you, you are presented with a -- the written complaint given a chance to respond.  I was never given the chance to response to what they alleged that I did.

Q.  You were never given any complaint is what you're

saying?

A. That's what I'm saying.

Q. Okay. How were you informed that this incident -- incident was being investigated?

A. I returned to work the next morning, the captain told me, Hey, they got four Texas Rangers up there and you are -- you're being investigated and we need to go there.

Q. Do you want to take a break?

A. No.

Q. Okay. So you found out the next day you returned to work and there's rangers there waiting to talk to you about this situation with Mr. Richards. Is that right?

A. No, not wanting to talk the me.

Q. What?

A. Not wanting to talk to me. They didn't want to talk to me.

Q. Did you -- were you ever interviewed by a ranger?

A. No.

Q. Did you -- were you inter -- were you interviewed by anyone at the sheriff's office?

A. No.

Q. Had you -- and you never -- did you provide any written statement when you learned about this?

A. They on -- on this paper he asked me if I wanted to give a statement I said, No, I wasn't giving a

statement.  He asked me to sign this paper, I told him, No, I wasn't signing because he -- I refused to sign.

Q.  Why did you not want to give a statement?

A.  Because they -- they didn't present me with nothing.  He just called me up there, told me you could -- you could give me your resignation or you could be terminated.  No, he suspended me first, he suspended me.

I think I went home for a day or two, and he called me back and he say -- he say, You could resign or you could be terminated.  And I said, Well, you're going to have to terminate me.  He said, Well, come on up here.  And I think I went up there and this is about the time I signed this -- this paperwork.

Q.  Okay.  If we need to take a short break we can, Mr. Jerry.

A.  No, I'm fine I'm just...

Q.  Okay.

A.  It's just upsetting when somebody tarnish your character, you know.

Q.  I understand.

MR. FULGHAM:  We're on exhibit?

THE COURT REPORTER:  We're on -- the next one is F.  E, F.

And he has the original of this one.

Q.  Hold on to that, Mr. Jerry.



MR. FULGHAM:  I didn't want to give him mine because I had some writing on it.  Yeah, we'll get -- we'll get it -- these back at the end.

I'm going to admit Exhibit F.  It's a Letter date February 6th, 2021.  On the letter it's a statement signed by Mr. Jerry.  It's titled Reference Complaint.

(Exhibit F was marked for identification.)

BY MR. FULGHAM:

Q.  Mr. Jerry, will you read that paragraph in this sentence -- in the middle of this page.

A.  On the above date, I William Jerry received a copy of the complaint against me in reference to a use of force in the Polk County Jail.  Also I received one ScanDisk 16 gigabyte jump drive which shows the four jailers' body cam videos and the jail video from when the inmate was placed in Cell 286.

Q.  Okay.  And you signed that document, correct?

A.  Yes, sir, I did.

Q.  Okay.  You're telling me you never received a complaint, why would you sign this is you never received a complaint?

A.  This -- this what I received.  I'm taking about I never received the complaint from Mr. Goins and -- and Wyatt stating what I allege.  Yes, I did receive this.

Q.   Well you're -- and you're pointing at the termination letter, correct?

A.   Yes.

Q.   Okay.  So you're saying this Exhibit F we just read -- when you're saying I received a copy of the complaint against me, you're saying that's talking about your termination letter, not the claimant by Mr. Goins, correct?

A.   Not -- not the complaint from Mr. Goins or Mr. Cronin.

Q.   Okay.  Well, the termination letter is dated March 2nd, 2021.  How could you have received that if it's dated six days after you signed this letter saying that you received the complaint?

A.   I know -- what I'm saying is I did receive this. I got a copy of this.

Q.   And that's dated -- and when you say "this," you're talking about the termination letter, correct?

A.   Yes.

Q.   Okay.  And that letter is dated March 2nd, 2021, correct?

A.   Yes.

Q.   And you signed it on March 2nd, 2021?

A.   Yes.

Q.   The other letter, Exhibit F, the other statement

we just read, it says -- it's dated February 26, 2021, and you're saying that you received a copy of the complaint against me.  How could that have been the termination letter if the termination letter is dated March 2nd, 2021?

A.  I recall receiving a jump drive, and I know I got the jump drive because I got it.  But I know I did sign this -- this letter right here, the termination letter.  I think I'm getting confused, but what I'm saying is when somebody make a complaint or allegation against you, in order for you to respond the policy is you're supposed to get a copy of whatever the person is alleging you did.  And I did receive that if -- if that's what you're asking.

Q.  Okay.  Well, I am asking that, but I'm asking why you would sign this and say you received a complaint if you actually didn't?

A.  Well, I don't recall, but I know I got the gigabyte and I know I signed this letter.

Q.  Yes, you agree but you don't dispute that's your signature on both documents?

A.  No, sir, I don't.

Q.  Okay.  And you did receive the scan drive, you do remember that?

A.  Yes.

Q.  Okay.  I think what you're trying to say is you



don't recall receiving the complaint even though you signed this letter saying you did receive the complaint?

A.  I don't recall.  Like I say, the policy state when someone, whether it's verbal or they call in and you get a complaint against you, you supposed to be afforded a copy of that complaint to -- to look at so you can respond to it.

Q.  Okay.  But it sounds like that's -- it sounds like, at least from what this letter you signed or -- it's called a letter -- or a statement dated February 26, 2021, it's titled complaint and the first thing it says is, I William Jerry received a copy of the complaint against me in reference to a use of force in the Polk County Jail. I'm just wondering why -- I mean, that's the whole point of you signing this is to confirm you received the complaint.

So you're telling me you don't think you received the formal complaint, I just don't understand then why you would sign this document if you didn't receive the complaint.

A.  I'm going say I don't recall receiving --

Q.  Okay.

A.  -- but I know I --

Q.  But you may have, you just don't recall?

A.  I don't recall.  I have the scan thang.  I got



William Jerry

the gigabyte thang.

Q. Okay.

A. Yeah.

Q. But you don't dispute signing this document?

A. No, I don't.

Q. Okay. Have you -- so you said you did receive the gigabyte drive, right?

A. Yes.

Q. You don't dispute that you received that, you remember receiving that?

A. Yes.

Q. And did you watch the videos on the drive?

A. In a long time.

Q. Okay. When was the last time you saw the video?

A. Couple of years ago.

Q. Okay. Why don't we go ahead and watch -- watch the video.

A. I can.

Q. Okay. If I can get this technology to work.

MR. FULGHAM: Madam Court Reporter, we'll go ahead and make the video -- this is Body Cam Video of Officer Mickey Guidry from February 23rd, 2021. The time stamp says 8:34:20 and we'll make this Exhibit G.

(Exhibit G was marked for identification.)

Q.  And I think the video is a minute and 30 seconds long.  So why don't we play it through and then I might come back and play certain parts and we can talk about it. okay.  I had it all set up.

MR. FULGHAM:  Can we go off the record for a second?

THE COURT REPORTER:  Off the record.

THE VIDEOGRAPHER:  Off the record at 12:50 p.m.

(A short recess was taken.)

THE VIDEOGRAPHER:  Back on the record on File 3 at 12:53 p.m.

BY MR. FULGHAM:

Q.  Okay.  I'm going to play the video, so the body cam video of Mickey -- officer Mickey Guidry date 2/23/21. Play the video now.

(Video played.)

Q.  Mr. Jerry, have you seen that video before?

A.  It's been a long time.

Q.  Okay.  And that video depicts the incident between and inmate Michael Richards on February 23rd, 2021.  That's the incident that resulted in your terminations.  Is that correct?

A.  Yes.

Q.  Okay.  What -- the camera turns on and you're

going into Mr. -- you're going into the cell blocks that Mr. Richards is in.  What prompted you -- we don't see what happened before that.  What prompted you to go into his  cell like that?  I guess what started this?

A.  We was getting ready for our jail inspections, the inmates was completing cells, and I had just got there and they told me to come down and look at some of the work, trying to get ready for the yearly inspection.  I go down there and he -- I'm not even talking to him, dealing with him, he shoot me the rod.  Everybody watching, a lot of inmates watching, so I tell him back up your stuff. You -- you moving.

Q.  So everything we just watched you going in there you're -- fair to say were you upset when he flipped you off?

A.  Somewhat, yeah.

Q.  You're offended by that?

A.  Yes.

Q.  Had you -- what -- what prior -- I guess, did you have prior interaction with Mr. Richards before this?

A.  No, sir.

Q.  Did you know him?

A.  No, sir.

Q.  Okay.  So you had never had any -- this wasn't something that had built up over time?



A.  No, sir.

Q.  This was him, just an inmate you didn't even know, you're walking by the glass, he flips you the middle finger, and then everything that we just saw is what happened as a result of that, correct?

A.  Yes.

Q.  Okay.  You say in your complaint:  Plaintiff -- you're talking about yourself, I'm at Paragraph 14 -- then instructed the offending inmate to pack his belongs and be moved to another cell.  The inmate refused.  The plaintiff requested his requests, the inmate refuse.

Paragraph 15:  As a result of these refusals, William Jerry used appropriate physical force to subdue the inmate and extract him from his cell so the inmate could be moved to another cell.  Are you saying that he on multiple times refused your instruction to pack his belongs?

A.  Yes.

Q.  When we see you go in the cell, when -- at what point did you instruct him to pack his belongs?  Because it looks like you immediately ran up to him and grabbed him.

MR. BOZEMAN:  Objection.  Form.

Q.  When did you -- can you -- can you answer the question.



A.   Before I went in the cell I instructed him several times to pack his stuff through the glass.

Q.   By doing this motion?

A.   Knocking on the glass, pointing at him, telling him pack your stuff you're moving.  He -- he see me livid.  I told him several time that before I pressed the emergency call button to get other officers over there.

Q.   And that -- so you're -- when you're talking about instructing him to pack his belongs, you're talking about through the glass, pointing and doing a little circle motion with your finger?

A.   Talking to him as well.  Hey, pack your stuff, you are moving.

Q.   Okay.  How much time -- and that was immediately before you went in the cell, right?

A.   I told him -- you're kind of confusing me now, I'm telling you what happened.  Before the officers get there I instructed him several times through the glass.  Just like I'm saying now, pointing at him pack your stuff, you are moving, giving him what he understand what I'm saying --

Q.   Okay.  But he can't -- is it -- can he hear you clearly through the glass?

A.   He understand --

MR. BOZEMAN:  Objection.  Form.



You can go ahead and answer.

A.   -- he under -- he could see me.  He understand what I'm saying.

Q.   Okay.

A.   If that make any sense.

Q.   And then how long after this what you just described telling him, Hey, get your stuff through the glass, how long before you went into the cell after that?

A.   It -- it -- I instructed him several times, like more than once, and before I went -- it was -- it was a couple minutes.  It just -- it was a while because I told him four -- four times at least.  And then like I say, before I went in I pressed the bottom and I'm the one who called for the other officers to come down there.

Q.   Okay.  You state in here:  When inmates insult jail officers in front of other inmates what usually follows is a reprimand from the office -- officers through removal of the inmate to another cell away from other inmates.  Is that a policy of Polk County Jail?

A.   It's what we do to maintain order in that type of environment.

Q.   Is that a written policy?

A.   We -- we could move -- I don't know.  I don't know.  I don't know if that's a written policy.

Q.   I mean, it's in your complain so I'm just asking

888-893-3767
www.lexitaslegal.com



you if that's -- because you're basically saying that that's the -- a policy of the jail.  I'm asking if that's a written policy or if that's just something you guys did?

A.  That -- I don't know if that's a written policy, but it's the way we maintained order in that type of environment is what I'm trying to say.  When you have a disruptive inmate in that type of environment, you remove him from -- from that setting.  It's -- it's the answer to my question --

Q.  Okay.

A.  -- to the question.

Q.  Okay.  And after you went in his cell you immediately went up to him -- do you agree that you immediately went up to him and grabbed him by the shirt and physically removed him from the cell?

A.  Yes.

Q.  Okay.  Was he being resistant at that time?

A.  I would say yes because I had given him orders, directives to -- to, you know, pack your stuff and move.  Most of the time when you tell a inmate that they usually do it.  I had given him several orders and he didn't comply so I --

Q.  Before you went in the cell is what you're saying?

A.  Yes.

Q.   When you went in the cell you went straight to him and you grabbed his, correct?

A.   Yes, sir.

Q.   Okay.  And I just want to go -- you already had a taser in your hand.  Is that correct?

A.   I -- I told them to bring -- bring me a taser, yes, I did.

Q.   Why did you already have the taser in your hand?

A.   The taser is used the -- it was used for intimidation person -- purposes.  Usually when an inmate see the taser they -- they know the officer mean business.  You know, I'm trying to use that as a intimidation factor.

Q.   Okay.  So the whole point of you having the taser in this situation was to intimidate the inmate?

A.   To try to get him to comply.

Q.   Okay.  Are you saying you had no intention on using the taser?

A.   No, I didn't.

Q.   Do you think it was appropriate to throw him up against the wall like you did --

MR. BOZEMAN:  Objection.  Form.

Q.   -- under these circumstances?

A.   Look -- to answer that question, looking back it's several things that I could have did different.

Q.   Okay.  So you agree in hindsight you could have

done things differently?

A.  Looking back, there's several things -- several things that I could have did different.

Q.  Okay.  And was there anything else -- just now that you said that -- was there anything else going on in you -- with you that would have caused you to be in more -- in a more aggressive type of manner that day?

A.  Once, again, looking back several thangs that I could have did differently.

Q.  Okay.  But there wasn't some other incident that had happened or something that had set you off so that you were, you know, acting in a more -- I'll say aggressive, it's probably the right word for that, there wasn't anything else that day that happened earlier that, you know, some other inmate had pissed you off or, you know, something that had built up?  I guess that's -- you understand my question?

A.  Yes, I do.

Q.  Okay.

A.  But what I'm saying that wasn't nothing else going on.  Like I say, looking back there's several thangs that I could have did different that day.

Q.  Okay.  Well, I guess tell me then what could you have done different?

A.  Well, one, I should have delegated those officers



to go in there and remove him and not myself.  I should have removed myself from going into the cell.  That's -- that's the reflection I get from me, self-reflection.

Q.  Okay.  Why do you think delegating in that situation would have been better?

A.  Because I'm -- I'm the lieutenant I -- you know, it would have defused that whole situation by delegating and letting them other officers go in there and do it and me stand back and watch.  And that's from self-reflection.

Q.  Okay.  No, that's fair.  I mean, so you're saying should have delegated maybe inserting yourself --

A.  Removing myself from the situation.

Q.  -- because he -- because he had flipped you off and therefore another officer had gone in they might not have had that upset them in the same way.  Is that what you're saying?

A.  I'm saying I should have removed myself from the situation, delegated and had the other officers go in and remove him.  And that's what I'm saying and that's my answer.

Q.  Oh, I understand, sir.  So it sounds like, I mean, you agree then that him flipping you off was offensive to you, correct?

A.  He -- yes, it was.

Q.  And it upset you?



A.   It didn't upset me.

Q.   Okay.

A.   Didn't upset me.  Like I say, I gave him a directive and he refused.  In that type of environment -- in that type of environment -- like I say, self-reflection, looking back, it's several thangs I know I should have did different.

Q.   Okay.

A.   And I'm telling -- I just want to say, the reason I'm asking -- answering that question like that, and I'm not going to go any further I gotta -- I don't know if you're aware but they still got a criminal investigation on me.

Q.   Is that -- is that your understanding that's -- that's still ongoing?

A.   Still going.

Q.   Okay.  Do you have anyone who's updating you on the status of that?

A.   They don't tell you nothing.

Q.   Okay.  And have -- have they -- have they -- have you been -- I know you said you didn't receive the complaint and the ranger didn't interview you, did -- has anyone ever interviewed you?

A.   No.

Q.   Okay.  And have you -- you didn't have to testify



William Jerry

about this, have you?

A.  Nobody ain't talk to me about nothing and this has been going on for four years.

Q.  Okay, I understand, sir.  I understand.  And I know that this -- I know this is not an easy thing to talk about but, you know, you filed the lawsuit so --

A.  Yeah.

Q.  -- I -- it's -- I have a responsibility to represent my client and ask you questions about this.  Do you understand that?

A.  I do understand that.

Q.  Okay.

A.  But I want you to understand certain questions that I'm just not going to answer.

Q.  Okay.  Well, I'm going to ask you all the questions because I have to so I can -- have done my due diligence.

A.  Yes, sir.

Q.  And, you know, I'm sure your lawyer's informed you of, you know, your rights, so I'm not going to counsel you because I'm not your attorney.  But I think I understand what you're saying, but I am going to ask -- ask questions about this while -- while I have you here today and because you filed a lawsuit against my client.

A.  Absolutely.



Q.  You said there's several things you would have done differently, one of them was you should have delegated to your other jailers.  What's -- what's another thing that you think you should have done differently?

A.  That's -- that's the main one.  I think if I would have did that -- looking back, reflection, looking back I think if I would have did it that way we wouldn't be here today.

Q.  As far as your actions on the video, are there any of those you would have done differently?

A.  Absolutely.

Q.  Okay.  Are you talking about the way you shoved him up against the -- the wall?

A.  I am talking about overall several thangs that I see I could have did differently.

Q.  Do you -- and when you say "do differently," do you think your actions in that -- under the circumstances as we just watched on the video, do you think your actions were excessive?

MR. BOZEMAN:  Objection.  Form.

A.  No, I don't.

Q.  Okay.  Do you agree that you threatened the inmate?

A.  No, I don't.

Q.  You told him he was fixing to find out.  What --

what were you referring to?

A. It's just several thangs I could have did differently that day.

Q. I understand that, sir, but I need you to answer my questions. I mean, you keep telling me there are several things you would have done different, I understand that, but I need to know what those things are. So I know -- I know that you used some language. You said, You got me F'ed you, you called him a mother-Fer several times.

A. He said some things to me, too.

Q. Okay. Do you regret using some of the language you used?

A. Yes.

Q. So I'm going to play a few parts of this video and I'm going to ask some questions, alright. I'm going to try see if I can read where we're stopped at but it's really tiny.

(Played video.)

Q. Okay. We're about 14 seconds in -- it's the video. Do you agree that you're pointing a taser at the inmate's head?

A. I'm not going -- I don't see where I'm pointing. I got it up in the air.

Q. Do you see how there's a few times in there where

it looks like you have the taser up against his head?

A.    It's not -- well, I'm -- I'm trying to control him and I got it in my hand so it's -- it's going everywhere.

Q.    Are you saying you never intended to point the taser at his head?

A.    That's what I'm saying.

Q.    Do you understand how looking at this video it looks like the taser at certain points is pointed at his head?

MR. BOZEMAN:  Objection.  Form.

A.    I never attended [sic] to point it at his head. I'm -- I'm trying to control him.  If you look at the video it's going everywhere.

Q.    At this point what -- at what point had he -- aside from, you know, you're saying he wasn't packing his stuff up, you went in there, you grabbed him, you pulled him out and you threw him in -- against the wall and against the door.

MR. BOZEMAN:  Objection.  Form.

Q    Do you agree with that?

A.    I agree that I used the minimum amount of force necessary to remove the inmate from the -- from their cell.

Q.    You think you used the minimum amount of force?

LEXITAS

MR. BOZEMAN:  Objection.  Form.

Q.  You can answer the question.

A.  I used the minimum amount of force necessary to remove the inmate.

Q.  So it was necessary to throw him up against the wall and throw him up against the door in the cell multiple times?

MR. BOZEMAN:  Objection.  Form.

A.  I used the force necessary to remove the inmate.  That's my answer.

MR. FULGHAM:  I'm going to object as nonresponsive.

Q.  You need to answer the question I'm asking.

MR. BOZEMAN:  I want to make an objection.  Asked and answered.  He's already answered the question.

MR. FULGHAM:  No, I -- he has not answered that question.  It's a different question.  I'm asking -- he said he used the minimum force necessary, I'm follow up on his response.

Q.  Sir, you said you used the minimum force necessary.  So was it necessary when he had not physically resisted at all -- do you agree that at this point, 14 seconds in, he had not physically resisted anything that you had done to him at that point?

MR. BOZEMAN:  Objection.  Form.

A.  Once again, I'm going to say I used the minimum force necessary to remove the inmate the cell.

Q.  Okay.

MR. FULGHAM:  I'm going to object as nonresponsive.

Q.  Okay.  And I'll respond to that.  If you used the minimum force necessary, when he was not actively resisting, why was it necessary to slam him up against the wall and slam him up against the door of the cell?

MR. BOZEMAN:  Objection.  Form.

Q.  You can answer the question.

A.  I answered the question, sir.

Q.  No, you haven't.  Why was -- you're saying it was the minimum amount of force necessary, why was it necessary to slam him up against the door and slam him up against the wall?

MR. BOZEMAN:  Objection.  Form.

Q.  Are you refusing to answer the question?

A.  No, sir, I believe I answered it.

Q.  No, you said he -- you used the minimum force necessary.  I'm asking why then was it necessary when he had not actively resisted you -- you walked in there -- he didn't have time to actively resist, you grabbed him and threw him out of his cell and threw him up against the

wall and threw him against the door of the cell.

MR. BOZEMAN:  Objection.  Form.

Don't answer that question.

Objection.  Because you're -- you're playing the fact witness and you're characterizing things --

MR. FULGHAM:  We can watch this -- I'll watch -- I'm happy to watch --

MR. BOZEMAN:  Yeah, I've seen the video, too, I disagree --

MR. FULGHAM:  I'm not mischaracterizing anything.

MR. BOZEMAN:  Well, based -- okay, that's your opinion.

MR. FULGHAM:  So you --

MR. BOZEMAN:  That's your opinion.  My opinion is that he is not doing any of that in this video. I've had cops yank me out of my car much worse than that. That is  just my opinion, you're entitled to your opinion. But I'm saying that you are playing a dangerous --

MR. FULGHAM:  Okay.

MR. BOZEMAN:  -- game that is erroneous if you characterize that in a universal way in an objective as if what he --

MR. FULGHAM:  Fine.

MR. BOZEMAN:  -- did was an objective --



William Jerry

could be classified that way objectively.  That's all I'm saying.

MR. FULGHAM:  Well, there's a video, it is objective.  But I'll ask the question and --

MR. BOZEMAN:  There's a video -- wait, wait, wait --

THE COURT REPORTER:  One at a time.

MR. BOZEMAN:  Whoa, whoa, whoa.

It's a video.

I have to come back on that comment because that was a silly comment.

It is a video, but you -- but different people --

MR. FULGHAM:  I'll rephrase the question.

MR. BOZEMAN:  -- can watch the same video and come away with completely different conclusions.

MR. FULGHAM:  Okay.

MR. BOZEMAN:  I'm just laying the foundation that your question is confusing and that's why he cannot answer it in the way you want him to answer it.

MR. FULGHAM:  Alright, I'll re -- I'll ask the  question again.

BY MR. FULGHAM:

Q.  When you entered the cell was inmate Richards

LEXITAS

resisting you?

A.  No.

Q.  He wasn't resisting you, okay.  Why did you run up to him and grab him then?

A.  Because I was using the minimum amount of force necessary to remove him from that environment.

Q.  Okay.  Why did you throw him up against the wall?

MR. BOZEMAN:  Objection.  Form.

A.  I answered the question, sir.

Q.  You said you used the minimum amount of force necessary, I'm asking you why?

A.  I was using the minimum amount of force necessary to control the inmate.

MR. FULGHAM:  Object to nonresponsive.

Q.  Do you -- do you agree that you threw him against the wall of the cell -- the wall -- like, what do you -- okay, strike that.

What is this little area that you guys are in right here in the video at 15 second?  What is this little room right here?

A.  They call it the D space area of the cell.

Q.  The D space area, okay.  Do you agree that you removed -- forcefully removed him from the cell and threw him up against the wall on the D space area of the cell?

MR. BOZEMAN:  Objection.  Form.



A.  I removed the inmate from the environment using the minimum amount of force necessary to control him.

Q.  Did you throw him against the wall?

MR. BOZEMAN:  Objection.  Form.

A.  I used the minimum amount of force necessary to remove him --

Q.  You're not answering the questions.

A.  I'm answering you, sir.

Q.  No, I'm asking you if you threw him against the wall?  We can watch the video again if you'd like because I think it's pretty clear.  It's a simple question, sir. I know that you understand my question.

MR. BOZEMAN:  Objection.  Form.

(Video played.)

Q.  Alright.  Do you agree that you have your arm against his neck against the wall on the door of the D space of the cell?

A.  His chest area.

Q.  Do you agree --

THE COURT REPORTER:  I'm sorry?

THE DEPONENT:  It's the chest area.

THE COURT REPORTER:  Okay.

A.  Upper chest.

BY MR. FULGHAM:

Q.  Okay.  But you agree that you have your forearm

on his crest, neck area up against the wall and the door of the D space of the cell?

MR. BOZEMAN:  Objection.  Form.

A.  Yes.

Q.  Okay.  And you're --

(Video played.)

Q.  You got me fucked up.  What you gone do?  Come on.  Is that what you said?

A.  Yes, sir.

Q.  If you're just trying to remove him from his cell, why -- why are you saying those things to him?

A.  He -- he told me who he was, some Aryan Brotherhood captain or whatever his rank was.

Q.  When?

A.  When we was in the cell when he said, Do you know who the fuck I am.  I said, no, you -- I'm not -- I'm not gonna -- I'm going to invoke my fifth amendment right on that -- that question.

Q.  Okay.  And when -- and you -- did you point the taser at his head when he was in the D space?

A.  When I was trying to control the inmate the taser was everywhere.  If it pointed at his head, it wasn't intentionally.

Q.  Okay, alright.

(Video played.)

Q.   When you say, Do you know who I am, you're about to find out Mother F-er, what did you mean by that statement?

A.   Didn't mean anything, just upset.

Q.   You were just upset?  Do you usually talk to inmates like that?

A.   Sometimes I -- like I say, it was unprofessional, I do agree with that; but sometimes they could get under your skin.

Q.   And are you familiar with the policy about conduct unbecoming of an officer in the Polk County Jail policies and procedures handbook?

A.   I know it's there, I can't verbate [sic] it from ya.

Q.   Do you think any of your conduct in the video we just watched was conduct unbecoming?

A.   Self-reflecting over the years, several thangs that I could have did different in that -- that day.

Q.   So you agree some of it was unbecoming?

A.   Several things I could have did different that day, self-reflecting.

Q.   You think any of your conduct that day violated the policies and procedures of Polk County Jail?

A.   No, sir.

Q.   Nothing you did was -- violated policies and

William Jerry

procedures?

                    MR. BOZEMAN:  Objection.  Form.

    A.  I think I answered this, sir.

    Q.  You said no.  None of your conduct violated policies and procedures?

    A.  Maybe my language.

    Q.  But as far as how you physically handled that inmate that was by the book?

    A.  I wouldn't say it was by the book, but -- I wouldn't say it was by the book.  Like I said, self-reflecting it's several thangs I could have did different.

    Q.  Okay.

    A.  It's looking back over the years I could have did thangs different.  I do agree to that.

    Q.  Okay.

                        (Video played.)

    Q.  Can you tell me what you said right there?

    A.  I'm going to invoke my fifth amendment right on that one.

    Q.  Do you agree that you're using threatening language with inmate Richards right there?

                    MR. BOZEMAN:  Objection.  Form.

    A.  I answered, sir.

    Q.  Sir?



A.  I'm going to invoke my fifth amendment right to that question.

(Video played.)

Q.  Alright, when you say you're fixing to find out. What -- what is -- what is he fixing to find out?

A.  Nothing.  He's -- he's talking trash to me and I'm just talking trash back.

Q.  What did he say?

A.  He said something, I couldn't hear what he said.

Q.  I didn't hear what he said either.  I don't know if he was saying anything.  It looks like he's pretty scared.

                    MR. BOZEMAN:  Objection.  Form.

Q.  I mean, you're -- and you're a jail lieutenant at this time, correct?

A.  Yes, sir.

Q.  How many officers do you have working under you?

A.  I don't recall the number, sir.

Q.  Guess?

A.  30 maybe.

Q.  30.  Was that the culture in the Polk County Jail to treat inmates like that?

A.  No, sir.

                    MR. BOZEMAN:  Objection.  Form.

A.  No, sir.  And like I say, I'll answer it once



again.  Looking back, self-reflecting, there's several thangs I could have did different that day.

Q.  So this -- so this incident is not reflective of the culture at the Polk County Jail?

MR. BOZEMAN:  Objection.  Form.

A.  No, sir, it's not.

Q.  Okay.  Would you agree you -- you went a little too far?

MR. BOZEMAN:  Objection.  Form.

A.  Like I say, sir, looking back I could have did several thangs different that day.

Q.  I understand, you've said that several times. You know, I --

A.  Yes, sir.

Q.  -- look I don't disagree with you, but you can't just answer all my questions like that.  I need to ask my questions.  And we don't have much longer today and -- you know, this is kind of the last part of the deposition, so I just want to get through this video and a few other things and then we'll be done.  Alright?

So I appreciate your cooperation and you have been very cooperative, but I hope you think I've been respective of you.

A.  Sir, well, like I say pertaining to that I'm going to invoke my fifth amendment right because I still



have a call over my head, so...

Q.  I understand.

(Video played.)

A.  Around 104 to 106 in the video is it okay to -- to grab a inmate by the hair and throw him through a doorway?

MR. BOZEMAN:  Objection.  Form.

A.  I did grab him by the hair.

Q.  You don't -- you don't think you grabbed him by the hair right there?

A.  I never touched his head.

Q.  Okay.  Did you shove him?

A.  I never touched his head.

Q.  Did you shove him?

A.  Grabbed him and pulled him along that way.

Q.  Okay.  And were you -- were you wearing a body cam video at the time?

A.  No, sir, I was never required to wear a body cam video.

Q.  Why is that?

A.  Because I didn't -- I didn't never.  I didn't never wear one.

Q.  Are other jailers required to wear a body cam video?

A.  Yes, sir.



Q.   Is it -- are you saying it's policy that the lieutenant was not required to wear a body cam?

A.   I wasn't required at the time to wear a body cam.

Q.   Okay, I'm -- I'm asking why?

A.   It just wasn't required.  It wasn't ever required of me.  Like I say, man...

Q.   I'm asking you -- you're -- I know what you're telling me that it wasn't required of you, I want to know is that because you were a lieutenant or for some other reason?

A.   It just never was required, sir.

Q.   So you -- you -- not because of your rank?

A.   I don't think so, it just never was required.

Q.   So you never -- I -- you didn't wear a body camera?

A.   No, sir, I didn't.

Q.   Okay.

A.   I didn't have to wear a uniform.

Q.   Okay.  Did other -- were other jailers required to wear a body camera?

A.   Yes, sir.

Q.   Okay.  Sergeants?

A.   Every -- I wasn't required, sir.  I think I done answered the question.  I'm not --

Q.   I'm asking -- I'm just needing to know -- I'm not

trying -- I just need to know why?

A.  I don't know.

Q.  Okay.

A.  It was never --

Q.  Okay.

A.  Okay.

Q.  I mean does the policy require you to wear a body camera if you're interacting with an inmate like that?

A.  I don't recall.

MR. BOZEMAN:  Objection.  Form.

A.  I don't recall, sir.

Q.  Okay.  Then you're familiar with the policies and procedures of the Polk County Sheriff's Office, correct?

A.  I used to be.

Q.  You used to be, okay.  I mean as part of being an officer for the Polk County Sheriff's Office you're expected to know and abide by the policies and procedures, correct?

A.  Yes.

Q.  Okay.  So you're not pleading ignorance to the policies and procedures of the Polk County Sheriff's Office?

A.  Yes.

Q.  Okay.

A.  I'm -- I'm not.



MR. FULGHAM:  Ma'am, what exhibit are we on?

THE COURT REPORTER:  H -- last one G, H.

BY MR. FULGHAM:

Q.  Alright, I'm handing you, sir, this is a -- this is the Policies and Procedures Polk County Sheriff's Office Body Worn Cameras.  I'm admitting this as Exhibit H.  And I'm going to hand this to you.

(Exhibit H was marked for identification.)

Q.  If you look on the second page starting at E it says -- well, why don't we start at B.  It says:  Officers who are assigned body worn camera equipment must use the equipment unless otherwise authorized by supervisory personnel.  Are you saying you were never assigned a body worn camera?

A.  I wasn't.

Q.  Never?

A.  No.

Q.  The entire time you were in the jail?

MR. BOZEMAN:  Objection.  Form.

A.  I wasn't assigned a camera.

Q.  But you had a camera when you were on patrol, correct?

A.  Yes.

Q.  So are you saying that once you switched from patrol to the jail that you never had a camera after that?

A.  I'm saying -- when I was in transport I did.

Q.  When you were transport you had a body worn camera?

A.  Yes.

Q.  So when did -- when did you -- when were you no longer assigned a body worn camera?

A.  When I made lieutenant.

Q.  Okay.  And did you turn in your body worn camera?

A.  For -- for -- for the transport?

Q.  Well, yeah, because you're telling I don't even have a body worn camera.  I'm asking when you turned it in?

A.  I was never assigned one when I got promoted.

Q.  To lieutenant?  So the one you had at transport you --

A.  It passed on to next --

Q.  Okay.

A.  -- person.

Q.  Alright I got it.  And, sir, I'm not -- I'm just trying to, you know, learn.  I don't know, so I appreciate it.  But you agree with the Section E:  Officers will ensure that the recording equipment is turned on, properly positioned, and adjusted to record events during their

tour of duty.  Officer will carry and activate a wireless microphone upon their person.

THE COURT REPORTER:  Slow down a little.

MR. FULGHAM:  Sorry.

BY MR. FULGHAM:

Q.  Officer will audio/video record the following. All enforcement contacts such as arrests, detentions, vehicular and pedestrian stops, field interviews or [sic] suspicious or other persons.  Non-enforcement contact should they become confrontational, assaultive or otherwise enforcement oriented.  And then I'm going to skip down to five:  Other events when the recording could have value as evidence to limit liability or to resolve citizen complaints.

So I guess you're telling me you just never had a body camera when you were a lieutenant?

A   I didn't.

Q.  Okay.

A.  And I --

Q.  But if you had, had a body camera you would agree that in this situation you would have turned it on?

A.  Absolutely.

Q.  Okay.

A.  And this -- this -- this policy right here refer mostly to the patrol aspect.



William Jerry

Q.  Yeah, I understand that; but obviously there's a -- you know, their stuff -- their's is not as many but a lot of jailers, most jailers including Polk County they have body worn cameras, too.

A.  Yes.  But this right here is mostly refer to patrol --

Q.  Gotcha.

A.  -- activity.  And I also noted I never signed for policy and procedure for when Sheriff Lyons took office.

Q.  You never signed --

A.  For policy and procedure.  And he did not do a addacked [sic] policy and procedures to Kenneth Hammack when he took office.

Q.  He did or did not?

A.  He didn't.

Q.  So he didn't change the policies and procedures?

A.  He did -- he did come out with his policy and procedure, I never signed the policy and procedure for -- for Sheriff Lyons.  And he did do an adapted policy and procedures of Kenneth Hammack when he took office.  So what I'm saying he never issued us policy and procedures.

Q.  So he just used the same policies and procedures in place?

A.  He -- he didn't adopt -- he didn't adopt it.  If you're going to use the same policy and procedures when

you take office, you must adopt it.  You know, you -- I'm going to adopt Kenneth Hammack policy and procedure until my policy and procedures come in place.

Q.  Okay.

A.  And he never got us to sign for that.  So I never signed for policy and procedures under Sheriff Hammack.

Q.  You mean under Sheriff Lyons?

A.  Under Sheriff Lyons.

Q.  Okay.  Let me play a little bit more of this video.

(Video played.)

Q.  So you took Mr. Richards to a sep -- separation.  Is that right?

A.  Yes.

Q.  And that was Cell 286?

A.  Yes, sir.

Q.  And why -- what was the purpose of taking him to a separation cell?

A.  Trying to de-escalate the situation.

Q.  Okay, trying to de-escalate the situation?

A.  Um-hmm.

Q.  Why did you go into the cell with Mr. Richards?

A.  Just --

MR. BOZEMAN:  Objection.  Form.

A.  -- I'm going to invoke my fifth amendment right

on that one.

Q.  You're invoking your fifth amendment right?

A.  Yes, sir.

Q.  On as to why you went in the cell with him?

A.  Yeah.

MR. BOZEMAN:  Objection.  Form.

Q.  You said, Give us some privacy.  Is that correct?

A.  Yes, I did.

Q.  Okay.  Why did you need privacy with Mr. Richards?

A.  Just telling everybody to get back to work.  You know, and like I say in that environment it's different. When  you separating sometimes, you know, it -- it can change the whole situation.

Q.  Well, is it -- but you said, Give me some privacy and you went inside the cell with Mr. Richards, correct?

A.  I did step in to talk to him, yes, I did.

Q.  How long were you in there with him?

A.  I was no longer then ten minutes.

Q.  Ten minutes?

A.  I said no longer then ten minutes.  I don't know the exact time, but I wasn't in there long.

Q.  And did you -- were you physical with him while you were in there?

A.  No, sir.

888-893-3767
www.lexitaslegal.com



Q.   Y'all didn't touch at all while you were in there?

A.   No, sir.

Q.   So y'all were just having a conversation?

A.   I was talking to him like saying, Hey, what is your problem, man, it's 8:00 o'clock in the morning? What -- what is your problem?  What is your deal?  And he responded to me, I'm trying to bless your morning.

Q.   If you're just trying to get the people to go back to work, what -- I don't understand how -- why wouldn't you just say, Already, everybody, go back to work?  Was is -- because that's a lot different that saying I need some privacy with this inmate in this cell.

MR. BOZEMAN:  Objection.  Form.

A.   Like I say, looking back it's a lot of things I could have did different, a lot of things I could have said different.

Q.   Do you agree there was any need to go in the cell with him?

MR. BOZEMAN:  Objection.  Form.

A.   Just trying to find out what -- what was his problem that morning.  That's it.  I didn't -- I didn't beat him up, I didn't touch him, just trying to find what his malfunction was.

Q.   So -- now I gotta find my stuff.

LEXITAS

Why don't we look at the -- the letter, your termination letter.  I'm just going to ask you a few questions and this is -- you have exhibit number.  What does that say on the front, Mr. Jerry?

A.  Exhibit E.

Q.  Exhibit E, okay.  We're looking at Exhibit E, I want to go to the second paragraph -- the second from the bottom that starts with I watched the bottom cam -- camera video.

A.  Um-hmm.

Q.  I'm going to start reading from here and I'm going to ask you a few questions about these next few paragraphs, okay.  I watched the body camera video from jailers Cronin, Guidry and Campbell which showed Lieutenant Jerry along with several jailers enter the dorm room with Lieutenant William Jerry grabbing inmate Michael Richards by the back of the neck and take him into the D space between the two doors.  Do you agree that, that -- what that sentence says that I just read?

A.  I did not grab him by the back of the neck.

Q.  Okay.  But you agree with what I just read I read that just like it's written, correct?

A.  Yes.

Q.  But you're saying you disagree that you grabbed him by the back of the neck?



A.   I didn't grab him by the back of the neck.

Q.   Where did you grab him?

A.   I grabbed his uniform.

Q.   Okay.  But otherwise you -- is there anything in that sentence that's incorrect?

A.   I grabbed his uniform.

Q.   Okay.  Other than that, I mean, is there anything wrong with that statement?

A.   No, sir.

Q.   Okay.  Lieutenant Jerry then physically manhandled inmate Richards to the extent of slamming him into the wall two times, placing his forearm into inmate Richards neck and placing a taser to the head of inmate Richards.  I read that correctly, right?

A.   Yes, you did.

Q.   Okay.  And you -- you deny slamming him into the wall two times?

A.   I used the force necessary to remove the inmate from the cell.

Q.   But you deny slamming him into the wall two times?

A.   Like I said I answered the question, sir.

Q.   Well the question is:  Do you agree with the statement that you slammed him into the wall two times, not I know your statement that you used the minimum force

necessary.  That doesn't answer the question.  It's a yes or no question.  Do you agree that you slammed him into wall two times?

A.  No, I didn't slam him into the wall.  I used the force nes -- necessary -- minimum force necessary to gain compliance of the inmate to remove him from the cell.

Q.  So you do not disagree with that statement?

A.  I didn't slam him against the call and I didn't point the taser at his head.  In -- in the process of me controlling the inmate with the taser in my hand, I -- it probably pointed at his head but I didn't directly point the taser --

Q.  Okay.

A.  -- to -- to his head.

Q.  I want to be clear on the slamming him into the wall two times.  Are you saying that you did or you did not slam him into the wall two times?

A.  Sir, I've answered that.  I didn't slam him against the wall.  I used the force necessary to control him.

Q.  Okay.  At no time during this video was inmate Richards aggressive.  Do you agree with that?

A.  I -- I agree with that, yes.

Q.  This action all began from inmate Richards flipping Lieutenant Jerry the finger which is not just

cause for use of force.  Do you agree with that?

A.  This cause for a use of force when he violated a directive.  I told him he was moving.

Q.  Okay.  But you agree that just alone flipping someone the finger is not just cause for using force?

A.  The just cause for the use of force was I gave him a directive, he didn't follow the directive, and I used the minimum force necessary to remove the inmate from that environment.

Q.  Okay.  But let's say if he had just flipped you off and you had not told him to pack his things, him alone just flipping you off would not have justified the use of force?

A.  Looking back I would have did thangs different, sir.

Q.  Okay.

A.  And doing thangs different I -- we wouldn't be here today.

Q.  No, I understand that.  But you would agree that -- and I'm not talking -- if he had just flipped you off, that alone would not have been just cause for you to go in there and do what you did, correct?

                    MR. BOZEMAN:  Objection.  Form.

A.  Me going in, sir, was not by him flipping me off for --

888-893-3767
www.lexitaslegal.com



Q.  I know that.

A.  -- me going in was he didn't follow the directive.

Q.  Okay, I know but I'm -- as far as -- so it sounds like you don't disagree that statement that -- because if he had just -- if it's just about him flipping you off, you would agree then that it would not have been just cause for the use of force?

A.  Sir, I think I done answered it, sir, and I'm --

Q.  Okay.

A.  -- you know.  I think you're trying to --

Q.  Lieutenant Jerry then physically moved inmate Richards from the D space down the hallway towards the booking area.  During this time Lieutenant Jerry is telling inmate Richards that he is going to put these hands on you.  Do you disagree with that?

A.  I was talking trash.  I don't recall what I said. I was talking trash.

Q.  So you don't disagree that you told him that you were going to put these hands on you?

A.  Like I said I don't call -- recall exactly what I said, but I was talking trash.

Q.  So you could have said that?

A.  I don't recall exactly what I said, I was talking trash, I don't recall what I said, sir.



Q.  You don't recall what you said to him?

MR. BOZEMAN:  Objection.  Form.

Q.  Once they arrived in the booking area, inmate Richards was placed in a tank 286 with Lieutenant Jerry going inside with him.  Lieutenant Jerry turned around and told the officers give us some privacy and closed the door behind him with just him and the inmate in this cell.  You don't disagree with that do you?

A.  No, I don't.

Q.  Okay.  And that -- this cell does not have a camera and Lieutenant Jerry was not wearing a body camera.  You don't disagree with that do you?

A.  I wasn't wearing a body camera, no, I wasn't.

Q.  And that cell doesn't have a camera in it?

A.  I don't recall, sir.

Q.  Several of the officers stated they could hear Lieutenant Jerry and the inmate hollering from inside the cell.  Do you -- were y'all hollering in the cell?

A.  He was hollering at me, I was hollering back at him.

Q.  Okay, so y'all were hollering in the cell?

A.  At each and all ore.

Q.  Okay.  Both jailers Cronin and Goins -- is it Goins?

A.  Yes.



Q.   Gave statements that they saw Lieutenant Jerry physically assault inmate Richards through the small window in Tank 286.  So you deny that?

A.   I say that's a lie.

Q.   That's a lie.  You say that's a lie?  So jailers Cronin and Goins lied about what they saw?

A.   I say that's a lie.

Q.   Okay.  A short time later Lieutenant Jerry exited the cell with the inmate walking behind him and Lieutenant Jerry turned around and shoved the inmate back in the cell.  Did that happen?

A.   I don't recall that, sir.

Q.   Okay.  And then you say you refused to sign the first part and you said -- so what did you sign -- okay, you signed, you did not agree with the findings, correct, and that's where you signed?

A.   Yes, sir.

Q.   And you refused to give a statement, correct?

A.   Yes, he -- he offered me the opportunity to gave a statement under the garrity warning and I told him, no, I wasn't giving no statements.

THE COURT REPORTER:  Under the what?

THE DEPONENT:  Garrity, it's a --

THE COURT REPORTER:  Guarantee?

MR. FULGHAM:  Garrity warning, it's

g-a-r-i-t-y [sic] warning.

THE COURT REPORTER:  Thank you.

BY MR. FULGHAM:

Q.  Is that correct?

A.  Yeah, he offered.

Q.  So you -- you did sign a garrity warning.  Is that right?

A.  No, I didn't.

Q.  Okay.

A.  But he -- he offered to give me -- to provide a statement under that.

MR. FULGHAM:  We're on Exhibit I?

THE COURT REPORTER:  I, yes.

(Exhibit I was marked for identification.)

BY MR. FULGHAM:

Q.  Have you seen this document, Mr. Jerry?

MR. FULGHAM:  And I'm admitting as Exhibit I it's a document entitled Garrity Warning. Appears to be signed by Mr. Jerry on March 2nd, 2021.

Q.  I think you had said you did not sign a garrity warning?

A.  I know he presented it, I -- obviously I signed it.  I see that now.

Q.  Okay.

William Jerry

A.   So I know it was brought up from my recollection.

Q.   Okay.  So you did see a garrity warning it looks like you -- now that you've seen this document that you did sign it?

A.   Yes, I signed it.  That is my signature.

Q.   Okay.

A.   But I knew -- I knew it came up in the talking.

Q.   And I'm just going to read the top part of this and it says:  As a condition of employment, you're being ordered to answer our questions as part of an official investigation of the department.  The questions will be specifically directed and narrowly related to the performance of your official duties.  Do you agree that's what the top paragraph says?

A.   Yes.

Q.   And it says:  The information or evidence you provide cannot be used against you in any criminal proceeding.  However, your statement may be used against you if a subsequent administrative action is commenced.  Do you agree with that?

A.   Yes.

Q.   If you refuse to answer our questions, you will be subject to the disciplinary action which could include job termination.  Do you understand?

A.   Yes.



Q.   And you put your initials and you signed?

A.   That is my initial and I did sign.

Q.   And did they try -- did they ask you questions?

A.   No.

Q.   But they asked you -- you were offered an opportunity to provide a statement and you did not do that, correct?

A.   Yes.

Q.   And I guess can you just tell me why you didn't want to provide a written statement?

A.   Because I didn't -- they didn't tell me what was going on.  They just say, Hey, we conducting an investigation, and then when I didn't -- did sign this, they placed me on suspension, took my stuff, sent me home.

Q.   Well, you did -- you received this termination letter, correct, that we just went through?

A.   Yes.

Q.   And you've told me in this deposition that you disagreed with a lot of the information in here, correct?

A.   Yes.

Q.   You know, and just -- we had spoken earlier about the policy violations that were cited and you said you didn't think your conduct violated those policy sections, and we talked, you know, what sheriff -- excuse me -- Chief Deputy Childers wrote about what he saw in the video



and what the other jailers Cronin and Goins stated they saw, and you disagreed with some of that, correct?

A.  I do.

Q.  I guess my question is then:  Why -- why didn't you want to provide a statement to -- to at least say that you disagreed with it and give your own version of events?

A.  Because they never told me -- he told me what was going on.

Q.  Wasn't it pretty clear from this letter that -- that you were being terminated?

A.  I'm talking about the -- when the -- when the investigation first kicked off when the -- when the rangers was there that day.  When he called me up there, he never told me what was going on.  He said you was understand an investigation.

Q.  Okay.  Well, you knew what you were under investigation for.

A.  About the incident, yes.

Q.  Okay.  So I mean --

A.  I found out later what was going on.

Q.  What, that they were investigating you?

A.  For saying that I -- I beat up Mr. Richards.

Q.  Um-hmm.  So they told you about the investigation and then later you got this letter saying you're terminated after the investigation.  Is that right?

A.  After the investigation.

Q.  Okay.  But you still didn't want to give a statement after that?

A.  No, sir, I wasn't giving no statement.

Q.  Okay.

MR. FULGHAM:  Why don't we take a short break and --

We can go off the record.

THE VIDEOGRAPHER:  Off the record at 1:59 p.m.

(A short recess was taken.)

THE VIDEOGRAPHER:  Back on the record on File 4 at 2:15 p.m.

BY MR. FULGHAM:

Q.  Alright, Mr. Jerry, I want to go back to your complaint you filed against Polk County and Polk County Sheriff's Office.  I guess, could you just tell me in -- in your words what your complaint is against Polk County and the Polk County Sheriff's Office?

A.  My complaint is that them officers lied on me and it cost me my job.

Q.  Okay.

A.  And they didn't -- they didn't give me due process of law.  Because when the complaint thang came down on the 21st, by the 24th I was fired.  I was fired

within three days and the investigation wasn't even completed.

Q.  But, sir, weren't you fired on March 2nd?

A.  If that's -- if that's what they dated, but I'm telling you that after -- I don't recall the date, but like I say, the officers lied on me, number one, Wyatt Cronin and Mr. -- what's his name -- Michael Goins.

Q.  You say Cronin and Goins?

A.  Yes.

Q.  Okay.  Well you understand you filed your complaint under Title 42 Section 1981 which is -- deals with racial discrimination.  Do you feel like -- you tell me, do you feel like your race played a role in your termination?

A.  Well, they -- they had some of my white counterparts do worse, worse than that, and they haven't been subjected to this type of treatment.

Q.  So just to be clear, you're saying you have white officers who've done worse than what you did and they were not fired, and that's the basis for your claim that you were -- that race played a role in your termination?

A.  Yes.

Q.  Okay.  And who specifically -- well, you name Polk County and Polk County Sheriff's Office so, I just want to know who is -- who -- who's the one that you

William Jerry

believe is discriminating you based on -- on race?

A.  I'm going to say the sheriff is.  He's the ultimate person in charge, he's the hierarchy.

Q.  You mean Sheriff Lyons?

A.  Yes, sir.

Q.  So your testimony is that Sheriff Lyons was discriminating against you based on race?

A.  Him and his chief deputy.

Q.  Okay.  Because you're -- because you're an African American?

A.  I believe so.

Q.  Okay.  And you'd agree with me that Sheriff Lyons is also an African American, correct?

A.  He is.

Q.  Okay.  And you think he despite also being African American is -- racially discriminates against his employees?

A.  I don't know about his employees but I know against me he did.

Q.  Okay.  So you think race played a role in his decision to uphold your termination?

A.  Yes.

Q.  Okay.  What evidence do you have of that?

MR. BOZEMAN:  Objection.  Form.

A.  He had another employee has an inmate handcuffed



to the bed, knocked him out cold.

Q. Who?

A. Who what?

Q. You said he had another employee, who was that other employee?

A. Kade Burman.

Q. Spell that?

A. K-a-d-e, B-u-r-m-a-n.

Q. And tell me what you said Kade Burman did?

A. Knocked an inmate out cold that was handcuffed to the bed, to a hospital bed.

Q. Do you know about when this occurred?

A. No, they got it. I don't recall when he record that --

Q. What was Kade -- okay, so Kade Burman was -- worked for the sheriff's office at the time of this incident?

A. Yes, sir.

Q. Okay. What was his title?

A. Deputy.

Q. And he was with an inmate at the hospital?

A. Yes, sir.

Q. Okay. And you're telling me that Kade Burman knocked an inmate out in a hop -- on a hospital bed?

A. Yes.



Q.  Okay.  And what happened to Mr. Burman?

A.  He ain't been subjected to this type of treatment.

Q.  Was he terminated?

A.  No.

Q.  Well, what happened to him, anything that you know of?

A.  Nothing.

Q.  Okay.  But was this investigated?

A.  I can't recall but I know ain't -- ain't nothing happened.  He wasn't subjected to this type of behavior.

Q.  Well, how -- how did you learn about the situation with Mr. Burman?

A.  I learned about it, sir.

Q.  Do you know how?

A.  I was told and I'm not going to elaborate on who told me but I was told.  It's on record, though.

Q.  Okay.  Well -- well, I mean, I agree that sounds like it's -- you know, if it's -- I know nothing about this incident but, you know a patrol deputy knocked out an inmate who was handcuffed to a bed, you know, we don't -- obviously, I don't know all the circumstances around this. But do you know -- do you know if he was disciplined or if this was investigated?

A.  He wasn't subjected to this treatment, sir.



Q.  I understand.

A.  He wasn't subjected to being investigated by the Texas Rangers, he wasn't terminated for this incident.

Q.  Do you know when this happened?

A.  Sir, I -- no, I don't but I know it happened, sir, I'm telling you it happened.

Q.  Did it happen while Sheriff Lyons --

A.  Sheriff.

Q.  -- sheriff?

A.  Yes, sir.

Q.  Okay.  So I guess I just want to be clear you're saying because -- is there any -- any other incidents that support your allegation that you are being discriminated against based on your race?  Is there -- I know you talked about this situation with Mr. Burman, anything else?

A.  Well, they had an employee who was notorious for tasing people and they knew about it, and at his retirement party they give him a golden taser plaque.

Q.  Who -- who was this gentleman?

A.  It's his current chief deputy now Andy Lowery.

Q.  Andy Lowery?

A.  Um-hmm.

Q.  You said he retired, did he come back?

A.  He came -- he retired and he came back.

Q.  How do you spell his name?



A.   Andy, L-o-w-r-i-e [sic].

Q.   And I'm guessing Kade Burman and Andy Lowery are both white?

A.   Yes.

Q.   Anyone -- anyone else?

A.   Well we not Gary Childers, Rickie Childers son.

Q.   What did he do?

A.   He assaulted two people with a taser and wasn't subjected to this type of behavior that I have been subjected to over the last four years.

Q.   Okay.  Well, what -- what happened?  Was he investigated or --

A.   On the first incident he tased another deputy, they was playing with the taser -- taser.  He tased another deputy, injured him that deputy.

Q.   Okay.

A.   And the deputy that was injured, he don't work there anymore.  His last name was McCrakey (phonetic).  And from my understanding it was reported to Chief Deputy Childers and he did nothing because it was his son.

Q.   So I just want to make sure I understand your complaint correctly.  You're not saying that you didn't do anything wrong, you're saying I wasn't treated the same as other white officers who also did things and I'm being treated, discriminated against -- strike that, that's a

William Jerry

poor question.

A.   And don't forgot about his second incident -- Mr. Childer's son's second incident.

Q.   Okay.  Yeah, tell me about that.

A.   Yeah, where he tased another employee with a taser who suffered injures and it wasn't investigated by the Texas Ranger, it was kept in house.

Q.   Okay.  Okay.  And all this happened, you say, under Sheriff Lyons?

A.   Yes, sir.

Q.   And all this happened before you were let go?

A.   I think one happened -- I can't recall when it happened but I know it happened, sir.  And none of them employees has been subject to what I've been subject to.

Q.   But some of them were investigated, you don't -- you don't really know the full extent of what happened with all these guys?

A.   I know it wasn't investigated by the Texas Rangers like they did me.  When -- when my incident happened they immediately called the Texas Ranger.  When these things happened, they didn't do that.

Q.   Okay.

A.   And My Lowery, you know, he was notorious for tasing people and they knew about it, and at his retirement they give him a golden taser plaque.



Q.  Okay.  So do you -- you don't think your actions your -- this incident with Mr. Richards, you don't think that was a sufficient basis to be terminated?

A.  Sir, them people lied on me.

Q.  You're -- you're saying --

A.  The two guys lied on me, man.

Q.  What -- what -- what part of their statement was a lie?

A.  The lie that they say they saw me assault that man.  I did not touch that man.  I didn't cause no harm to that man.

Q.  Are you talking about in the cell or the whole time?

A.  I'm talking about the whole time.  I ain't cause no injuries to that man.  I probably hurt his feelings.

Q.  But you did touch him.

A.  But I didn't cause no injuries to him.  I did not beat that man up.  They saying that I beat that man up.  I did not beat that man up, I didn't touch him.  To remove him from the cell, yes.

Q.  Okay.

A.  They lied on me, cost me my job.

Q.  And but you did -- you did say that there was things you would have done differently, correct?

A.  Self-reflecting, yes.



Q.  Okay.  And do -- you don't agree that the actions and what's seen in that video you don't think that's a sufficient basis for your termination?

A.  I don't know how they come up with the decisions, but I know them guys lied on me, man.

Q.  I'm not even talking about what they said, I'm talking about what -- what we can see that happened on the video.  You don't think -- I just want to know do you -- it's -- I want to know why -- you're obviously are upset about the fact that you were terminated.

In your complaint you talk about there being a racial element to that, I want -- I want to break down, are you saying that you did nothing wrong and you're only being targeted because of your race.  Is that what you're saying?

A.  No, sir, I'm saying I wasn't fairly treated based on them guys doing a worse thing and they -- they ain't been subjected to half of what I been subjected to.

Q.  And that was by -- by Sheriff Lyons, correct?

A.  All that stuff happened under Sheriff Lyons and he knew about it and he did nothing to them.  He didn't even hear me out, man, on my -- on my appeal.  Gave me five minutes of his time.

Q.  And just to be clear, Sheriff Lyons had just weeks -- well, yeah, one month before he had agreed to

promote you to jail captain, correct?

A.  Yes.

Q.  But then you're saying a month later he's all of a sudden a racist and he wants to ruin your career?

A.  He has ruined my career, sir.

Q.  Well --

A.  He has ruined my career.

Q.  -- I understand that's what you think.  My question is:  This man was getting ready to promote you to jail captain, correct --

A.  Yes.

Q.  -- Sheriff Lyons?   And then we have this incident that happens and you get terminated, and you're saying your termination, part of the reason for your termination was he was racially discriminating against you, correct?

A.  Yes.

Q.  My question is:  So he was promoting you to jail captain at the same time, so --

MR. BOZEMAN:  Objection.  Form.

Q.  -- you're not seeing how that is a little bit confusing as to why someone who's treating you unfairly based on race to fire you as -- also at the same time trying to promote you?

MR. BOZEMAN:  Objection.  Form.

Q.   I guess help me understand that.

A.   Sir, all I could say to that I was lied on, guys did worser then what they're alleging I did, which I didn't do, I didn't beat the guy up, and he haven't subjected them to what he subjected me to.  I can't -- I can't get a job.

Q.   Sir, I guess what I'm try to wrap my head around, and I'm sure the jury is going to wonder is:  When did -- when did Sheriff Lyons all of a sudden become racist towards you because he was in the process of promoting you to the third highest ranking position in this office and then he just all of a sudden says, No, I want to ruin this man's career?

MR. BOZEMAN:  Objection.  Form.

Q.   Is that your position?

MR. BOZEMAN:  Objection.  Form.

A.   My position is he listened to those lies and never gave me a chance to -- not going to go into that, but he listened to the lies.

Q.   And what about what's on the video?

MR. BOZEMAN:  Objection.  Form.

A.   Sir, I answered that.

THE COURT REPORTER:  What was your answer?

THE DEPONENT:  I just said I answered



that about the video, ma'am.

THE COURT REPORTER:  Okay.

BY MR. FULGHAM:

Q.  So even setting apart what you're calling the lies, the statements of jailers Cronin and Goins, just off what we saw in the video, you wouldn't think that, that is enough to terminate you while just standing alone?  I'm not -- I'm saying without the lies, just the video itself, you're -- is it your position that is an insufficient basis for your termination?

A.  Them other officers I named, sir, did worse than what I did.

Q.  That's -- you've got to answer my question, sir.

MR. FULGHAM:  I'm going to object as nonresponsive.

Q.  Do you think your actions, just the actions on the video, not talking about what happened or didn't happen in the cell, is it your position that those actions as seen on the video are insufficient for your termination -- as a basis for your determination?

MR. BOZEMAN:  Objection.  Form.

A.  I don't think I should have been terminated, sir. So that -- to answer your question, I say I shouldn't have been terminated.

Q.  Okay.  And do you think that race must have had

something to do with it, correct?

MR. BOZEMAN:  Objection.  Form.

Q.  I mean I'm just going from your complaint. You're say -- you're accusing -- you're saying race -- racial discrimination was the basis for your termination. I'm just trying to understand that, sir.  Are you say that your race played a role in your termination?

A.  Yes, it did because my white counterparts had did worse and he haven't took actions that he have taken against me.  So I'm answering the question.

Q.  And that's your -- that's the evidence of -- of the fact that you're discriminated against because other people who had done wrong they didn't get in as much -- they didn't get terminated for what they did?

MR. BOZEMAN:  Objection.  Form.

A.  Yes, that's what I'm saying, sir.

Q.  Do you have any other evidence that Sheriff Lyons is -- has a racial -- he has a racial discrimination -- he's -- he's discriminatory against African-American employees of his?

MR. BOZEMAN:  Objection.  Form.

A.  I -- I don't know, sir.

Q.  Okay, I'm asking you:  Other than what you've already told me that there was white officers who did things that you consider worse than what you did and they

were not terminated, do you have any other evidence that Sheriff Lyons discriminates against his employees, his African-American employees other than that?

MR. BOZEMAN:  Objection.  Form.

A.  I don't -- like I said, the answer, sir, I don't know what you're asking me.

Q.  Okay.  You don't understand my question.  My question is:  We just sat here and talked about, Oh, these -- these -- you just went through a list of I think three or four guys, said they did this and they didn't get terminated.  He did this, he didn't get terminated.  He did this, he didn't get terminated, and you consider what those guys did worse than what you did, correct?

A.  Yes.

Q.  Okay.  Other than those things we just talked about, do you have any other evidence that Sheriff Lyons is racially discriminate towards his African-American employees?

A.  Not -- no, I don't.  No, I don't.  If that --

Q.  And you've known Sheriff Lyons for a long time, correct?

A.  Yes, I have.

Q.  How long?

A.  Every since I've been there.

Q.  For -- you were terminated in 2021, correct?

A.  Yes, sir.

Q.  And you started there in 2004?

A.  Yes, sir.

Q.  You knew him for 17 years?

A.  Yes, sir.

Q.  And he's an African-American like you, correct?

A.  Um-hmm.

Q.  Did he ever do anything racist towards you during those 17 years?

MR. BOZEMAN:  Objection.  Form.

A.  No.

Q.  No, any -- you can't think of one thing?

A.  I know he didn't treat me fair in this incident.

Q.  Okay.  But in the 17 years before that he didn't do anything racist towards you, correct?

MR. BOZEMAN:  Objection.  Form.

A.  No.

Q.  Okay.  And he just all of a sudden became racist after you had this incident with Mr. Richards and just decided to ruin your career because you're a black man?

MR. BOZEMAN:  Objection.  Form.

A.  I'm saying he didn't treat me fair, sir.  I'm not saying -- I'm not calling him a racist, I'm not calling him anything, I'm just saying he didn't treat me fair, sir.

William Jerry

Q. He didn't -- do you think he didn't treat -- why do you think he didn't treat you fair?

A. He didn't listen to me --

MR. BOZEMAN:  Objection.  Form.

A. -- he listened to lies, sir.

Q. Not -- not because you're black.

MR. BOZEMAN:  Objection.  Form.

A. He didn't take action on them guys and it happened under his watch.

Q. So you think once he became sheriff he was just like, I'm gonna -- you know what, I don't like my African-American employees, I'm going to treat them different from my white employees?

MR. BOZEMAN:  Objection.  Form.

Q. I'm just trying to follow, sir.

A. Can I tell you of another instance or no?

Q. Yes.  You're talking about another incidence of --

A. With Sheriff Lyons.

Q. Of who?

A. With Sheriff Lyons.

Q. Yes.  Are you talking about an incident of him treating someone else differently?

A. With treating me unfairly.

Q. Yes.

888-893-3767
www.lexitaslegal.com



A.  He called a meeting one morning to announce his administration staff, so we go in, he announce his chief deputy, he announce the new patrol lieutenant.  He offered me the lieutenant spot over patrol, and he announced the command staff, his command staff.  Well, after the meeting several of the deputies went and complained to him about me being the new patrol lieutenant.

He called me, he said, Look, man, you could -- I got some complaints, you can either come up here and be the patrol lieutenant or you can stay down there and be the captain.  So I just say, You know what, I'll just stay in the jail, man, cause they -- they already complaining to you about me.  But he -- he -- I was part of his administration, but when they went complained to him, you know...

Q.  Well, so what you're telling me is somebody was complaining about you being patrol lieutenant to Sheriff Lyons --

A.  Um-hmm.

Q.  -- and then he told you, he said, Hey, I've got some complaints so you can either be the captain or you can be patrol lieutenant.  He gave you the option?

A.  He, he put it out there.

Q.  Well, I don't think that's -- I would think that's being nice to you, he's offering you --



A.  No, that's not being nice, just stand on your word.  You called the meeting, you -- you said that this was going to happen --

Q.  Okay.

A.  -- you said this was going to happen, a group of people don't like what you said but you're the hierarchy, you don't like what you said -- a group don't like what you said, so you going to try to change it.  Stand on your word.  You called the meeting, you said this the way it was going to be, stand on that.

Q.  Okay.  But you -- and you think that was him being discriminatory towards you?

A.  I would say so.  I think it's relevant, yes, sir. Because you called this meeting, you the hierarchy, what you say goes.  It's like -- like a king.  So you said this and you get some backlash about it and then you -- you know, you crawfish backwards.

Q.  Okay.  But he did give you the option to either become captain or be patrol lieutenant, correct?

A.  He did.

Q.  Okay.  Who's -- what about Mickie Guidry?  Was he there that -- during this incident with Mr. Richards?

A.  Just --

THE COURT REPORTER:  Mickie Guidry and what?



MR. FULGHAM:  Mickie Guidry.  Do you want me to spell it for you?

THE COURT REPORTER:  No, no, the last part of it.

MR. FULGHAM:  Oh, I said was he present during this incident with Mr. Richards.

THE COURT REPORTER:  Thank you.

BY MR. FULGHAM:

Q.  And that's hi body cam video, he was standing right behind, correct?

A.  I believe -- yeah, that's his body cam.

Q.  Okay.  And you haven't mentioned him, you don't have any complaints about Officer Guidry?

A.  About what?

Q.  I'm just asking because we watched this video and I think he was involved in this investigation because he was standing right there.  You had mentioned these other guys Crowings -- Cronin and Goins, but you haven't mentioned Mr. Guidry.  I was wondering if you had any complaints about him?

A.  Sir, it was several people involved in -- in this investigation that it's continuing to this day from my knowledge.

Q.  But the ones that you -- you've -- are calling liars is Goins and Cronin?



William Jerry

A.  Absolutely.

Q.  Okay.  And -- but you're not calling anyone else a liar or are you?

A.  I don't know what they said, but I -- based on what them two said, I'm calling them liars.

Q.  Okay.  And you've never been disciplined for excessive use of force or assault on another inmate?

A.  At Polk County?

Q.  Yeah.

A.  No, sir.

Q.  Okay.  But there was some other one and I -- there was the Orange County -- was it the Orange County that there was a situation with the --

A.  An inmate, a mental health inmate, yes, sir.

Q.  Okay.  Other than that?

A.  No, sir.

Q.  Okay.  So I guess this last thing.  You know you filed this lawsuit, what do you want -- like what do you want out of this lawsuit?  What -- what result do you want?

A.  I want to be made right that's what I want.

Q.  And you listed under damages section you're asking for loss wages and for mental anguish.  Is there anything else that you're seeking in this lawsuit?

A.  That's what it says, sir, that's what I'm -- I'm



asking for.

Q.  And just to be clear, have you applied to any other agencies?

A.  Several.

Q.  Okay.

A.  Several.

Q.  And other than -- I guess, can you tell me other than Corrigan, Jasper, Texas Medical Center, Benavides, can you give me the others that you've applied to?

A.  Now?  Or since --

Q.  Since this.

A.  -- this incident?

Q.  Yes, sir.

A.  Harris County Sheriff's Office.  Port of Galveston.  Cleveland Police Department.  Southlake Police Department.  What's that -- Damon ISD.  Man, I done applied to so many places.

Q.  Okay.  And then other than the jobs we've talked about where you, you know, you're a reserve at Benavides, you had the job at Medical Center, they -- they let you go, and then you were a reserve at Jasper?

A.  I wasn't reserve I'm full time.

Q.  Oh, full time at Jasper.  And then at Corrigan were -- you were reserve?

A.  Yes, sir.



Q.   Okay.  And then you were doing traffic control and some other stuff.  Is that correct.

A.   Yes, sir, anything to try to keep the lights on.

Q.   Yes, sir.  And then you've applied -- you've listed off the ones you can remember as far as where else you've applied?

A.   Man, I done applied about ten, 12 agencies.

Q.   Okay.

A.   Can't get a job, don't got a retirement.

Q.   I understand.

A.   No, you don't understand.

Q.   Well, I understand the situation you're in, yes, I do.  When you got your -- you received your F-5, correct, from Polk County?

A.   Yes, sir:

Q.   And you were -- you were given an dishonorable discharge.  Is that correct?

A.   Yes, sir.

Q.   Did you attempt to challenge that?

A.   Yes, sir, I did.

Q.   How did you go about that process?

A.   I filed for appeal, Tarensit (phonetic) had a hearing and got it overturned.

Q.   He did?

A.   Yes, sir.



Q.   You had a F-5 hearings?

A.   Yes, sir.

Q.   Did you have an attorney represent you in the F-5 hearing?

A.   Yes, sir.

Q.   And what was it overturned to?

A.   Honorable.

Q.   You were given an honorable?

A.   Yes, sir.

Q.   Okay.  So you don't have a dishonorable discharge on your record?

A.   No, sir, it was overturned.

Q.   Okay.  So any other -- is there anything else you did -- did you do any sort of EEOC or Texas Workforce Commission Employment?

A.   For Polk County?

Q.   Yes.

A.   I filed for my unemployment and they denied it. I had a hearing, I won the hearing, and then they challenged the hearing and they -- they -- they upheld it.

THE COURT REPORTER:  The heening?

MR. FULGHAM:  Hearing.

THE DEPONENT:  The hearing.

THE COURT REPORTER:  Okay.

A.   And they upheld it and gave me my unemployment.

BY MR. FULGHAM:

Q.  Okay.  So you were able to get your unemployment and you got your dishonorable overturned to an honorable?

A.  Yes.

Q.  And you had an attorney that helped you out --

A.  Yes.

Q.  -- for both of those?

A.  No, for the unemployed, man, I just filed it on my own.

Q.  On the dishonorable?

A.  On the unemployment.

Q.  The unemployment you did on your own is what you're saying?

A.  Yes.

Q.  Okay.  Okay.  Have you ever -- have you spoken with Sheriff Lyons since this incident?

A.  I don't talk to him, man.  I ain't got nothing for him.

Q.  Okay.  Have you spoken to anyone else at Polk County about this?

A.  Sir, when this went down, I moved out that county for a reason.

Q.  Okay, alright.

A.  You know, you work at a place for 17 years and you think you got some friends, get in some trouble, you

find out real quick.

Q. Okay. So you haven't -- you're no longer in contact with anyone at the sheriff's office, correct?

A. That's what I'm saying, sir.

Q. Yes, sir, okay. And this -- in -- when you did the F-5 -- you had the hearing in front of the judge for the F-5?

A. Yes, sir.

Q. Did Sheriff Lyons testify at that?

A. No one showed up.

Q. No one showed up, okay.

A. And they was told about it but no one showed up.

Q. And so they gave you the honorable. Okay. And have you -- I mean, you haven't seen this Michael Richards since this?

A. No, sir.

Q. Okay.

MR. FULGHAM: I'm going to pass the witness.

MR. BOZEMAN: No questions.

THE COURT REPORTER: Okay, before we get off. Are you -- electronic copy?

Q. Well, actually, was I respectful to you Mr. Jerry?

A. Yeah.



Q.  Okay.

THE COURT REPORTER:  Electronic copy for you?

MR. FULGHAM:  Yes, ma'am.

THE COURT REPORTER:  What about you, sir?  Would you like to order a copy?

MR. BOZEMAN:  I'll -- I'll -- I'll get back to you.  Do you have a card or anything?

THE COURT REPORTER:  I can find one.  Okay.

THE VIDEOGRAPHER:  Okay.

Off the record at 2:51 p.m.

(Proceedings ended at 2:51 p.m.)

```
             IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF TEXAS
                      LUFKIN DIVISION

WILLIAM JERRY            §
      Plaintiff,         §
                         §
V.                       § CIVIL ACTION NO.: 9:23-cv-00032-MJT
                         §
POLK COUNTY, TEXAS,      § JURY DEMANDED
AND POLK COUNTY          §
SHERIFF'S OFFICE,        §
      Defendants.        §
```

-----------------------------------------------------------
                  REPORTER'S CERTIFICATION OF
                        WILLIAM JERRY
                  TAKEN ON OCTOBER 18, 2024
_____

I, Angela Steele, Shorthand Reporter, Notary in and for the State of Texas, do hereby certify that the facts as stated by me in the caption hereto are true; that the above and foregoing answers of the witness, WILLIAM JERRY, to the interrogatories as indicated were made before me by the said witness after being first duly sworn to testify the truth, and same were reduced to typewriting under my direction; that the above foregoing deposition as set forth in typewriting is a full, true and correct transcript of the proceeding has at the time of taking of said deposition.

888-893-3767
www.lexitaslegal.com

LEXITAS

I further certify that I am not in any capacity, a regular employee of the party in whose behalf this deposition is taken, nor in the regular employ of this attorney; and I certify that I am not interested in the cause, nor of kin or counsel to either of the parties.

Certified to by me on this, the 25th day of October, 2024.

*Angela Steele*

Angela S. Steele,
Shorthand Reporter, Notary
Expiration:  10/17/27
LEXITAS
13101 NW Freeway
Suite 210
Houston, TX 77040
281-469-5580

### -

**--I** 87:16

### 0

**04** 31:14

### 1

**1** 5:4

**1.1** 90:12

**104** 129:4

**106** 129:4

**10:10** 5:5

**10th** 22:17

**11:25** 60:7

**11:42** 60:10

**12** 41:22 64:12,16,17 172:7

**12:50** 104:9

**12:53** 104:12

**13** 60:25 61:1,2 64:21 91:8,9 92:1

**14** 74:4,5 106:8 116:20 118:23

**14th** 22:4

**15** 106:12 122:19

**16** 99:15

**17** 29:23 92:25 93:11 165:4,9,14 174:24

**18th** 5:4

**1981** 151:11

**1995** 60:22 61:18

**1:59** 150:10

**1st** 47:12

### 2

**2** 60:10

**2.4** 90:13

**2/23/21** 104:15

**2/28/1976** 9:20

**2000** 25:2 40:21 56:1 61:21 77:5

**2000s** 70:9

**2001** 50:21

**2002** 50:21

**2003** 24:22 44:3 51:15

**2004** 25:3,4,5 28:8 29:23 30:5 37:4,23 44:4,19 45:7 165:2

**2012** 24:21

**2013** 24:21 37:8

**2015** 84:14,17,20 85:2

**2016** 84:1,15

**2017** 25:10,16,18 28:22

**2021** 21:23 22:4,16 24:22 25:11 29:23 41:8,22 42:4 75:14 89:5,21 91:23 99:5 100:12,20,23 101:1,4 102:10 103:22 104:22 146:20 164:25

**2022** 20:10 22:4

**2023** 15:15 19:18 20:10 22:17

**2024** 5:4 13:15

**20s** 56:2 71:1,19 72:20 73:11,17 74:3

**20th** 42:4

**21** 21:11 41:8

**21st** 150:25

**23** 19:6

**23rd** 91:22 103:22 104:21

**24** 15:15 16:11

**24-hours** 13:23

**24th** 89:5 150:25

**25th** 22:4,16

**26** 84:1 101:1 102:10

**286** 99:17 136:15 144:4 145:3

**2:15** 150:13

**2:51** 176:12,13

**2nd** 89:21 100:12,20,23 101:4 146:20 151:3

### 3

**3** 104:12

**3.18** 90:11

**3/4** 21:23

**30** 104:1 127:20,21

**30s** 71:19,20 72:1,2

**31** 19:18

**31st** 19:6

**3rd** 84:20 85:2

### 4

**4** 150:13

**4.30** 90:19

**4/18/2021** 75:20

**42** 151:11

**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** 9:22

**48** 56:2

### 5

**5.06** 90:19



**50s**  67:6

**55**  67:16

**5:00**  16:20

---

### 6

**6th**  99:5

---

### 8

**801**  90:13

**8:00**  138:6

**8:34:20**  103:23

---

### 9

**923-cv-32**  5:23

**9:23-cv-32**  88:19

---

### A

**A-A-L-I-Y**  73:7

**A-A-L-I-Y-H-A**  70:18

**a.m.**  5:5 16:20 60:7,10

**Aaliyah**  70:14,19,25 71:1 73:4,6,7,13

**abide**  131:17

**abouts**  30:11

**Absolutely**  64:3 96:7 114:25 115:11 134:22 170:1

**accepted**  42:7,14

**accusing**  163:4

**acting**  58:21 111:12

**action**  5:8,23 6:1 49:13 88:18 141:24 147:19,23 166:8

**actions**  115:9,17,18 158:1 159:1 162:16,18 163:9

**activate**  134:1

**actively**  119:8,23,24

**activities**  23:21

**activity**  135:8

**Adam**  64:12,16,17

**adapted**  135:19

**add**  86:16

**addacked**  135:12

**adjusted**  133:25

**administration**  45:23,24 49:5 167:2,14

**administrative**  42:2 48:14 147:19

**admit**  83:20 89:20 99:4

**admitting**  132:7 146:18

**adopt**  135:24 136:1,2

**Adrena**  41:9

**affairs**  79:4

**affected**  27:4

**affiliated**  46:13

**affirm**  5:7

**afforded**  102:5

**African**  152:10,13,16

**African-**  166:11

**African-american**  163:19 164:3,17 165:6

**age**  71:21

**agencies**  171:3 172:7

**agency**  46:13,15

**aggressive**  111:7,12 141:22

**agree**  41:16,23 42:20 84:12 85:18,22,23 86:12 89:3,7,12,15 90:3,9,20 92:10,16,22 101:19 109:13 110:25 112:22

115:22 116:21 117:21,22 118:23 122:15,22 123:15, 19,25 125:8,19 126:15,21 128:7 133:23 134:20 138:18 139:18,21 140:23 141:2,22,23 142:1,4,19 143:7 145:15 147:13,20 152:12 154:18 159:1

**agreeable**  8:25

**agreed**  159:25

**ahead**  5:13 12:1 87:25 89:19 90:8 103:16,21 108:1

**air**  116:24

**Alabama**  31:5 33:8 37:6 81:2

**Alabama-**  32:6

**Alabama-coushatta**  29:21 36:13,24 37:3

**Alex**  74:15

**Alexander**  74:15,19

**alive**  65:2,9

**allegation**  101:9 155:13

**allege**  99:25

**alleged**  78:5 96:24

**alleges**  89:5,10 90:23

**alleging**  101:11 161:3

**alright**  12:19 19:4 20:5 37:2 43:24 47:4 50:12 71:12,24 73:4,7,21 75:2 116:16 121:22 123:15 124:24 127:4 128:20 132:5 133:21 150:15 174:23

**amended**  88:5

**amendment**  124:17 126:19 127:1 128:25 136:25 137:2

**American**  152:10,13,16



166:12

**amount** 49:22 117:22,25 118:3 119:15 122:5,10,12 123:2,5

**Amy** 69:7,8,13,14,15,23 70:8 73:9

**Amy's** 69:12

**and/or** 85:17

**Andy** 155:20,21 156:1,2

**anguish** 170:23

**announce** 167:1,2,3

**announced** 167:4

**answering** 7:6 8:8 113:10 123:7,8 163:10

**answers** 18:24

**anymore** 18:6 156:18

**appeal** 86:1 159:22 172:22

**Appears** 146:20

**applied** 31:12 38:23 171:2,9,17 172:4,6,7

**approximately** 13:21 21:1

**April** 15:15 16:10

**area** 10:17 63:4 122:18, 21,22,24 123:18,21 124:1 143:14 144:3

**areas** 63:13

**arm** 123:15

**arrest** 49:22

**arrestee** 50:10

**arresting** 50:2

**arrests** 134:7

**arrived** 144:3

**Arthur** 55:15,16 56:5 60:18,24 61:2,4 62:12 63:5

**Aryan** 124:12

**Ashley** 74:19

**aspect** 134:25

**assault** 85:4 86:24 145:2 158:9 170:7

**assaulted** 84:14 156:8

**assaultive** 134:10

**assigned** 15:25 19:15 25:23 132:13,15,22 133:8,15

**assume** 48:19 76:1

**attempt** 172:19

**attend** 61:12

**attended** 117:12

**attorney** 5:18 6:19 41:4 83:19 114:21 173:3 174:5

**attorney's** 85:1

**audio/video** 134:6

**August** 19:6,18 50:21 51:14 52:4,7

**auh** 48:20 74:17 76:1

**aunts** 74:23

**Austin** 73:1

**Author** 56:6 63:2

**authority** 91:19

**authorized** 132:14

**aware** 113:12

---

**B**

---

**B-U-R-M-A-N** 153:8

**back** 13:3 30:18 31:8 33:17,19 37:8,9 38:8 51:20 52:1 60:9 72:5 81:3 85:21 87:25 89:24 90:22 91:6 95:13 98:9 99:3 104:3,11 105:11 110:23 111:2,8,21 112:9 113:6

115:6,7 121:10 126:14 127:7 128:1,10 137:11 138:10,11,15 139:17,20, 25 140:1 142:14 144:19 145:10 150:12,15 155:23, 24 176:8

**backed** 47:25 48:3

**background** 9:7 21:17 54:2

**backlash** 168:16

**backwards** 11:22 26:6 168:17

**bad** 83:7

**balanced** 27:5

**based** 14:12 35:9 63:3 120:12 152:1,7 155:14 159:16 160:23 170:4

**basically** 21:3 23:1 24:6 28:10 38:2 45:17,21 109:1

**basis** 23:9,10 59:5 151:20 158:3 159:3 162:10,20 163:5

**beat** 44:23 138:23 149:22 158:18,19 161:4

**beats** 47:5

**Beaumont** 63:17,18

**bed** 153:1,11,24 154:21

**began** 141:24

**behavior** 85:13 90:13 154:11 156:9

**bell** 81:22

**belongs** 92:8 106:9,17,20 107:9

**Benavides** 13:5,8 14:23 171:8,19

**benefit** 8:10

**bid** 55:9,10



**big**  10:10 27:7 54:16 78:6, 22 94:22

**biggest**  10:12

**birth**  9:19

**birthday**  71:21

**bit**  5:22 21:17 27:5 33:18 35:20 64:21 77:12 136:9 160:21

**black**  165:20 166:6

**Blanton**  72:9,10

**bless**  138:8

**blocks**  105:1

**board**  40:7,8,10

**body**  90:19 99:16 103:21 104:14 129:16,18,23 130:2,3,14,20 131:7 132:7,13,15 133:4,8,10, 13 134:16,20 135:4 139:13 144:11,13 169:9, 11

**book**  126:8,9,10

**booking**  143:14 144:3

**born**  9:23 60:12 61:1

**boss**  39:21

**bottom**  31:9 37:10,12 108:13 139:8

**Boy**  72:22

**boys**  72:21

**Bozeman**  12:4,8 50:17,18 60:4 106:23 107:25 110:21 115:20 117:11,20 118:1,8,14 119:1,11,18 120:2,8,12,15,21,25 121:5,8,16,19 122:8,25 123:4,13 124:3 126:2,23 127:13,24 128:5,9 129:7 131:10 132:21 136:24 137:6 138:14,20 142:23 144:2 152:24 160:20,25 161:14,16,21 162:21

163:2,15,21 164:4 165:10,16,21 166:4,7,14 175:20 176:7

**break**  8:20,21,23,25 9:4 17:11 31:5 50:14 60:3 97:8 98:14 150:7 159:12

**breast**  78:5

**bring**  48:17 54:12 110:6

**broken**  24:24

**Brotherhood**  124:13

**brought**  83:2 147:1

**buck**  56:2

**buddy**  14:20

**build**  62:15

**builder**  62:7,11

**built**  105:25 111:16

**Burman**  153:6,9,15,23 154:1,13 155:15 156:2

**burn**  54:15

**burned**  26:20 28:5

**burnt**  28:2,3,6

**business**  18:18 110:11

**button**  107:7

---

### C

**call**  7:3 14:12 23:1,16,19 52:3 94:15 102:4 107:7 122:21 129:1 141:8 143:21

**called**  23:14 52:16 87:2 98:5,9 102:10 108:14 116:9 149:13 157:20 167:1,8 168:2,9,14

**calling**  162:4 165:23 169:24 170:2,5

**calls**  13:25 14:5,7,8 19:16

**cam**  99:16 103:21 104:15

129:17,18,23 130:2,3 139:8 169:9,11

**camera**  90:19 104:25 130:15,20 131:8 132:13, 16,22,23 133:2,5,8,10,13 134:16,20 139:8,13 144:11,13,14

**cameras**  132:7 135:4

**Campbell**  139:14

**Caney**  10:1,2,12,20,23 11:1,18

**captain**  32:19,25 33:1,4 35:25 36:3 39:12,16,18 40:2,6,11,25 41:10,20,21 42:3,5 43:4,13,18 81:13 97:5 124:13 160:1,10,19 167:11,21 168:19

**captain's**  42:7

**car**  120:17

**card**  176:8

**career**  11:24 18:19 61:21 76:1,14 77:5,15 160:4,5,7 161:13 165:20

**carry**  134:1

**case**  6:23 9:13,15 84:25 87:20

**casino**  32:13,14 34:23 35:22 36:7,12,22

**Cassandra**  64:23,25

**catch**  83:17

**caused**  49:9 111:6

**cell**  81:8 91:14 92:2,9,15, 16,19 99:17 105:1,4 106:10,14,15,19 107:1,15 108:8,18 109:12,15,23 110:1 112:2 117:24 118:6 119:3,10,25 120:1 121:25 122:16,21,23,24 123:17 124:2,11,15 136:15,18,22 137:4,16 138:13,18



Case 9:23-cv-00032-MJT    Document 21-18    Filed 10/31/24    Page 183 of 205 PageID #: 375
William Jerry
Index: cells..concrete

140:19 141:6 144:7,10, 14,18,21 145:9,11 158:12,20 162:18

**cells** 105:6

**Center** 15:14,21,22 17:25 19:21,24 41:22 42:6 171:8,20

**certification** 75:22

**chain** 43:12

**challenge** 86:1 172:19

**challenged** 173:20

**chance** 41:6 84:7 87:19 88:7,22,25 96:23 161:18

**change** 14:21 26:21 49:5 135:16 137:14 168:8

**character** 98:19

**characterize** 120:22

**characterizing** 120:5

**charge** 40:4 51:1 152:3

**charged** 79:21,22,25 80:1

**charges** 82:9

**Charlotte** 74:6,10

**chase** 57:18

**check** 54:16 60:2 94:21

**checking** 78:5

**Cherokee** 62:7,12,22

**chest** 123:18,21,23

**chief** 17:20 32:17 40:12 43:7,13 46:16,22 148:25 152:8 155:20 156:19 167:2

**child's** 70:13

**Childer's** 157:3

**Childers** 43:10,11,12 79:6 84:3,5 148:25 156:6,20

**children** 16:9 68:10 69:10 70:11

**Chillers** 43:14

**Chips** 64:12

**circle** 107:11

**circumstances** 19:19 94:7 110:22 115:17 154:22

**cited** 16:22 148:22

**citizen** 50:2,9 77:17 80:16 134:14

**citizens** 49:21 83:11

**city** 10:12 11:6 13:8 72:4

**civil** 5:23 83:5 88:18

**claim** 151:20

**claimant** 77:25 95:3 100:7

**claimants** 77:18

**claiming** 84:13

**claims** 6:6

**classified** 121:1

**clean** 14:21 48:20,24 89:25

**cleaner** 7:24

**clear** 18:25 34:21 35:5 43:23 45:20 81:14 95:9 123:11 141:15 149:9 151:18 155:11 159:24 171:2

**cleared** 47:14

**Cleveland** 171:15

**client** 6:6 114:9,24

**close** 10:12 27:11

**closed** 144:6

**closer** 20:20 55:23,24 56:4,5,7,8,22,23

**cold** 153:1,10

**colleges** 61:12

**command** 43:13 167:5

**commenced** 147:19

**comment** 121:10,11

**commissary** 51:1,5,6

**commission** 82:16 94:22 173:15

**commissions** 26:1

**commit** 89:7,11,15 90:24

**committed** 54:5 89:6,10, 16 90:24

**comp** 54:13

**companies** 62:5

**company** 14:20 15:3 62:1, 13,18

**complain** 49:21 108:25

**complained** 82:13 85:4 167:6,15

**complaining** 167:13,17

**complaint** 79:12 80:17 87:20,22 88:3,6,18 89:3, 4,9 90:23 91:7,8 95:10 96:2,10,20,21,22,25 99:6, 13,21,22,24 100:6,9,14 101:2,9,15 102:1,2,5,6, 11,12,16,18,20 106:7 113:22 150:16,18,20,24 151:11 156:22 159:11 163:3

**complaints** 80:16 83:3,6, 11 134:14 167:9,21 169:13,20

**completed** 151:2

**completely** 121:17

**completing** 105:6

**compliance** 141:6

**comply** 109:22 110:15

**conclusions** 121:17

**concrete** 38:19



**condition** 147:9

**conduct** 13:24 90:12,13 125:11,15,16,22 126:4 148:23

**conducted** 85:8

**conducting** 148:12

**confirm** 102:15

**confrontational** 134:10

**confused** 101:8

**confusing** 8:15 107:16 121:20 160:22

**considered** 14:15 32:4

**construction** 15:7,9 24:7, 9 61:17,23 62:14,20 63:13 75:3

**constructional** 53:4

**contact** 134:9 175:3

**contacts** 134:7

**contents** 85:22

**continuing** 93:11 169:22

**control** 14:24 15:1 75:4 91:18 117:2,13 122:13 123:2 124:21 141:19 172:1

**controlling** 141:10

**conversation** 42:1 84:23 138:4

**conversational** 7:7

**cool** 54:22

**cooperation** 128:21

**cooperative** 128:22

**cops** 63:25 120:17

**copy** 12:7 41:3 83:19 84:20 85:7 87:22 96:10, 15 99:13 100:5,16 101:2, 11 102:6,12 175:22 176:2,6

**Corning's** 93:20

**correct** 11:15,19 13:16 15:15 16:12 18:11 19:6 21:20 22:19,20 24:18 25:11,12 39:11 42:15,24 43:2,8 44:1 60:13 67:17 85:24 92:3 94:11 99:18 100:2,8,18,21 104:23 106:5 110:2,5 112:23 127:15 131:13,18 132:24 137:7,16 139:22 142:22 145:15,18 146:4 148:7, 16,19 149:2 152:13 158:24 159:19 160:1,10, 16 163:1 164:13,21,25 165:6,15 168:19 169:10 172:2,14,17 175:3

**correction** 52:18,23 81:7, 10

**correctional** 52:16,25 53:10,16,18

**correctly** 140:14 156:22

**Corrigan** 20:9,12,18 21:5, 10,15,18 22:1,4,15,21 23:3 24:17 171:8,23

**cost** 150:21 158:22

**counsel** 5:13 88:13 114:20

**Counselor** 8:2

**counterparts** 151:16 163:8

**countless** 77:8

**county** 5:19,24,25 6:1 9:14 10:4,24 11:1,6,8,10, 11,14,17 13:9,11,12,13 19:5,8,14,19 20:6,8,16,22 21:5,8,15,18,25 24:17,22 25:2,4,7,9,18 26:7 29:19, 23 31:9 33:7,14,17,19 35:20 36:20 38:3 39:11 41:21 42:5,24 43:1,25 44:1,7,16,20,22,23 45:7

46:2 49:13,23 50:7,20,21, 25 51:12,15,16,17 52:11, 15,18,20,24 53:10 54:16, 24 55:2,3,12,13,21 56:3, 5,7,21 57:17,23 58:2 68:5 74:23,25 75:5 77:13,14, 19 78:10 79:5 81:1 82:21, 25 84:22 85:2,14,18 87:12 88:4,5 89:5,9 90:5, 10,23 99:14 102:13 108:19 125:11,23 127:21 128:4 131:13,16,21 132:6 135:3 150:16,18,19 151:24 170:8,12 171:14 172:14 173:16 174:20,21

**couple** 28:23 29:15 68:1,2 69:1 103:15 108:11

**courses** 75:25 76:2,4

**court** 5:6,12 6:15,18 7:12 10:9 11:10,12 17:17 30:25 31:3 39:2 48:2 58:8 64:14,17 65:6 66:21 68:16 70:15 79:22 82:1 83:22 88:12,16 90:15,17 98:22 103:20 104:7 121:7 123:20,22 132:3 134:3 145:22,24 146:2,13 161:23 162:2 168:24 169:3,7 173:21,24 175:21 176:2,5,9

**Courtney** 72:7,8

**courtyard** 58:21

**Coushatta** 31:6 32:7

**Cousins** 74:25

**cover** 23:15

**covered** 43:24

**Covid** 29:6,8

**coworker** 80:13

**cracker** 87:3

**crawfish** 168:17

**crest** 124:1



William Jerry

criminal  6:15 113:12
147:17

Cronin  93:3,6,7,13 94:11
95:15,19 100:10 139:14
144:23 145:6 149:1
151:7,8 162:5 169:18,25

Crowings  169:18

crystal  18:25

CSC  52:16

cultural  34:8

culture  34:6 127:21 128:4

current  13:3,18 46:18
48:4 155:20

cushion  27:10

cussed  87:3

customary  9:8 92:21

cut  7:8 14:20 27:7

### D

D-A  66:25 67:1

D-A-M-O-N-I-C-A  67:1

D-E-M-O-N-I-C-A  66:24

damages  170:22

damn  66:3

Damon  171:16

Damonica  66:20 67:1

dangerous  120:19

date  9:19 10:25 21:9 25:6
26:11 39:9 40:21 78:8
99:5,12 104:15 151:5

dated  84:1 100:11,13,17,
20 101:1,4 102:10 151:4

dates  24:24

Dawson  81:10 86:21,22

day  16:14 21:7 56:24
92:25 93:12 97:10 98:8

111:7,14,22 116:3
125:18,21,22 128:2,11
149:13 169:22

days  100:13 151:1

de-escalate  136:19,20

de-escalation  76:10,11,14

deal  34:1 78:6,22 138:7

dealing  76:18 105:9

deals  151:11

dealt  58:10

deceased  66:5

decide  28:4 32:10 51:16
57:13 63:20

decided  26:23 27:3,23
35:9 56:20 165:20

decision  28:2 40:5,16
42:18,21 55:13 152:21

decisions  159:4

defense  83:5

defiant  92:20

defused  112:7

delegated  111:25 112:11,
18 115:3

delegating  112:4,7

demoted  27:16

demotion  26:18,19 27:15

denied  95:8,11,21,22 96:4
173:18

deny  140:16,20 145:3

department  13:6 15:14,21
16:2 18:1 20:9 29:22
32:7,12,16,18 34:25
46:12 51:2 147:11
171:15,16

departments  54:13

depending  8:22

depends  48:21,24

depicts  104:20

DEPONENT  5:11 10:10
17:18 31:2 48:3 58:9
64:16 65:7 66:22 68:17
79:25 123:21 145:23
161:25 173:23

deposition  6:7,21 7:3 9:8
128:18 148:18

deputies  48:9 167:6

deputy  14:14 19:9,13 27:8
28:8 30:6 31:9,18 37:9,16
38:9,12 40:12 43:7,13
44:16 46:17,22 85:13
148:25 152:8 153:20
154:20 155:20 156:13,15,
17,19 167:3

describe  35:23 49:15

details  24:4

detectives  32:4

Detention  41:22 42:6

detentions  134:7

determination  162:20

Diboll  20:14

Dickens  41:20 42:3

Dickson  39:20

differently  111:1,9 115:2,
4,10,15,16 116:3 158:24
166:23

diligence  114:17

directed  147:12

Directing  15:2

directions  85:23

directive  113:4 142:3,7
143:3

directives  109:19

directly  141:11



**director** 41:17

**disagree** 42:17 120:9 128:15 139:24 141:7 143:5,16,19 144:8,12

**disagreed** 148:19 149:2,6

**discharge** 18:2,4,5,8 19:1 172:17 173:10

**disciplinary** 16:23 20:6 49:12,13 57:23 58:2 77:12 94:3 147:23

**discipline** 79:15 80:10 95:11,16 96:3

**disciplined** 50:8 82:20 83:13 93:24 94:14,24 95:2 154:23 170:6

**discriminate** 164:17

**discriminated** 155:13 156:25 163:12

**discriminates** 152:16 164:2

**discriminating** 152:1,7 160:15

**discrimination** 151:12 163:5,18

**discriminatory** 163:19 168:12

**discussed** 40:11 75:6

**discussing** 41:9

**discussion** 42:10

**dishonorable** 18:5 172:16 173:10 174:3,10

**dismissive** 91:19

**dispute** 101:19 103:4,9

**disruptive** 109:7

**distance** 55:17

**distributing** 51:6

**district** 84:25

**divert** 15:8

**division** 30:9 31:24 36:5

**document** 12:25 75:17 99:18 102:19 103:4 146:17,19 147:3

**documentation** 86:17

**documented** 94:9 95:5

**documents** 101:20

**don't.i** 29:3

**door** 117:19 118:6 119:10, 16 120:1 123:16 124:1 144:6

**doors** 139:18

**doorway** 129:6

**dorm** 139:15

**drive** 14:11 56:23 99:15 101:5,6,22 103:7,12

**due** 114:16 150:23

**Duenes** 85:7,11

**duties** 13:24,25 16:5 19:13 23:2 26:8 35:23 36:4,6 147:13

**duty** 134:1

**Duval** 13:12,13,14

**Dynamic** 62:8,12,22

---

**E**

---

**E-S-T-E-S** 65:7

**earlier** 24:6 54:3 86:6 111:14 148:21

**early** 70:9 72:1,2

**easier** 12:3

**easy** 114:5

**education** 9:9 61:10

**Edward** 65:15

**EEOC** 173:14

**effective** 41:22

**elaborate** 154:16

**elected** 45:12 46:3,8,12, 15 48:22

**election** 44:24 47:4

**electronic** 175:22 176:2

**element** 159:12

**Ella** 66:3

**emergency** 107:7

**emotional** 17:14

**employee** 152:25 153:4,5 155:16 157:5

**employees** 152:17,18 157:14 163:20 164:2,3,18 166:12,13

**employment** 14:17 21:24 75:6 85:17 147:9 173:15

**end** 24:21 32:10 92:25 93:11,12 99:3

**ended** 25:2 33:19 176:13

**enforcement** 6:14 11:24 12:15 46:13,15 53:18 57:2,3 61:20,24 63:21 64:2,5,10 70:6 75:3,10 76:1 77:5,14 83:4 134:7, 11

**ensure** 133:24

**enter** 139:15

**entered** 121:25

**entire** 25:14 44:15 61:23 132:20

**entitled** 120:18 146:19

**environment** 82:12 108:21 109:6,7 113:4,5 122:6 123:1 137:12 142:9

**equipment** 132:13,14 133:24



**erroneous** 120:21

**essential** 91:17

**essentially** 6:5 16:1 23:19

**Estes** 65:5,6

**estimate** 68:7

**etcetera** 13:25

**evaluation** 17:2,3

**events** 133:25 134:12 149:6

**everyone's** 8:25

**evidence** 134:13 147:16 152:23 163:11,17 164:1, 16

**exact** 21:9 29:3 30:3 137:22

**exceptional** 17:3

**excessive** 49:19,22 115:19 170:7

**excuse** 148:24

**exhibit** 12:9,15,17 41:8,11 75:19 83:21,23 84:2 88:17,20 89:20,22 90:1, 10 98:21 99:4,7 100:4,25 103:23,24 132:1,7,9 139:3,5,6 146:12,14,19

**exited** 145:8

**exonerated** 79:18

**expect** 37:11

**expected** 131:17

**experience** 11:23,25 12:5, 15 13:5 25:1 33:18 37:18

**explain** 19:1 22:25

**extensive** 41:25

**extent** 140:11 157:16

**extra** 14:21

**extract** 92:15 106:14

---

**F**

---

**F'ED** 116:9

**F-5** 45:18 172:13 173:1,3 175:6,7

**F-ER** 125:2

**face** 80:19 81:6 92:20 95:18

**facility** 52:16,18,23,25 53:4,14,18

**fact** 120:5 159:10 163:12

**factor** 110:12

**failed** 85:1

**fair** 22:3 29:16 48:25 77:9 105:14 112:10 165:13,22, 24 166:2

**fairly** 10:7,9,10 159:16

**fall** 55:10

**false** 80:1

**familiar** 6:2 10:20 12:25 125:10 131:12

**family** 9:9,12,15,16 56:3, 24 61:4 64:4,7,22 71:10

**father's** 64:22 65:4

**February** 21:11 22:4,16 29:12 89:4 91:22 99:5 101:1 102:10 103:22 104:21

**feel** 151:12,13

**feelings** 158:15

**female** 58:6,9 59:9,10 78:4 80:12,14,15

**field** 134:8

**file** 5:4 60:10 80:5 83:6 88:6 96:21 104:12 150:13

**filed** 5:20,23 9:15 77:18, 25 82:9 83:11 85:4 87:20

88:4 114:6,24 150:16 151:10 170:18 172:22 173:18 174:8

**final** 43:17

**finalized** 21:25

**financial** 57:15

**financially** 33:11 56:18

**find** 45:17 52:7 59:2 93:6 115:25 125:2 127:4,5 138:21,23,25 175:1 176:9

**finding** 50:9

**findings** 145:15

**fine** 8:20 98:16 120:24

**finger** 87:17 106:4 107:11 141:25 142:5

**finish** 7:6,11 9:3

**fire** 18:16 160:23

**fired** 46:24 150:25 151:3, 20

**fixing** 115:25 127:4,5

**flipped** 87:9 105:14 112:13 142:10,20

**flipping** 112:22 141:25 142:4,12,24 143:6

**flips** 106:3

**flirt** 34:13

**flirtatious** 33:23 34:22 35:6

**flow** 24:8

**focus** 25:9

**follow** 85:23 118:20 142:7 143:2 166:15

**force** 49:19,22 50:1 59:3 76:2,4 84:21 85:5 86:25 87:6 90:14,17,19 92:14 99:14 102:13 106:13 117:22,25 118:3,9,19,21 119:3,8,15,21 122:5,10,



12 123:2,5 140:18,25 141:5,19 142:1,2,5,6,8,13 143:8 170:7

**forced** 16:14,16,25

**forcefully** 122:23

**forearm** 123:25 140:12

**forgot** 66:4 157:2

**form** 39:18 40:7 106:23 107:25 110:21 115:20 117:11,20 118:1,8 119:1, 11,18 120:2 122:8,25 123:4,13 124:3 126:2,23 127:13,24 128:5,9 129:7 131:10 132:21 136:24 137:6 138:14,20 142:23 144:2 152:24 160:20,25 161:14,16,21 162:21 163:2,15,21 164:4 165:10,16,21 166:4,7,14

**formal** 102:18

**formally** 27:15

**formed** 84:24

**found** 79:12,14 82:19 83:12 97:10 149:20

**foundation** 121:20

**Friday** 5:4

**friend** 64:7

**friends** 64:7 95:24 174:25

**front** 6:20 91:12 108:16 139:4 175:6

**frowned** 34:6,8

**fuck** 124:16

**fucked** 124:7

**Fulgham** 5:15,18 10:11 11:11,13 12:1,5,9 17:19 39:3,5 41:7 48:5 50:16,19 58:11 60:1,5,11 64:19 65:8 66:23 68:18 70:16 79:23 82:3,4 83:20 88:14, 17 89:19 90:16,18 98:21

99:1,9 103:20 104:5,13 118:11,17 119:5 120:6, 10,14,20,24 121:3,14,18, 22,24 122:14 123:24 132:1,4 134:4,5 145:25 146:3,12,16,18 150:6,14 162:3,14 169:1,5,8 173:22 174:1 175:18 176:4

**full** 20:24 22:10 157:16 171:22,23

**full-time** 22:5,22 25:10

### G

**g-a-r-i-t-y** 146:1

**gain** 141:5

**Galveston** 55:2,3,13,15, 20 56:7,15,21 57:14,17, 23 171:15

**game** 120:21

**gap** 29:20 52:10 53:2,3

**garrity** 145:20,23,25 146:6,19,21 147:2

**Gary** 156:6

**gather** 6:5

**gave** 35:16 52:19,24 75:17 113:3 142:6 145:1, 19 159:22 161:18 167:22 173:25 175:13

**general** 18:5

**generally** 19:13 64:10

**gentleman** 155:19

**Georgia** 72:24

**get all** 71:5

**get along** 38:6

**gigabyte** 99:15 101:18 103:1,7

**Gilbert** 41:9,17

**girl** 72:22

**girls** 33:23

**give** 5:8 6:10 16:19 41:2, 3,5 42:21 47:17 54:13,20 65:14 83:18 87:4,22 88:22 97:25 98:3,6 99:1 137:7,15 144:6 145:18 146:10 149:6 150:2,23 155:18 157:25 168:18 171:9

**giving** 7:23 87:17 97:25 107:20 145:21 150:4

**glass** 106:3 107:2,4,10, 18,23 108:8

**goal** 52:1,7 54:7

**God** 68:24

**Goins** 93:6,7,13,20 94:11, 13 95:22 99:24 100:7,9 144:23,24 145:6 149:1 151:7,8 162:5 169:18,25

**golden** 155:18 157:25

**good** 17:12 35:16,19 50:16

**gotcha** 18:14 27:22 28:10 31:13 32:6 53:12,17 55:19 67:1 135:7

**gotta** 113:11 138:25

**grab** 122:4 129:5,8 139:20 140:1,2

**grabbed** 106:21 109:14 110:2 117:17 119:24 129:9,15 139:24 140:3,6

**grabbing** 139:16

**graduate** 60:19

**graduated** 61:9,15

**graduating** 61:24

**grandmother** 65:22,24

**grandmother's** 66:2



**great** 7:2 8:19

**grievance** 85:3

**grievances** 83:6

**ground** 7:3

**group** 168:5,7

**Groves** 63:11

**growing** 64:13 65:12,20

**Guarantee** 145:24

**guess** 13:20 16:4 17:24 19:4,12 22:25 24:8 25:16 26:9 27:11 33:17 35:6,22 38:3 40:5 44:10,18,21 47:24 49:15 51:6,8 54:3 55:12,19,22 57:13 58:1 59:2 60:23 64:8 66:11 68:7 69:3,10 73:21 74:14 76:17,21 77:13,17,23,24 82:11 83:10 86:16 87:14, 16 105:4,19 111:16,23 127:19 134:15 148:9 149:4 150:17 155:11 161:1,7 170:17 171:7

**guessing** 53:20 156:2

**Guidry** 93:5 103:22 104:15 139:14 168:21,24 169:1,13,19

**guy** 80:17 161:4

**guys** 12:7 41:3 48:13 68:23 76:8 95:24 109:3 122:18 157:17 158:6 159:5,17 161:2 164:10,13 166:8 169:18

**H**

**ha** 58:4

**hair** 129:5,8,10

**half** 8:22 159:18

**hallway** 143:13

**Hammack** 37:21,22 38:4,6

40:14,15 135:12,20 136:2,6

**Hampton** 73:24,25 74:1, 10

**hand** 5:7 110:5,8 117:3 132:8 141:10

**hand-ons** 59:16

**handbook** 125:12

**handcuffed** 152:25 153:10 154:21

**handing** 132:5

**handle** 76:23

**handled** 126:7

**handling** 76:21

**hands** 58:21 143:16,20

**hands-on** 59:10

**happen** 145:11 155:7 162:18 168:3,5

**happened** 19:3 27:20,25 28:1,4 43:21 49:2 57:23 58:20 78:9 84:16 91:22 93:19 96:5,9 105:3 106:5 107:17 111:11,14 154:1, 6,11 155:4,5,6 156:11 157:8,11,12,13,16,20,21 159:7,20 162:17 166:9

**happy** 8:24 120:7

**hard** 7:18 55:16 56:18

**harm** 158:10

**Harris** 171:14

**head** 7:14 42:23 116:22 117:1,6,10,12 124:20,22 129:1,11,13 140:13 141:9,11,14 161:7

**heads** 7:23

**health** 58:6,9,13,14,15,18 59:8 170:14

**hear** 8:6 107:22 127:9,10

144:16 159:22

**hearing** 172:23 173:4,19, 20,22,23 175:6

**hearings** 173:1

**heening** 173:21

**held** 25:20,24 39:11 53:9 75:22

**helped** 174:5

**Hey** 5:16 27:23 47:9,12 54:12 97:6 107:12 108:7 138:5 148:12 167:20

**hierarchy** 152:3 168:6,14

**high** 60:15 61:13,15,24 63:14 70:2

**higher** 32:24

**highest** 31:15 75:22 161:11

**hindsight** 110:25

**hirer** 31:20

**history** 9:9 12:11,20 75:20

**hold** 52:20 53:11,14 75:9, 10 98:25

**holding** 28:13

**hollering** 144:17,18,19,21

**home** 11:2,3 39:13 55:23, 24 56:8,13,22,23 98:8 148:14

**honorable** 18:4,8 173:7,8 174:3 175:13

**hop** 153:24

**hope** 128:22

**hospital** 15:24,25 16:2,8 78:4 153:11,21,24

**hotel** 73:24

**hour** 8:21 60:2,3

**house** 48:24 55:16 56:24 157:7



**Houston** 9:24 15:18,22,23 20:13 56:4 60:12,17,24 61:1,2,5 64:20 72:4

**human** 7:7 41:18

**hurt** 158:15

---

**I**

**I-N-A** 67:8,11

**idea** 16:25

**identification** 12:18 41:12 83:24 88:21 89:23 99:8 103:25 132:10 146:15

**ignorance** 131:20

**immediately** 21:4 44:20 106:21 107:14 109:13,14 157:20

**Ina** 67:8

**inappropriate** 35:7

**incidence** 166:17

**incident** 14:12 16:22 21:16 28:1 39:12,24 49:3, 8 58:22 59:24 77:11 78:3 81:18,24 83:25 84:10,16, 21 85:12 86:3,6,16,18 87:11 93:9,16,21 95:13 96:14 97:4 104:20,22 111:10 128:3 149:18 153:17 154:20 155:3 156:13 157:2,3,19 158:2 160:13 165:13,19 166:22 168:22 169:6 171:12 174:16

**incidents** 20:5,6 49:25 50:7 57:22 58:2 77:23 87:5,13 94:5,20 155:12

**include** 147:23

**including** 135:3

**incoming** 45:1,6,14

**incorrect** 22:12 140:5

**incumbent** 47:7

**Indian** 32:8 33:23 34:23 36:8,14,15

**individual** 64:9 77:25

**individuals** 94:6

**information** 6:5 9:18 12:10,23 147:16 148:19

**informed** 45:1 84:23,24 93:15 97:3 114:19

**informing** 40:24

**Ingrid** 17:16,17,20

**initial** 83:1 148:2

**initials** 148:1

**injured** 156:15,17

**injures** 157:6

**injuries** 158:15,17

**inmate** 50:2,10 59:10 77:17 78:4 80:12,14,15, 16,17 81:6,15 84:1,13,21, 23 85:3,8 87:1,8,11,15 91:14 92:6,9,10,14,15 99:17 104:21 106:2,9,10, 11,14 108:18 109:7,20 110:10,14 111:15 115:23 117:23 118:4,9 119:3 121:25 122:13 123:1 124:21 126:8,22 129:5 131:8 138:13 139:16 140:11,12,13,18 141:6, 10,21,24 142:8 143:12,15 144:3,7,17 145:2,9,10 152:25 153:10,21,24 154:21 170:7,14

**inmate's** 93:14 116:22

**inmates** 49:21 51:10,11 76:18,21,23 83:6,11 85:9 87:5 91:11,12,14,18 92:2, 18,20 105:6,11 108:15, 16,19 125:6 127:22

**inserting** 112:11

**inside** 137:16 144:5,17

**inspection** 105:8

**inspections** 105:5

**inspired** 64:9

**instance** 166:16

**instruct** 106:20

**instructed** 92:5 106:9 107:1,18 108:9

**instructing** 107:9

**instruction** 106:16

**insufficient** 162:9,19

**insult** 91:11 108:15

**insulting** 92:3

**integral** 91:19

**intended** 117:5

**intention** 8:9 110:16

**intentionally** 124:23

**intents** 54:23

**inter** 97:19

**interacting** 131:8

**interaction** 105:20

**interfere** 15:9

**internal** 78:23 79:4

**interview** 113:22

**interviewed** 85:9 97:17,19 113:23

**interviews** 134:8

**intimidate** 110:14

**intimidation** 110:10,12

**investigate** 79:1

**investigated** 35:12 79:2 82:6 83:12 97:4,7 154:9, 24 155:2 156:12 157:6, 15,18

**investigating** 149:21



**investigation** 34:16 35:14 78:24 79:8,16 80:8,10 82:8 85:8 113:12 147:11 148:13 149:12,15,17,23, 25 150:1 151:1 169:16,22

**invoke** 124:17 126:19 127:1 128:25 136:25

**invoking** 137:2

**involved** 169:16,21

**involvement** 95:12

**ISD** 171:16

**issue** 49:3

**issued** 75:20 135:21

**J**

**Jack** 5:18

**Jackson** 74:15,16,17

**jail** 26:3,9,13,16 27:9,21 28:16,24 29:2,10,11 30:18,19 38:24 41:9 43:1, 4,13 44:11 51:3,19,23 54:4 55:4,8 75:8,9 76:18, 21 80:20,24 81:4,5,13 82:16 83:8 84:22 85:2 90:11 91:11,17,20 92:22 94:22 99:14,16 102:13 105:5 108:16,19 109:2 125:11,23 127:14,21 128:4 132:20 133:2 160:1,10,18 167:12

**jailer** 25:10,17,18,21 28:11 44:6 57:16 58:1 85:7,11

**jailer's** 85:6

**jailers** 52:19 53:4,11 54:8 115:3 129:23 130:19 135:3 139:14,15 144:23 145:5 149:1 162:5

**jailers'** 52:20 99:16

**James** 65:15

**January** 41:8 42:4 44:3 47:12 51:15 84:1

**Jasper** 19:5,8,13,19 20:6, 8 73:20 171:8,21,23

**Jefferson** 60:16 61:9

**Jerry** 5:5,16,24 12:11,13, 19 41:4,9,13 42:1,2,4,6 64:23,24,25 67:20,25 68:21 69:13,14,15 71:13, 16 72:15 84:6 85:13 88:23 89:21,25 92:13 93:17,23 98:15,25 99:6, 10,12 102:12 104:18 106:13 139:4,15,16 140:10 141:25 143:12,14 144:4,5,11,17 145:1,8,10 146:17,20 150:15 175:24

**job** 11:23,25 12:5 17:4,5,6 24:7 35:18,19 45:10,17 52:8,24 54:20 55:21 57:2, 3,7,14 83:4 147:24 150:21 158:22 161:6 171:20 172:9

**jobs** 14:18,24 15:1,6 75:3, 5 171:18

**Joe** 45:1,5,6

**John** 17:21,22

**Johnathan** 81:19 84:1,22 85:3

**join** 32:11

**Jones** 73:14,16

**judge** 175:6

**July** 13:15 15:15 25:10 50:21

**jump** 99:15 101:5,6

**jury** 6:18,21 9:17 71:10,11 161:8

**justified** 142:12

**justly** 93:23

**K**

**K-A-D-E** 153:8

**K-E-A-L** 66:22 67:2

**K-I-A-R-A** 71:15,16

**Kade** 153:6,9,15,23 156:2

**Keal** 66:20,21

**keeping** 91:17

**Kennedy** 73:13,14,22

**Kenneth** 37:21,22 135:12, 20 136:2

**Kiara** 71:12 72:5

**Kiara's** 72:6

**kicked** 149:12

**kid** 63:22 64:13 71:12

**kids** 71:2,3,6

**Killeen** 72:25

**kind** 7:3,9 10:7 11:21 14:8 16:5 23:8,20 24:25 26:18 27:5,14 35:7 36:13 39:21 43:21 53:3 54:5,7 58:25 79:7 87:9 107:16 128:18

**king** 168:15

**Kingwood** 10:14

**knew** 46:1 147:7 149:16 155:17 157:24 159:21 165:4

**knocked** 153:1,10,24 154:20

**Knocking** 107:4

**knowledge** 169:23

**Kountze** 56:25 57:1,6,23

**L**

**L-A** 67:22

**L-A-U-R**  67:21

**L-A-U-R-A**  67:22

**L-A-V-A-N**  67:10,11

**L-E-S-H-A-T-A**  68:17,19

**L-O-W-R-I-E**  156:1

**lanes**  15:8

**language**  85:13 86:11 87:1 116:8,12 126:6,22

**Laura**  67:20,21,23,25 68:12 69:6

**Lavan**  67:8

**law**  6:13 11:24 12:15 46:13,14 53:18 57:2,3 61:20,24 63:20 64:2,5,10 70:6 75:3,9 76:1 77:5,14 83:4 150:24

**lawsuit**  5:20 6:2 50:6 88:4,18 114:6,24 170:18, 19,24

**lawyer's**  114:19

**laying**  121:19

**lead**  79:7 85:16

**learn**  133:22 154:12

**learned**  97:23 154:14

**leave**  16:13 35:9 40:1 48:23 51:16 57:14

**leaving**  19:19 31:8 54:14 75:4

**led**  28:1

**left**  16:10 19:18,25 21:4 31:5 39:23 44:19 51:14 52:6,11 55:21

**Leshata**  68:15,21,25 69:6, 8,10,14,16,17

**letter**  40:22,23,24 41:3,4, 8,13,15,16 42:8 45:18 83:25 84:2 85:19 89:20 90:1,3,4,7 99:4,5 100:2,7,

11,13,18,20,25 101:4,7,8, 18 102:2,9,10 139:1,2 148:16 149:9,24

**letting**  112:8

**Lewis**  64:24,25

**liability**  134:13

**liar**  170:3

**liars**  169:25 170:5

**license**  25:20,21 44:7 52:21 53:11 57:1 75:8,9, 10

**licenses**  28:13 53:14

**lie**  52:17 145:4,5,7 158:8,9

**lied**  79:11,14 82:9 145:6 150:20 151:6 158:4,6,22 159:5 161:2

**lies**  161:17,19 162:5,8 166:5

**lieu**  19:2

**lieutenant**  16:18 17:15 25:13 38:22,24 39:1,4,8 42:1,2,4,6 112:6 127:14 130:2,9 133:9,16 134:16 139:15,16 140:10 141:25 143:12,14 144:4,5,11,17 145:1,8,9 167:3,4,7,10, 17,22 168:19

**life**  9:11

**light**  35:11

**lights**  172:3

**limit**  134:13

**list**  12:2 164:9

**listed**  170:22 172:5

**listen**  85:10 166:3

**listened**  161:17,19 166:5

**live**  9:25 10:23 11:6 65:20 72:23,24 73:11 74:5,12, 20,23,25

**lived**  10:21,24

**lives**  72:3 73:19

**livid**  107:5

**living**  66:14

**Livingston**  11:7,8,15 74:13

**local**  46:13,14

**location**  93:15

**logs**  14:20

**long**  6:14 10:21 28:6 29:1, 23 30:14 38:15 50:13 57:4 59:6,20,21,22 62:5 63:1 68:7 83:7,16 103:13 104:2,19 108:6,8 137:18, 22 164:20,23

**longer**  45:2,8 128:17 133:8 137:19,21 175:2

**looked**  64:2

**loss**  170:23

**lot**  37:17 46:9 54:4,7 83:5, 8,9 87:13 105:10 135:3 138:12,15,16 148:19

**Louis**  65:15

**Lowery**  155:20,21 156:2 157:23

**Lufkin**  74:21

**Lyons**  38:4 40:13,15,19 41:5,8 42:11,14,17,20 135:9,19 136:7,8 152:4,6, 12 155:7 157:9 159:19, 20,24 160:12 161:9 163:17 164:2,16,20 166:19,21 167:18 174:16 175:9

---

### M

**Madam**  103:20

**made**  27:8 28:4 32:19 40:5,16 63:20 133:9



170:21

**main** 62:19 115:5

**maintain** 108:20

**maintained** 109:5

**maintaining** 91:20

**make** 6:24 7:4,13,23 12:3 14:21 28:1 32:24 33:4 83:3 94:21 96:1 101:9 103:21,23 108:5 118:14 156:21

**makes** 31:13 53:24,25

**making** 6:6 27:12 80:1 87:16

**male** 81:7

**malfunction** 138:24

**man** 35:16 66:4 71:1,2,7, 12,21 80:3 82:12 87:13 130:6 138:6 158:6,10,11, 15,18,19 159:5,22 160:9 165:20 167:8,12 171:16 172:7 174:8,17

**man's** 161:13

**manage** 24:8

**manhandled** 140:11

**manner** 111:7

**March** 19:5 20:10 22:16 25:11 41:22 89:21 100:12,20,23 101:4 146:20 151:3

**mark** 11:3 41:7 89:21

**marked** 12:17 41:11 83:23 88:20 89:22 99:7 103:24 132:9 146:14

**marking** 88:12

**married** 34:11 56:9 67:17, 25 68:4,8,23 69:1,19,23 70:2,8

**master** 75:20

**Masters** 75:11,12

**math** 22:14

**Mccrakey** 156:18

**means** 43:1

**measures** 94:3

**Medical** 15:14,21,22 17:25 19:21,24 171:8,20

**meeting** 42:1 167:1,5 168:2,9,14

**members** 9:15,16 42:2

**mental** 58:6,9,13,15,18 59:7 170:14,23

**mentioned** 169:12,17,19

**met** 42:2 68:24

**Michael** 93:6 104:21 139:16 151:7 175:14

**Mickey** 103:22 104:15

**Mickie** 168:21,24 169:1

**microphone** 134:2

**mid** 24:21

**middle** 10:19 87:17 99:11 106:3

**mine** 99:2

**minimum** 117:22,25 118:3,19,21 119:2,8,15, 21 122:5,10,12 123:2,5 140:25 141:5 142:8

**minute** 104:1

**minutes** 60:5 108:11 137:19,20,21 159:23

**mischaracterizing** 120:10

**misread** 25:6

**missing** 94:25 95:20

**Missouri** 72:4

**Misty** 73:16

**mom** 74:6

**money** 19:23,24 23:6 32:20,24 33:3,4 56:22 57:19

**monkey** 87:2

**Montgomery** 10:5 13:8

**month** 13:23,24 21:1 55:12 159:25 160:3

**months** 13:21 20:9,25 22:5,11 33:17

**morning** 16:20 97:5 138:6,8,22 167:1

**Moscow** 20:14,15

**mother** 64:22,23 65:2,21 72:6 73:1,9,15 74:18 125:2

**mother-fer** 116:9

**motion** 107:3,11

**move** 56:8 60:24 87:25 92:19,21 108:23 109:19

**moved** 10:25 37:5 61:2 72:24 92:8,16 106:10,15 143:12 174:21

**moving** 11:18 39:19 91:6 105:12 107:5,13,20 142:3

**multiple** 62:2,3 76:13 93:24 106:16 118:7

## N

**N-E-D-E-L-A-N-D** 63:8

**Nah** 35:8

**name's** 72:17

**named** 84:1 162:11

**names** 62:5,25 64:22 65:14 66:19 71:6

**narcotic** 81:2

**narcotics** 28:25 30:1,2,9, 12,15,17,19,23 31:15,21, 24 32:3 37:5



**narrowly** 147:12

**nature** 7:8 43:18

**Neches** 63:4,11,12

**neck** 123:16 124:1 139:17,20,25 140:1,13

**Nedeland** 63:3,6,9

**Nederland** 63:8 73:12

**needed** 14:11 23:1,9,10, 15,21 26:21 45:3,8

**needing** 130:25

**Neiland** 63:5

**nes** 141:5

**Newton** 25:7 43:25 44:7, 16,22,23 45:7 46:2 49:13, 23 50:7,20 51:15,17 52:11,15,18,23 53:9 54:24

**nice** 167:25 168:1

**night** 15:20

**nine-month** 24:20

**nod** 7:14

**Non-enforcement** 134:9

**nonresponsive** 118:12 119:6 122:14 162:15

**normal** 36:6

**north** 20:13

**noted** 135:8

**notorious** 155:16 157:23

**November** 84:14,16,20 85:2

**nuh-un** 7:15

**number** 9:21 29:3 127:18 139:3 151:6

---

**O**

**oath** 6:10

**Obedience** 90:12

**object** 118:11 119:5 122:14 162:14

**objection** 106:23 107:25 110:21 115:20 117:11,20 118:1,8,15 119:1,11,18 120:2,4 122:8,25 123:4, 13 124:3 126:2,23 127:13,24 128:5,9 129:7 131:10 132:21 136:24 137:6 138:14,20 142:23 144:2 152:24 160:20,25 161:14,16,21 162:21 163:2,15,21 164:4 165:10,16,21 166:4,7,14

**objective** 120:23,25 121:4

**objectively** 121:1

**observations** 94:25

**occurred** 153:12

**October** 5:4 20:10 22:4 25:5 44:4,19

**odd** 14:18 75:5

**offended** 105:17

**offending** 92:5 106:9

**offensive** 112:23

**offer** 7:11 12:2 42:7

**offered** 32:17 42:4 47:11 145:19 146:5,10 148:5 167:3

**offering** 167:25

**offhand** 87:18

**office** 5:19,25 6:1 11:14, 18 19:5 24:17 35:2 38:4 40:20 41:22 42:6,24 44:1, 7,20 45:2,22 46:3,11 47:8,12,21 48:14 50:21 51:22 52:12 53:10,19 68:5 76:8 79:1,5 85:1,14, 18 88:5 90:5,11 97:20 108:17 131:13,16,22

132:7 135:9,13,20 136:1 150:17,19 151:24 153:16 161:11 171:14 175:3

**officer** 13:19 14:15,16 20:19,25 22:6,9,21,22,24, 25 23:18 25:21 28:12 31:11 35:1 51:2 52:1,3,25 57:7 63:23 75:12,20,23 77:6 80:18 81:7,10 93:13 103:22 104:15 110:11 112:14 125:11 131:16 134:1,6 169:13

**officer's** 44:7

**officers** 16:7 48:9 53:16 54:4 64:11 91:11,13,18 92:25 93:1,12,17,24 94:2 107:7,17 108:14,16,17 111:25 112:8,18 127:17 132:12 133:23 144:6,16 150:20 151:6,19 156:24 162:11 163:24

**official** 93:15 147:10,13

**oldest** 71:22,23

**ongoing** 24:9 113:15

**opinion** 96:1 120:13,15, 16,18

**opponent** 48:12 49:6

**opportunity** 19:20,25 20:3 26:21 27:19 31:11 32:23 33:5,11,14 35:16 37:13 38:22 145:19 148:6

**option** 167:22 168:18

**Orange** 50:20,25 51:12,16 54:24 55:2,12,13,21 56:3, 5,7,20 58:2 170:12

**order** 101:10 108:20 109:5 176:6

**ordered** 147:10

**orderly** 91:20

**orders** 85:24 109:18,21

LEXITAS

**ore** 144:22

**oriented** 134:11

**original** 88:18 98:24

**outcome** 79:10

**overlap** 21:21 28:12

**overrun** 91:18

**oversaw** 52:19

**overseeing** 51:9

**overturned** 172:23 173:6, 12 174:3

## P

**P-I-N-Z-O-N** 17:18

**p.m.** 104:9,12 150:10,13 176:12,13

**pacifics** 59:24

**pack** 92:8 106:9,16,20 107:2,5,9,12,19 109:19 142:11

**packing** 117:16

**paid** 17:6 23:2,3,6,23 32:17 33:7,8 57:16

**paper** 97:24 98:1

**paperwork** 39:14 84:21 98:13

**parade** 23:14

**paragraph** 84:19 90:8,10, 20 91:8,9 92:1,25 93:11 99:10 106:8,12 139:7 147:14

**paragraphs** 139:13

**part** 36:17 37:11 42:18,21 46:2,5,14 76:7 91:20 128:18 131:15 145:14 147:8,10 158:7 160:14 167:14 169:4

**parts** 89:2 104:3 116:15

**party** 155:18

**pass** 20:14 69:19 175:18

**passed** 65:3,10 69:16,17 133:18

**past** 93:23

**Patrick** 39:20 41:20

**patrol** 14:1,8 19:9,10,13 23:13 25:17,23 26:7 28:15,24 29:25 30:1,6,17, 19,20 31:10,14 36:5,10, 14,15 37:3,4,16 38:10 44:10,11,12,13,14,16 51:12,17 52:1,8 54:7 57:7 78:12,15 81:1,2,3 83:12 132:23 133:2 134:25 135:6 154:20 167:3,4,7, 10,17,22 168:19

**patrolled** 19:15

**Patton** 10:14

**Paul** 44:23 46:16,18,20, 22,24 47:25 52:19 54:11

**pay** 27:4,7 32:5 55:18 56:21

**paying** 23:23 56:11,13,19

**PD** 16:21 46:5 53:19 57:9, 11

**peace** 25:21 28:12 44:6 75:12,20,23

**pedestrian** 134:8

**penalties** 5:10

**people** 47:11 48:11 49:6 54:4 57:11 121:13 138:9 155:17 156:8 157:24 158:4 163:13 168:6 169:21

**perception** 64:11

**perfectly** 8:1,20

**performance** 49:3 147:13

**period** 20:24 22:5 23:18

24:21 57:5 59:22 61:23 70:22 77:7

**perjury** 5:10

**person** 79:5 101:11 110:10 133:20 134:2 152:3

**personal** 12:10,22 47:22

**personnel** 80:5 132:15

**persons** 134:9

**pertaining** 128:24

**phone** 60:2

**phonetic** 156:18 172:22

**physical** 50:1 92:14 106:13 137:23

**physically** 92:18 109:15 118:22,24 126:7 140:10 143:12 145:2

**pick** 71:10

**Pinzon** 17:16,18,20

**pissed** 111:15

**place** 20:22 56:14,15 135:23 136:3 174:24

**places** 55:18 56:19 171:17

**placing** 140:12,13

**plaintiff** 5:24 89:5,6,10 90:23,24 92:5,9 106:7,10

**plaque** 155:18 157:25

**play** 63:25 104:2,3,14,16 116:15 136:9

**played** 104:17 116:19 123:14 124:6,25 126:17 127:3 129:3 136:11 151:13,21 152:20 163:7

**playing** 120:4,19 156:14

**pleading** 131:20

**point** 26:2 28:18 30:8



102:14 106:20 110:13 117:5,12,15 118:23,25 124:19 141:9,11

**pointed** 117:9 124:22 141:11

**pointing** 100:1 107:4,10, 19 116:21,23

**points** 117:9

**police** 13:6,19,24,25 14:15,16 15:14,21 16:1 17:25 20:9 23:2,12,20 29:21 32:7,12,16 34:25 36:6 46:11 63:22 64:11 171:15

**policies** 82:20 83:13 90:25 91:4 125:12,23,25 126:5 131:12,17,21 132:6 135:16,22

**policy** 85:16 89:13 90:11 101:10 102:3 108:19,22, 24 109:2,3,4 125:10 130:1 131:7 134:24 135:9,11,12,17,18,19,21, 25 136:2,3,6 148:22,23

**political** 48:6

**Polk** 5:19,24,25 6:1 10:24 11:1,6,14,17 20:17,22 21:4,8,15,18,25 24:17,22 25:2,3,9,18 26:7 29:19,22 31:8 33:7,13,17,19 35:20 36:19,20 38:3 39:11 41:21 42:5,23 43:1,24,25 44:20 68:5 74:23,25 75:4 77:13,14,18 78:10 79:5 80:25 82:21,25 84:22 85:2,14,18 87:12 88:4 89:5,9 90:4,10,23 99:14 102:13 108:19 125:11,23 127:21 128:4 131:13,16, 21 132:6 135:3 150:16, 18,19 151:24 170:8 172:14 173:16 174:19

**poor** 157:1

**poorly** 8:5

**popular** 70:22

**porch** 87:2

**Port** 55:14,16 56:5,6 60:18,24 61:2,4 62:12 63:2,3,5,11,12 171:14

**position** 13:3 15:19 16:6, 10 19:8 26:25 27:9,20 37:18 38:21,23 39:10,13 42:5,8 46:8 91:3 161:11, 15,17 162:9,18

**positioned** 133:25

**possibly** 95:11

**post** 61:13

**practice** 91:17,19 92:18, 22

**present** 93:14 98:4 169:5

**presented** 18:12,15 19:20 31:11 37:13 96:14,22 146:23

**pressed** 107:6 108:13

**pretty** 9:7 10:6 39:13 55:25 93:9 123:11 127:11 149:9

**primarily** 26:3 63:13

**Prinzone** 17:17

**prior** 11:18 15:13 19:4 20:8 43:25 50:20 95:10, 16 96:3 105:19,20

**privacy** 137:7,9,15 138:13 144:6

**private** 9:10

**problem** 94:15 138:6,7,22

**problems** 18:9 33:13 38:7

**procedure** 85:16 90:11 135:9,11,18 136:2

**procedures** 91:1,4 125:12,23 126:1,5

131:13,17,21 132:6 135:12,16,20,21,22,25 136:3,6

**proceeding** 147:18

**proceedings** 6:15 176:13

**process** 141:9 150:24 161:10 172:21

**profane** 85:12

**promote** 40:5 42:14,18 160:1,9,24

**promoted** 30:21 31:16,18, 20 37:4 38:9 39:1,4,8,15 41:9 95:21 96:4 133:15

**promoting** 40:4 160:18 161:10

**promotion** 26:17 40:24 41:5 42:21 43:16,17,21 95:11,22

**promotions** 95:7 96:4

**prompted** 105:2,3

**properly** 133:24

**protect** 16:7

**provide** 97:22 146:10 147:17 148:6,10 149:5

**provided** 85:24

**providing** 8:12

**pry** 9:10

**prying** 9:17

**pulled** 117:17 129:15

**punched** 80:18 81:6

**punished** 94:2,6,17

**purpose** 136:17

**purposes** 54:23 110:10

**pursue** 61:10

**put** 12:16 26:25 27:23,24 95:7 143:15,20 148:1 167:23



Case 9:23-cv-00032-MJT    Document 21-18    Filed 10/31/24    Page 197 of 205 PageID #: 389
William Jerry
Index: putting..relevant

**putting** 7:17

**Q**

**question** 7:5,6,9 8:2,5,15,
16 9:2,3 18:24 39:6 64:8
83:1,7,10 89:8 106:25
109:9,11 110:23 111:17
113:10 118:2,13,16,18
119:12,13,19 120:3
121:4,15,20,23 122:9
123:11,12 124:18 127:2
130:24 140:22,23 141:1,2
149:4 157:1 160:9,18
162:13,23 163:10 164:7,8

**questions** 8:1,7,12,13 9:7,
11 13:4 78:1 114:9,13,16,
23 116:5,16 123:7
128:16,17 139:3,12
147:10,11,22 148:3
175:20

**quick** 175:1

**quit** 52:4

**R**

**R-I-D-G-L-E-Y** 82:3

**R-O-Y** 72:16

**race** 95:23 151:13,21
152:1,7,20 155:14 159:14
160:23 162:25 163:4,7

**racial** 151:12 159:12
163:5,18

**racially** 152:16 160:15
164:17

**racist** 160:4 161:9 165:8,
15,18,23

**Raise** 5:6

**ran** 106:21

**ranger** 97:17 113:22
157:7,20

**rangers** 97:6,11 149:13
155:3 157:19

**rank** 32:25 33:1 124:13
130:12

**ranking** 161:11

**ranks** 30:21

**re-establish** 32:18

**read** 41:15 84:6,7 85:5,22
88:22 89:2 90:8 91:1
99:10 100:5 101:1 116:17
139:19,21 140:14 147:8

**reading** 84:9 139:11

**ready** 47:8 48:13 105:5,8
160:9

**real** 175:1

**reason** 8:23 9:11,18 16:19
46:24 47:17 55:22 113:9
130:10 160:14 174:22

**reasonable** 8:1

**rec** 51:2,5,8,9,10,11 58:6

**recall** 21:9 26:11 27:13
28:23 29:9 34:20 39:9
40:21,23 42:10 49:16
59:7,18,23 69:3 77:23
78:8,20 80:2 81:1,23
82:5,11,21 83:14 84:9
86:3 87:18 94:6,8 95:4
101:5,17 102:1,3,21,24,
25 127:18 131:9,11
143:17,21,24,25 144:1,15
145:12 151:5 153:13
154:10 157:12

**receive** 99:25 100:15
101:12,22 102:2,20 103:6
113:21

**received** 84:20 85:3,7
96:10 99:12,14,20,21,23,
24 100:5,12,14 101:2,15
102:12,15,18 103:9
148:15 172:13

**receiving** 40:24 101:5
102:1,21 103:10

**recent** 78:14

**recess** 60:8 104:10
150:11

**recognize** 18:6

**recollection** 147:1

**recommended** 82:23
86:25

**record** 5:3 7:24 18:13,19,
23 60:6,9 104:5,7,8,11
133:25 134:6 150:8,9,12
153:13 154:17 173:11
176:12

**recorded** 85:7

**recording** 133:24 134:12

**refer** 84:25 134:24 135:5

**reference** 85:4 99:6,13
102:13

**referencing** 6:2

**referring** 92:6 93:1 116:1

**reflection** 112:3 113:6
115:6

**reflective** 128:3

**refusals** 92:13 106:12

**refuse** 106:11 147:22

**refused** 92:9,10 98:2
106:10,16 113:4 145:13,
18

**refusing** 119:19

**regret** 116:12

**related** 49:18 50:1 59:15
95:2 147:12

**relates** 50:6

**relationship** 33:22,23
34:14,23 35:6,10

**relevant** 168:13



**reluctantly** 38:23

**remain** 92:20

**remained** 37:5

**remember** 7:20 29:1 30:11 35:3,4 59:23 62:1, 4,15,24 77:25 78:2,3,7 81:15,18,23 101:23 103:10 172:5

**removal** 91:13 93:14 108:18

**remove** 34:9 109:7 112:1, 19 117:23 118:4,9 119:3 122:6 123:6 124:10 140:18 141:6 142:8 158:19

**removed** 109:15 112:2,17 122:23 123:1

**removing** 92:2 112:12

**Rene** 73:2

**rent** 55:18 56:15,19,21

**repeated** 92:9

**rephrase** 8:3,16 121:14

**report** 12:2,10,23 13:23 14:4 22:11 85:5,6,22

**reported** 96:14 156:19

**reporter** 5:6,12 6:18 7:12 10:9 11:10,12 17:17 30:25 31:3 39:2 48:2 58:8 64:14,17 65:6 66:21 68:16 70:15 79:22 82:1 83:22 88:12,16 90:15,17 98:22 103:20 104:7 121:7 123:20,22 132:3 134:3 145:22,24 146:2,13 161:23 162:2 168:24 169:3,7 173:21,24 175:21 176:2,5,9

**represent** 5:19,25 114:9 173:3

**reprimand** 58:25 80:9

84:13 85:15 86:12 91:13 108:17

**reprimanded** 50:8 58:23 59:12,13 82:20 83:13 86:11 87:1,5,14

**reprimands** 49:12

**request** 92:10,20

**requested** 106:11

**requests** 106:11

**require** 131:7

**required** 129:18,23 130:2, 3,5,8,11,13,19,23

**requires** 51:22 76:8

**reservation** 36:8,14,15,18

**reserve** 13:19,20 20:19,25 22:9,20,24,25 23:7,18 77:6 171:19,21,22,24

**resign** 16:15,16,17 17:1 18:13,16 33:21 34:2 35:16 44:22 45:8 98:9

**resignation** 41:21 42:3 98:6

**resigned** 17:9 18:10,14,15 19:2 20:2 33:20,24 35:17

**resist** 119:24

**resistant** 109:17

**resisted** 118:23,24 119:23

**resisting** 119:9 122:1,3

**resolve** 134:13

**resources** 41:18

**respectful** 175:23

**respective** 128:23

**respond** 14:7,8 82:16 96:23 101:10 102:6 119:7

**responded** 138:8

**response** 9:3 87:15 92:3 96:24 118:20

**responses** 8:13 19:16 82:15

**responsibility** 114:8

**rest** 50:15

**restroom** 8:24 60:3

**result** 79:16 80:10 82:8 84:13 86:13 92:13 106:5, 12 170:19

**resulted** 96:18 104:22

**retaliation** 95:14 96:6

**retired** 155:23,24

**retirement** 155:18 157:25 172:9

**returned** 97:5,10

**Richards** 77:21,22 87:9 91:23,25 92:6 96:6 97:12 104:21 105:2,20 121:25 126:22 136:12,22 137:10, 16 139:17 140:11,13,14 141:22,24 143:13,15 144:4 145:2 149:22 158:2 165:19 168:22 169:6 175:14

**Rick** 84:3

**Rickey** 43:10

**Rickie** 79:6,7 84:4,5 156:6

**rid** 49:5

**Ridgley** 81:20 82:3 84:1, 22,23 85:3,8

**rights** 114:20

**ring** 81:22

**road** 15:5,7 24:6

**robber** 64:1

**robbers** 63:25

**rod** 105:10

**role** 5:21 45:21 151:13,21 152:20 163:7



**roles** 16:5 36:4

**room** 122:20 139:16

**rough** 68:7

**roughly** 29:24 62:6

**rounds** 94:21,22 95:20

**Roy** 72:16,17 73:2

**ruin** 160:4 161:12 165:20

**ruined** 160:5,7

**rules** 7:3 89:13 90:12

**run** 47:4 54:19 122:3

**running** 46:6 95:18,23

---

### S

**S-H-A-R-O-T-T-L-E** 74:6

**safe** 70:10

**sanger** 73:6

**sat** 41:25 164:8

**saving** 56:22

**SBI** 62:13

**scaffold** 62:7,11

**scaffolding** 62:8,9,15,16, 18,19

**scale** 32:5

**scan** 101:22 102:25

**Scandisk** 99:15

**scared** 127:12

**school** 60:15 61:13,16,24 63:14 70:2

**schooling** 61:13

**SDI** 62:14,22

**season** 55:9

**seat** 11:8,11,12

**seconds** 104:1 116:20 118:24

**section** 19:15 133:23 151:11 170:22

**sections** 148:23

**security** 9:21 16:3

**seeking** 170:24

**self-** 113:5

**self-reflecting** 125:17,21 126:11 128:1 158:25

**self-reflection** 112:3,9

**sense** 31:13 53:24,25 108:5

**sentence** 99:11 139:19 140:5

**sep** 136:12

**separated** 69:21

**separating** 137:13

**separation** 90:4 136:12, 18

**September** 61:21

**sergeant** 15:20 16:5 31:18 32:1,2,5 37:4,5 38:9

**sergeants** 32:5 130:22

**service** 12:11,20 45:2 75:19

**service-wise** 13:22

**services** 45:7 47:13,18

**set** 104:4 111:11

**setting** 76:18,22 109:8 162:4

**sexual** 34:14,20

**sheriff** 37:20,23 38:3,6 40:12,13,14,15,17,19 41:5,8 42:11,14,17,20,23 43:5,8,17 44:23 45:1,6, 14,21 46:6,18 47:5,10 48:4,25 51:22 52:19 53:10 54:13 135:9,19 136:6,7,8 148:24 152:2,4,

6,12 155:7,8,9 157:9 159:19,20,24 160:12 161:9 163:17 164:2,16,20 166:10,19,21 167:17 174:16 175:9

**sheriff's** 5:19,25 6:1 11:14,18 19:5 24:17 41:21 42:6,24 44:1,7,20 46:3,11 50:21 52:12 53:19 54:4 68:5 76:8 79:1,5 85:14,18 88:5 90:5,11 97:20 131:13,16, 21 132:6 150:17,19 151:24 153:16 171:14 175:3

**sheriffs** 46:10 48:22

**shift** 15:20 23:15

**shirt** 109:14

**shit** 68:1 71:4

**shoot** 105:10

**short** 8:25 31:5 34:1 50:14 57:5 60:8 98:14 104:10 145:8 150:6,11

**shove** 129:12,14

**shoved** 115:12 145:10

**show** 53:20 54:5 94:16,17 95:19

**showed** 16:20 139:14 175:10,11,12

**shower** 80:18 86:6

**showing** 95:20

**shows** 64:12,13 99:15

**sibling** 67:7

**siblings** 66:7,16

**sic** 48:18 59:24 63:3,5,8 70:18 82:23 85:1 86:25 117:12 125:13 134:8 135:12 146:1 156:1

**sick** 23:10



**sign** 98:1,2 99:21 101:7, 15 102:19 136:5 145:13, 14 146:6,21 147:4 148:2, 13

**signature** 101:20 147:5

**signed** 84:3 85:21,24 86:23 98:13 99:6,18 100:13,23 101:18 102:2,9 135:8,10,18 136:6 145:15,16 146:20,23 147:5 148:1

**signing** 98:2 102:15 103:4

**silly** 121:11

**similar** 6:17 24:5 50:7 87:10 95:22

**simple** 123:11

**singer** 70:18 73:8

**sir** 5:12 6:3,8,16 7:1,22 8:18 9:5 10:3 11:5 12:21, 24 13:1,7,10,17 14:2 15:16,23 16:20,24 17:2,8 18:17 20:7 21:12,19,22 22:2,7,8,13,18,23 23:11, 22 24:10,15,19,23 25:8, 15 27:1,17 28:5,21 29:14, 16 30:7,10,13 31:17,19, 22 35:21 36:21 38:11,25 39:7,17 40:9 41:14,19,24 42:9,16 44:2,9 45:12 47:14,16 49:7,10,20,24 50:4,11 51:13,24 57:18, 25 59:25 60:14,18,20 61:11,14,22 64:6 65:19 68:6 69:5 75:13,18,21 77:10,16 78:8,11 79:9 80:11 83:15 84:8 85:20 87:7 88:3 89:1 90:2,6,21 91:2,5,8,10,21 92:7,17 94:12,18 99:19 101:21 105:21,23 106:1 110:3 112:21 114:4,18 116:4 118:21 119:13,20 122:9 123:8,11 124:9 125:24 126:3,24,25 127:16,18,

23,25 128:6,10,14,24 129:18,25 130:11,16,21, 23 131:11 132:5 133:21 136:16 137:3,25 138:3 140:9,22 141:18 142:15, 24 143:9,25 144:15 145:12,17 150:4 151:3 152:5 153:18,22 154:14, 25 155:5,6,10 157:10,13 158:4 159:16 160:5 161:2,7,22 162:11,13,22 163:6,16,22 164:5 165:1, 3,5,22,25 166:5,15 168:13 169:21 170:10,14, 16,25 171:13,25 172:3,4, 15,18,20,25 173:2,5,9,12 174:21 175:4,5,8,16 176:6

**sister** 65:24,25 67:13

**situation** 34:10 48:25 54:11 87:9 97:12 110:14 112:5,7,12,18 134:21 136:19,20 137:14 154:13 155:15 170:13 172:12

**situations** 76:23

**skin** 125:9

**skip** 134:12

**slam** 119:9,10,16 141:4,8, 17,18

**slammed** 140:24 141:2

**slamming** 140:11,16,20 141:15

**slate** 48:20

**slot** 37:16

**Slow** 90:15 134:3

**small** 10:6 54:13 57:8,12 145:2

**smoother** 7:4

**Social** 9:21

**solemnly** 5:7

**son** 156:6,20

**son's** 157:3

**sort** 16:23 21:21 24:7 27:15 49:12 61:12 75:8 173:14

**sound** 20:10 24:22 44:4 75:15

**sounds** 19:2 20:11 44:5 102:8 112:21 143:4 154:18

**Southlake** 171:15

**space** 122:21,22,24 123:17 124:2,20 139:18 143:13

**speak** 42:13

**specifically** 59:19 147:12 151:23

**spell** 63:7 65:6 67:9 68:16 70:15,17 71:14 73:5 82:1 153:7 155:25 169:2

**spelled** 74:7

**spend** 77:15

**Splendora** 10:14

**spoken** 148:21 174:15,19

**spot** 54:20 167:4

**spouse** 68:12

**spouses** 69:6

**spurred** 49:3

**staff** 16:8 27:9 35:2 42:3 48:15 167:2,5

**stage** 80:25

**stamp** 103:23

**stand** 112:9 168:1,8,10

**standby** 23:19

**standing** 162:7 169:9,17

**start** 9:6 11:21 13:3 26:5,9 29:8 30:5 47:3 55:8,21



132:12 139:11

**started** 13:15 21:5,10 25:2,3,16,18,24 28:8 29:11 30:5,20 31:9,14 32:16 36:5 37:4,9,23 38:8 44:20 46:25 47:1 51:15 52:11 56:25 61:20 77:5 87:10 105:4 165:2

**starting** 32:13 37:12 57:18 61:18 77:4 132:11

**starts** 139:8

**state** 102:3 108:15

**stated** 144:16 149:1

**statement** 80:1 86:24 89:12 92:11,16 95:3 96:15 97:23,25 98:1,3 99:5 100:25 102:10 125:3 140:8,24,25 141:7 143:5 145:18,20 146:11 147:18 148:6,10 149:5 150:3,4 158:7

**statements** 145:1,21 162:5

**stating** 99:25

**station** 14:3

**status** 113:18

**stay** 32:2 38:15 47:10 56:14,15 167:10,12

**stayed** 38:12 61:1 77:7

**staying** 55:14,15,16

**steer** 24:7

**step** 137:17

**Stepfather** 65:16

**stepfathers** 65:12

**stepmothers** 65:11

**sticker** 90:1

**stop** 51:17

**stopped** 21:25 116:17

**stops** 134:8

**store** 96:5

**story** 46:16 93:18 95:12

**straight** 110:1

**street** 51:23 52:3

**streets** 26:21 28:7 36:6

**strike** 35:24 122:17 156:25

**stuff** 16:21 54:2 105:11 107:2,5,12,19 108:7 109:19 117:17 135:2 138:25 148:14 159:20 172:2

**subdue** 92:14 106:13

**subduing** 92:18

**subject** 5:9 147:23 157:14

**subjected** 151:17 154:2, 11,25 155:2 156:9,10 159:18 161:5

**submitted** 41:20 85:6

**subsequent** 147:19

**substance** 85:23

**sudden** 160:4 161:9,12 165:18

**suffered** 58:13 157:6

**sufficient** 158:3 159:3

**summary** 24:25

**superiors** 26:24

**supervise** 16:7

**supervisor** 26:14,16 27:9, 20 28:19 29:19,25 38:13, 16 78:16,18 93:18

**supervisory** 132:14

**support** 155:13

**supported** 48:12 49:6

**supposed** 101:11 102:5

**surviving** 66:17 74:22

**suspect** 58:6,10

**suspended** 59:1,11,22 98:7

**suspension** 59:5 85:17 148:14

**suspicious** 134:9

**switched** 28:18 133:1

**sworn** 6:9,11,24

---

### T

**Tailor** 72:14

**takes** 54:6

**taking** 29:22 47:10 51:10, 11 77:21 99:23 136:17

**talk** 12:14 64:21 76:22 77:12,22 83:18 97:11,13, 15,16 104:3 114:2,5 125:5 137:17 159:11 174:17

**talked** 37:2 40:23 75:2 148:24 155:14 164:8,15 171:18

**talking** 8:4 41:5 86:6 90:25 94:10 100:6,18 105:9 106:8 107:8,9,12 115:12,14 127:6,7 138:5 142:20 143:17,18,22,24 147:7 149:11 158:12,14 159:6,7 162:17 166:17,22

**tank** 85:9 144:4 145:3

**Tarensit** 172:22

**targeted** 159:14

**tarnish** 98:18

**tased** 156:13,14 157:5

**taser** 77:1,2 90:20 110:5, 6,8,9,11,13,17 116:21 117:1,6,9 124:20,21 140:13 141:9,10,12



155:18 156:8,14 157:6,25

**tasing** 155:17 157:24

**Taylor** 72:24

**TCOLE** 12:2,10,22 18:6 76:7

**team** 48:14

**technically** 53:19

**technology** 103:19

**telling** 34:22 54:3 80:9 99:20 102:17 107:4,17 108:7 113:9 116:5 130:8 133:12 134:15 137:11 143:15 151:5 153:23 155:6 167:16

**ten** 60:5 137:19,20,21 172:7

**term** 21:24

**terminate** 34:3 45:11 98:11 162:7

**terminated** 17:8 21:8 26:10 29:2,12 33:24 44:22 52:6 55:20 89:5 96:17 98:7,10 149:10,25 154:4 155:3 158:3 159:10 160:13 162:22,24 163:14 164:1,11,12,25

**termination** 18:11,13,22 19:2 20:2 45:18 49:9 85:17 89:11,20 90:4 96:19 100:2,7,11,18 101:3,4,7 139:2 147:24 148:15 151:14,21 152:21 159:3 160:14,15 162:10, 20 163:5,7

**terminations** 18:19 104:23

**test** 55:9

**testified** 6:14

**testify** 113:25 175:9

**testifying** 6:20

**testimony** 5:7 6:10,11,23, 24 152:6

**Texas** 9:24 10:1,24 15:14, 18,21,22 16:9 17:25 19:20,24 20:15 29:21 32:7 36:17 60:12 73:12, 20 97:6 155:3 157:7,18, 20 171:8 173:14

**thang** 53:10 64:18 94:22 102:25 103:1 150:24

**thangs** 55:6 111:8,21 113:6 115:14 116:2 125:17 126:11,15 128:2, 11 142:14,17

**thanking** 48:18

**their's** 135:2

**there'll** 6:21 7:20

**thing** 8:19 48:6 62:19 86:5 102:11 114:5 115:4 159:17 165:12 170:17

**things** 7:4 9:9 76:24 110:24 111:1,2,3 115:1 116:6,7,11 120:5 124:11 125:20 128:20 138:15,16 142:11 156:24 157:21 158:24 163:25 164:15

**Thomas** 60:16 61:9

**thought** 58:17

**threatened** 84:24 115:22

**threatening** 126:21

**threw** 117:18 119:25 120:1 122:15,23 123:9

**throw** 110:19 118:5,6 122:7 123:3 129:5

**tight** 95:18,23

**tile** 20:18

**time** 6:14 18:7 20:24 22:10,21 23:5,24 24:2,12 25:2,14 28:24 29:25 32:3

34:11 35:25 37:20 38:2 39:24 40:16 43:24 44:13, 15 46:22 47:4,5,7 49:17 52:14,15 54:15,19 55:25 56:9 62:5 63:1 70:22 77:9,15 82:13 83:3,6,17 87:11 88:10 93:14 98:12 103:13,14,23 104:19 105:25 107:6,14 109:17, 20 119:24 121:7 127:15 129:17 130:3 132:20 137:22 141:21 143:14 145:8 153:16 158:13,14 159:23 160:19,23 164:20 171:22,23

**timeline** 29:17

**times** 7:21 76:14 80:16 82:19 106:16 107:2,18 108:9,12 116:10,25 118:7 128:12 140:12,17,21,24 141:3,16,17

**tiny** 116:18

**title** 13:18 25:19 31:25 32:19 44:16 151:11 153:19

**titled** 99:6 102:11

**today** 5:16 6:4,10,18 68:10 114:24 115:8 128:17 142:18

**told** 34:2 41:2 45:7 47:12, 19 93:18 95:12 96:5 97:6 98:1,5 105:7 107:6,16 108:11 110:6 115:25 124:12 142:3,11 143:19 144:6 145:20 148:18 149:7,14,23 154:16,17 163:24 167:20 175:12

**tolerated** 85:14

**top** 12:20 77:7 90:7 147:8, 14

**topic** 8:4

**touch** 138:1,23 158:10,16,



19

**touched** 78:5 129:11,13

**tour** 134:1

**town** 10:6 46:1

**trade** 62:9

**traffic** 13:24 14:24 15:1,2, 8 19:16 23:15 24:4,5,8,9 75:4 172:1

**training** 75:25 76:10,11, 14 77:1,7

**trainings** 76:7,17,19,22 77:2,8

**trans** 27:19

**transcribing** 7:13

**transcript** 6:21,24

**transcription** 7:17

**transport** 26:14,16 29:19, 24 31:11 38:13,15 78:13, 16,18,19 133:3,4,11,16

**transportation** 28:19

**transported** 78:4

**transporting** 78:13

**trash** 127:6,7 143:17,18, 22,25

**traveled** 93:15

**treat** 127:22 165:13,22,24 166:1,2,12

**treated** 156:23,25 159:16

**treating** 160:22 166:23,24

**treatment** 151:17 154:3, 25

**trial** 9:13 71:9

**tribe** 29:21 32:7,8 36:12, 13

**trick** 8:10,14

**trip** 54:1

**trouble** 49:17 174:25

**true** 91:15,20 93:25 94:3

**truth** 5:8,9

**turn** 133:10

**turned** 133:13,24 134:21 144:5 145:10

**turns** 104:25

**twins** 72:12 73:4

**Tyler** 72:14,24

**type** 15:5,6 53:4 82:12 84:24,25 85:13 108:20 109:5,7 111:7 113:4,5 151:17 154:2,11 156:9

**types** 76:19

**typical** 23:12

**typically** 28:13

---

## U

**ultimate** 52:1 152:3

**Um-hmm** 32:21 52:2 55:7 57:20,22 65:1 67:3,12,14 68:20,22 69:18 74:2 78:17 80:21 136:21 139:10 149:23 155:22 165:7 167:19

**un-huh** 7:15 45:13,15 48:16 67:24 71:17 81:7

**unbecoming** 90:13 125:11,16,19

**uncles** 74:23

**undergo** 77:1

**underneath** 93:17

**understand** 5:20 6:11,25 7:16,25 8:2,5,7,11,13,15, 16 9:4 17:13,15 39:6 46:9 47:14 56:19 83:4,5 96:2 98:20 102:18 107:20,24 108:2 111:17 112:21

114:4,10,11,13,22 116:4, 6 117:8 123:12 128:12 129:2 135:1 138:10 142:19 147:24 149:15 151:10 155:1 156:21 160:8 161:1 163:6 164:7 172:10,11,12

**understanding** 11:24 43:20 47:24 89:8 113:14 156:19

**unemployed** 174:8

**unemployment** 173:18,25 174:2,11,12

**unfairly** 160:22 166:24

**unfounded** 79:13 82:9 83:2,9

**uniform** 130:18 140:3,6

**universal** 120:22

**unprofessional** 85:12 125:7

**untrue** 93:18,21 95:12 96:5,9,12,16,18

**upbringing** 64:9

**updating** 113:17

**upheld** 173:20,25

**uphold** 152:21

**Upper** 123:23

**ups** 17:3

**upset** 17:12 105:14 112:15,25 113:1,3 125:4, 5 159:9

**upsetting** 98:18

---

## V

**vacant** 42:7

**vacation** 42:5

**Vaguely** 42:12 84:11,12



vehicle 19:10

vehicular 134:8

verbal 102:4

verbally 7:14

verbate 125:13

version 89:25 149:6

versions 93:16,21

versus 5:24

video 85:7,10 99:16
103:14,17,21,22 104:1,
14,15,16,17,18,20 115:9,
18 116:15,19,21 117:8,14
120:8,16 121:3,5,9,12,17
122:19 123:10,14 124:6,
25 125:15 126:17 127:3
128:19 129:3,4,17,19,24
136:10,11 139:9,13
141:21 148:25 159:2,8
161:20 162:1,6,8,17,19
169:9,15

videos 99:16 103:12

Village 10:15

violate 82:19 83:13 91:3

violated 89:13 125:22,25
126:4 142:2 148:23

violations 85:16 89:6,10,
16 90:11,24,25 93:24
148:22

visitors 16:8

voluntarily 92:21

voluntary 92:21

---

**W**

W-A-R-R-E-N 73:24

wages 170:23

wait 20:20 121:5,6

waiting 97:11

walk 12:14

walked 119:23

Walker 45:1,5,6

walking 106:3 145:9

wall 110:20 115:13 117:18
118:6 119:10,17 120:1
122:7,16,24 123:3,10,16
124:1 140:12,17,20,24
141:3,4,16,17,19

Walter 17:22

Walton 17:21,23,24

wanna 7:3

wanted 18:25 43:23 55:24
63:22 97:24

wanting 97:13,15

warning 145:20,25 146:1,
6,19,22 147:2

Warren 73:22,23,24 74:1,
5

watch 64:13 103:12,16
112:9 120:6,7 121:16
123:10 166:9

watched 85:10 105:13
115:18 125:16 139:8,13
169:15

watching 105:10,11

Wayne 44:23 46:16,18,20,
22,24 47:25 52:19

wear 129:18,22,23 130:2,
3,14,18,20 131:7

wearing 129:16 144:11,13

weeks 159:25

white 87:2 92:25 93:1,12
151:15,18 156:3,24
163:8,24 166:13

who've 151:19

whoa 121:8

wife 56:13 69:25 70:23

wife's 67:19

William 5:5,24 12:11 65:5
85:13 92:13 93:17,23
99:12 102:12 106:13
139:16

window 145:3

wipe 48:19

wireless 134:1

wise 75:6

witnessed 86:23

won 173:19

wondering 46:9 102:14
169:19

wood 14:20

word 111:13 168:2,9

worded 8:5

words 150:18

work 9:9 11:22 13:3,24
14:1,3,9 15:5,9 19:24
23:12 24:1,5,6 29:25 30:2
34:23 44:10 51:1,19,22
52:8,14 53:4,16 54:6,18
61:23 62:2 82:12 83:4
94:15,17 95:19,20 96:21
97:5,11 103:19 105:8
137:11 138:10,12 156:17
174:24

worked 11:17 15:14 19:16
22:3 23:5 26:2,7 30:8
31:9 34:24 36:6 38:3
43:25 44:3 46:19 51:3
61:17 62:6,7,8,13,22 75:4
83:8,16 93:17 153:16

Workforce 173:14

working 15:24 21:15,21,
25 22:15 24:3 26:6,20
28:6,14,15 29:2 46:25
47:1,3 52:24 55:4 62:20
63:13 77:18 78:12 80:24



95:25 127:17

**workplace**  35:7

**worn**  90:19 132:7,13,16
133:4,8,10,13 135:4

**worse**  120:17 151:16,19
159:17 162:11 163:9,25
164:13

**worser**  161:3

**wrap**  161:7

**write**  14:4 17:3 54:16

**writing**  99:2

**written**  59:11 84:13 85:15
96:22 97:23 108:22,24
109:3,4 139:22 148:10

**wrong**  140:8 156:23
159:13 163:13

**wrote**  59:1 148:25

**Wyatt**  93:3,6 99:25 151:6

---

### Y

**y'all**  16:1 34:13 35:6 60:3
67:25 68:4,8,10 69:1,19,
21 70:2,11 138:1,4
144:18,21

**ya**  125:14

**yank**  120:17

**yard**  51:9 58:7

**year**  11:3 20:24 22:5,10
23:18 38:17,20 50:24
60:21 68:24 78:8

**yearly**  105:8

**years**  10:22 11:4 20:21
22:16 28:9,23 29:15,24
30:4,16,20,23 31:2,3,10
62:6 68:1,2,9 69:1,4
103:15 114:3 125:17
126:14 156:10 165:4,9,14
174:24

**young**  51:20,25 55:25
56:2 57:18 69:24

**youngest**  71:23

